UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF <br> VIRGINIA, DEPARTMENT OF <br> MEDICAL ASSISTANCE SERVICES, <br> 600 E. Broad Street, Suite 1300 <br> Richmond, VA 23219 <br><br> Plaintiffs, <br><br> v. <br><br> MICHEAL O. LEAVITT, in his official <br> capacity as SECRETARY, UNITED STATES <br> DEPARTMENT OF HEALTH AND HUMAN <br> SERVICES, 200 Independence Avenue, S.W., <br> Washington, D.C., 20201 <br><br> and <br><br> KERRY N. WEEMS, in his official capacity <br> as ACTING ADMINISTRATOR, CENTERS <br> FOR MEDICARE AND MEDICAID SERVICES <br> of the United States Department of Health & <br> Human Services, 200 Independence Avenue, S.W., <br> Washington, D.C., 20201 <br><br> Defendants. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is an action seeking reversal of a final administrative decision by the United States Department of Health and Human Services ("HHS") Departmental Appeals Board ("DAB"). In that decision, the DAB held that certain costs incurred by the Commonwealth of Virginia

1

Department of Medical Assistance Services ("DMAS") to provide physician services at two "disproportionate share hospitals" ("DSHs") serving indigent patients are unallowable expenses under the federal Medicaid program. There is no dispute that the physicians provided medical care to indigent patients while they were being treated by the DSH hospitals; that the hospitals incurred costs compensating the physicians; that DMAS in fact reimbursed the hospitals for the costs they incurred in paying the physicians for these services; that the patients have reimbursed neither the hospitals nor DMAS for the services; or that Virginia's DSH payments during the fiscal years at issue were within the DSH funding allotments that Congress had established for Virginia.

The federal Medicaid statute, found in title XIX of the Social Security Act, requires state Medicaid programs to make special payments, known as DSH payments, to hospitals that serve unusually large numbers of indigent patients. Specifically, subject to limitations not applicable here, the Medicaid program must provide a "payment adjustment" not to exceed the "costs incurred during the year of furnishing hospital services . . . by the hospital to individuals who either are eligible for [Medicaid] or have no heath insurance (or other source of third party coverage) for services provided during the year." 42 U.S.C. § 1396r-4(g)(1)(A). The federal Government reimburses states for a percentage of their payments to DSH hospitals in the form of payments known as Federal Financial Participation ("FFP"). Although neither the statute nor the regulations define the term "hospital services," the obvious purpose of the DSH statute, and its plain language meaning, is to provide financial support for hospitals for the otherwise unreimbursed costs they incur in treating the neediest patients.

The DAB's decision to disallow the federal share of the DSH expenditures at issue here relies principally on a novel interpretation of the term "hospital services" that excludes

2

"physician services" from that category. This new interpretation is not supported by the applicable statute, regulations, or prior guidance from HHS or the Centers for Medicare and Medicaid Services ("CMS", which is charged with administering the Medicare and Medicaid programs). In adopting this new position and applying it retroactively to avoid reimbursement for DSH services, HHS and the CMS have acted inconsistently with the statute, arbitrarily and capriciously, all in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A),(C).

## INTRODUCTION

1. The proceedings below involved an administrative appeal of CMS's decision to disallow $11,085,181 in claimed FFP under Title XIX of the Social Security Act ("the Act") for DSH payments for state fiscal years ("SFY") 1997 and 1998. The two DSH hospitals relevant to the disallowance decision are the University of Virginia Hospital ("UVA") and the Virginia Commonwealth University's Medical College of Virginia Hospitals ("VCU/MCVH"). UVA and VCU/MCVH treat a disproportionately larger number of indigent patients than any other hospitals within the State.

2. CMS based its disallowance decision on, among other things, audit findings of the HHS Office of Inspector General ("OIG").

3. DMAS appealed the CMS disallowance decision to the HHS DAB, which is empowered to adjudicate disputes and make final determinations involving the Medicaid DSH program.

4. On May 18, 2007, the DAB issued Decision No. 2084 affirming CMS's disallowance of the $11,085,181 in FFP funds that Virginia had claimed for providing physician services at UVA and VCU/MCVH for SFY 1997 and 1998.[1]

5. Virginia brings this action to appeal the final agency action as reflected in the DAB decision upholding CMS's disallowance of certain hospital physician costs under the Medicaid DSH program. HHS's position is not supported by the applicable statute, regulations, or guidance and it is contrary to Virginia's federally-approved Medicaid State Plan.

## THE PARTIES

6. Plaintiff Commonwealth of Virginia ("Virginia"), through its Department of Medical Assistance Services ("DMAS"), is responsible for developing and managing Virginia's Medicaid program under Virginia's Medicaid State Plan ("State Plan") and applicable federal law.

7. Defendant Michael O. Leavitt, named herein in his official capacity as Secretary of HHS, is responsible for administering the federal Medicaid program.

8. CMS is an operating component of HHS charged with the administration of Medicaid. Defendant Kerry N. Weems, named herein in his official capacity as Acting Administrator of CMS, administers the Medicaid program under a delegation of authority from the Secretary.

---

[1] Citing the DAB's May 18, 2007 decision for support, CMS issued another disallowance letter to Virginia on October 1, 2007, disallowing $7,146,426 in claimed FFP for SFY 1999 that represented costs associated with providing physician services at the two Virginia DSH hospitals. On November 1, 2007, Virginia appealed CMS's Oct. 1, 2007 disallowance for SFY 1999. That case is currently pending before the DAB, Docket No. A-08-19, and is not a part of this action.

## JURISDICTION AND VENUE

9. The United States District Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the laws of the United States. The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10. Plaintiff is also entitled to judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, (including, without limitation, 5 U.S.C. §§ 703, 704 and 706).

11. Venue is proper in this court under 28 U.S.C. § 1391(b) and (e) because, *inter alia*, the defendants, agencies and employees of agencies of the United States, reside within this judicial district, and a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## BACKGROUND

The Medicaid Program

12. The Medicaid program was enacted in 1965 as a cooperative venture between the federal and state governments to assist states in the provision of medical care to eligible low-income individuals. The primary objective of the Medicaid program is "to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396. Although states administer Medicaid, the program is federally supported and operates under federal statutes, regulations and guidelines.

13. The Act requires that states make available supplemental funds to safety-net hospitals that serve a disproportionate share of Medicaid and other low-income patients with special needs. Such hospitals are known as "disproportionate share hospitals" ("DSHs"). 42 U.S.C. § 1396a(a)(13)(A) and 42 U.S.C. § 1396r-4(b). This requirement was added to Title XIX of the Social Security Act by §2173(B)(ii) of the Omnibus Budget Reconciliation Act of 1981 ("OBRA 1981"), Pub. L. No. 97-35, 95 Stat.357. Congress intended the supplemental funds to improve the financial stability of DSHs so as to preserve access to quality health services for low-income patients. OBRA 1981, Pub. L. No. 97-35, §2173; H.R. Conf. Rep. 97-208 at 962 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1010, 1324.

14. Medicaid DSH payments are jointly funded by the federal government and states. The federal funding is known as Federal Financial Participation ("FFP"). Both UVA and VCU/MCVH satisfy the statutory criteria for, and have been designated by Virginia as, DSHs. States have discretion in deciding which hospitals receive DSH payments and the level of funds that those hospitals will receive, although there are certain limits.

15. First, section 1923(f) of the Social Security Act imposes a specific DSH funding limit (the "State DSH Allotment") on each state for each federal fiscal year. The dollar amount of that allotment is fixed by statute. 42 U.S.C. § 1396r-4(f)(2). The State DSH Allotments provide Congress with control over the overall level of federal DSH funding that may be expended by each state. All of the DSH payments at issue here were well within the State DSH Allotment set by Congress for Virginia.

16. Second, Section 1923(g) of the Social Security Act (as added by section 13621 of the Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993")), limited DSH payments that can be paid to each DSH hospital for uncompensated costs incurred for treating the uninsured

6

and Medicaid-eligible individuals. 42 U.S.C. § 1396r-4(g). This hospital-specific DSH cap is referred to as the uncompensated care cost limit (the "UCC limit"). The UCC limit equals the cost of uncompensated medical care that the hospital provides to uninsured patients (*i.e.*, costs less any payments by those patients) plus the shortfall between costs for the medical care that the hospital provides to Medicaid patients and the Medicaid payments received.

17. OBRA 1993 was enacted because Congress was concerned that some states were making DSH payments that exceeded the hospitals' costs of providing medical care to the indigent. The physician costs at issue in this case were incurred by the hospitals and the DSH payments to the hospitals for SFY 1997 and 1998 did not exceed those costs.

18. The cost limitations imposed by Congress in section 1923(f) and in section 1923(g) of the Act did not exclude costs for physician services. Indeed, Congress requires DSH hospitals to provide certain specific physician services. For example, section 1923(d) of the Act requires all DSH hospitals to have at least two obstetricians on staff to provide OB/GYN services.

19. The term "hospital services" is not defined by the Act. CMS has stated, however, in other contexts that the phrase "hospital services" refers to both inpatient and outpatient hospital services. CMS regulations for the Medicaid program define "outpatient hospital services" and "inpatient hospital services" to include services provided "by or under the direction of a physician" and "under the direction of a physician," respectively. 42 C.F.R. §§ 440.20, 440.10.

20. Both CMS and the DAB have previously recognized that Medicaid regulatory definitions are *not* mutually exclusive; *i.e.*, one defined term may incorporate or include other defined terms. For example, the DAB previously acknowledged that "[n]umerous services which may meet the definitions of inpatient or outpatient hospital services are also themselves

7

defined separately, such as laboratory and x-ray services, physicians' services, pharmacy services, and diagnostic services." *Alaska Dept. of Health and Social Services,* DAB No. 1919 (2004), 2004 WL 1038088, *20. (As addressed below, in the administrative decision at issue here the DAB acted directly contrary to this statement, holding that physicians' services cannot be included in hospital services.) Similarly, CMS has described Medicaid categories of service as "separate" but "not mutually exclusive" such that nurse-midwife services, like physician services, "may be billed in their own distinct category or alternatively may be billed under other categories such as hospital or clinic services." 60 Fed. Reg. 61483, 61484-85 (Nov. 30, 1995). In a recent proposed Medicaid rule, CMS acknowledged that "[b]ecause the regulatory definition of outpatient hospital services is so broad, there is a high possibility of overlap between outpatient hospital services and other covered benefits." 72 Fed. Reg. 55158, 55159 (Sept. 28, 2007). CMS further noted that "[t]he definition of outpatient hospital services in current regulation may allow States to include such non-facility services (that is, physician and professional services)…within the State Plan definition of outpatient hospital services." *Id.* at 55160.

21. Similarly, the Fifth Circuit has recognized that hospital-based "rural health clinic services" may be included as part of the hospital-specific DSH limit as "outpatient hospital services", despite the fact that federal statutes and regulations distinguish the two terms. *Louisiana Dept. of Health and Hospitals v. CMS,* 346 F.3d 571, 577 (5th Cir. 2003).

22. HHS has not promulgated regulations implementing the DSH payment limit enacted by OBRA 1993.

23. HHS (acting through the Health Care Financing Administration, the predecessor to CMS) issued a letter dated August 17, 1994 to state Medicaid directors that purported to set

out HHS's interpretation of the new provision in OBRA 1993 (hereinafter "1994 CMS Letter"). The letter provided, in pertinent part, that (1) "the legislative history of this provision makes clear that States may include both inpatient and outpatient costs in the calculation of the limit", and (2) "in defining 'costs of services' under this provision, HCFA would permit the State to use the definition of allowable costs in its State plan, or any other definition, as long as the costs determined under such a definition do not exceed the amounts that would be allowable under the Medicare principles of cost reimbursement." The letter explained that the "Medicare principles are the general upper payment limit under institutional payment under the Medicaid program." It further stated that HCFA (the predecessor to CMS) "believes this interpretation of the term 'costs incurred' is reasonable because it provides States with a great deal of flexibility up to a maximum standard that is widely known and used in the determination of hospital costs."

24. The 1994 CMS Letter stated that HCFA planned to issue regulations to codify the new requirements, but "[u]ntil these regulations are published, this summary represents HCFA's interpretation of the new DSH requirements." To date, HHS has not issued regulations interpreting this provision of OBRA 1993, and specifically, it has not promulgated a regulatory definition of the term "hospital services," including as it relates to the hospital-specific DSH limits established by the statute.

25. The 1994 CMS Letter is the only relevant guidance that CMS has issued regarding the DSH limits established by OBRA 1993. The letter did not address whether the cost of physician care provided by DSH hospitals may be included with the UCC.

26. The Medicare principles of cost reimbursement referenced in the 1994 CMS Letter do not preclude the hospitals from claiming reasonable cost reimbursement for physician

9

care provided to patients and expressly permits reimbursement under certain circumstances specific to Medicare.

27. CMS's rationale for the disallowance has changed substantially over time.

28. By way of example, in at least two other audits involving different medical centers in a different state, the OIG concluded that medical centers could properly include the costs of medical services provided by physicians in the calculation of UCC. CMS has not offered a reasonable explanation why those cases are different from this one.

29. On August 26, 2005—more than two years after the OIG issued the SFY 1997 and 1998 audit reports for UVA and VCU/MCVH—CMS issued a proposed rule implementing the new DSH auditing and reporting requirements contained in the Medicare Prescription Drug Improvement and Modernization Act of 2003. In the preamble discussion of the proposed rule, CMS stated for the first time that "[t]he uncompensated care costs of providing physician services cannot be included in the calculation of the hospital-specific DSH limit." 70 Fed. Reg. 50262, 50265. CMS provided no basis supporting this one-sentence statement contained in the preamble of the proposed rule.

30. More than 50 organizations, representing states, hospital associations, and individual hospitals, submitted formal comments on the proposed rule and objected to CMS's statement regarding the exclusion of physician services from UCC on the grounds that CMS's statement was contrary to existing Medicaid law and regulations and CMS policy guidance.

31. By and large the comments demonstrated that many states and hospitals currently include physician services as UCC, and that excluding them will have significant adverse consequences for safety-net hospitals and the indigent patients they serve. The reaction to

CMS's August 26, 2005 statement demonstrates that CMS's position is both new and inconsistent with the law.

Virginia's State Plan

32. The disallowed DSH payments at issue were made consistent with Virginia's State Plan. Virginia's State Plans for FY 1997 and 1998 provided, in pertinent part, the following methodology for calculating the UCC:

> A payment adjustment during a fiscal year shall not exceed the sum of:
> 1. Medicaid allowable costs incurred during the year less Medicaid payments, net of disproportionate share payment adjustments, for services provided during this year, and
> 2. Costs incurred in serving persons who have no insurance less payments received from those patients or from a third party on behalf of those patients. Payments made by any unit of the Commonwealth or local government to a hospital for services provided to indigent patients shall not be considered to be a source of third party payment.

33. Virginia's State Plan, as demonstrated above, does not exclude the costs incurred for physician services for the treatment of uninsured and Medicaid eligible patients from the UCC compensation.

34. Virginia's State Plans for FY 1997 and 1998 were both approved by CMS or its predecessor organization, HCFA.

35. CMS regulations acknowledge that section 1903(a)(1) of the Social Security Act prohibits CMS from retroactively disallowing federal matching funds for the DSH payments made under the approved State Plan. Section 1903(a)(1) of the Act states, in pertinent part:

> [T]he Secretary....shall pay to each State which has a plan approved under this subchapter...an amount equal to the Federal medical assistance percentage (as defined in section 1905(b), subject to subsections (g), (h)

11

and (j) of this section and section 1923(f) of the total amount expended…as medical assistance under the State plan….

Section 1903(a)(1) of the Act requires "payments to States, on the basis of a Federal medical assistance percentage, for part of their expenditures for services under an approved State plan." 42 C.F.R. §433.10(a).

36. Virginia was not provided notice of CMS's interpretation that physician costs were excluded from UCC until several years after Virginia made the DSH payments at issue. CMS's failure to provide timely and clear notice that physician costs must be excluded from UCC is contrary to the Supreme Court's ruling in *Pennhurst State School v. Halderman*, 451 U.S. 1, 24-25 (1981).

The OIG Audit Findings and the CMS Disallowance

37. Commencing in or about April, 2001, the OIG audited Virginia's DSH payments made to UVA and VCU/MCVH for SFYs 1997 and 1998. The OIG's stated objectives for both audits were to determine if DSH payments to the hospitals (1) "were calculated in accordance with the approved state plan," and (2) "did not exceed the UCC as imposed by OBRA of 1993."

38. The OIG issued final audit reports, dated April 24, 2003 and May 5, 2003, for VCU/MCVH and UVA, respectively. These reports purported to set out the OIG's findings and recommendations based on its audit of DSH payments for SFYs 1997 and 1998.

39. Although the OIG explicitly stated that Virginia's DSH payments complied with its State Plan, the OIG asserted that Virginia should not have included the hospitals' cost of physician care in the UCC calculations. The OIG recommended that CMS recoup the federal government portion (the FFP) of DSH payments attributable to physician costs. The

12

recommended disallowances included $4,760,385 for UVA and $6,324,796 for VCU/MCVH, for a total of $11,085,181 in SFYs 1997 and 1998.

40. The OIG based its recommendation on two main findings. First, the OIG concluded that the physician costs were not incurred by the hospitals, but by physician groups, which were separate entities. Second, according to the OIG, because UVA and VCU/MCVH did not include the physician costs in their cost reports submitted for Medicare purposes, the hospitals could not properly include such costs as part of their Medicaid DSH UCC. The OIG further claimed that such physician costs could not be included in the Medicare cost report because they are normally reimbursed under a separate fee schedule.

41. A meeting was held between Virginia and CMS officials on October 15, 2003 to discuss the OIG audit findings. According to unchallenged accounts of that meeting in the Board proceeding below, CMS officials stated that the cost of a physician's service could be included in the calculation of a hospital's DSH payment limit if the physician was a salaried employee of the hospital and the hospital customarily billed and received revenue for the service.

42. More than two years later, by letter dated September 8, 2005 ("Disallowance Letter"), CMS notified Virginia that it was disallowing FFP for Medicaid DSH payments allegedly in excess of each hospital's UCC, as recalculated by CMS, for SFYs 1997 and 1998.

43. CMS based its disallowance on a series of erroneous "determinations" that it claimed supported a finding that the hospitals did not incur the physician costs at issue. CMS concluded that "the physician groups are separate entities and their costs should not have been included with the hospitals' uncompensated cost of furnishing hospital services."

44. Without explanation, the Disallowance Letter concluded, contrary to the OIG Reports, that the DSH payments to the hospitals did not comply with the State Plan.

45. On or about October 7, 2005, Virginia filed a notice of appeal regarding CMS's disallowance decision with the DAB.

46. During the DAB proceeding CMS no longer relied upon its contention that the hospitals had not incurred the physician costs at issue and instead defended its disallowance by contending that "physician services" are not "hospital services" as that term is used in OBRA 1993. Specifically, CMS took the position that physician services can never be included in calculating the UCC limit.

47. On May 17, 2007 the DAB issued a decision upholding the CMS disallowance ("Decision No. 2084"). Initially, the DAB stated that "[t]he initial justification for the disallowance was that 'independent physician groups,' not the hospitals, had incurred the costs." The Board stated, however, that because CMS had made no attempt to defend that basis of the formal disallowance letter, it would instead decide a different issue; that is, whether the costs were for "hospital services" under Section 1923(g)(1)(A).

48. The DAB held that by designating "hospital services" (*i.e.*, "inpatient hospital services" and "outpatient hospital services") and "physician services" as separate categories of medical assistance, Congress intended states to treat them "as distinct for coverage, payment, and other program purposes." The DAB concluded that hospital services did not include physician services—despite the regulatory definitions, which define outpatient and inpatient hospital services to include services provided "by or under the direction of a physician" or "under the direction of a physician," respectively. 42 C.F.R. §§ 440.20, 440.10. The DAB also held that the 1994 CMS Letter placed Virginia on adequate notice of CMS's statutory interpretation of "hospital services" prior to making the disallowed DSH payments and that the interpretation set out in the letter was reasonable. The DAB further held that "the physician costs at issue were not

14

recognized by Virginia's Medicaid program as allowable costs of inpatient hospital or outpatient hospital services, nor could they have been considered allowable hospital costs under Medicare cost reimbursement principles." Neither the Audit Report issued by the OIG, the CMS disallowance letter, nor the arguments made by CMS to the DAB set forth this basis for the disallowance.

49. Since the HHS DAB's decision, CMS has reclaimed the disallowed amount of $11,085,181, plus $884,458 in interest.

50. The DAB's decision was erroneous and should be overturned.

## COUNT I

### Violation of the Administrative Procedure Act— Arbitrary and Capricious Agency Action

51. Plaintiff hereby repeats, realleges and incorporates herein by reference all prior paragraphs.

52. The agency's decision is contrary to the plain meaning of the statutory provisions governing the allowability of uncompensated care costs incurred by disproportionate share hospitals.

53. The agency's decision is inconsistent with the law and is arbitrary and capricious inasmuch as CMS failed to provide timely and adequate notice of its interpretation at issue in this case.

54. The agency's decision is inconsistent with the law and is arbitrary and capricious, including because it is inconsistent with, among other things, HHS regulations at 42 C.F.R. § 440.10 and § 440.20, and guidance in the 1994 CMS Letter.

15

55. The agency decision is arbitrary, capricious and contrary to law, as it contravenes standards previously established by CMS, the DAB, and the federal courts for determining when categories of Medicaid costs are reimbursable.

56. As set forth more particularly above, HHS's decision that physician costs may not be included in the UCC limit is arbitrary, capricious, and constitutes an abuse of discretion; is not supported by substantial, credible evidence; and otherwise must be set aside and reversed pursuant to 5 U.S.C. § 706.

## COUNT II

### Violation of the Administrative Procedure Act
### Failure to Comply with Rulemaking Requirements

57. Plaintiff hereby repeats, realleges and incorporates herein by reference all prior paragraphs.

58. CMS's decision, as upheld by the DAB, determined that costs incurred by DSH hospitals for furnishing physician care to uninsured indigent patients could not be included as part of the hospital's incurred UCC for hospital services. This determination, based on policy first announced in the CMS 2005 Disallowance Letter, constitutes new, substantive rulemaking which is contrary to the Secretary's prior rulings, interpretations and regulations.

59. This action was taken without satisfying the notice and comment requirements of 5 U.S.C. § 553.

60. In addition to the foregoing improper rulemaking activity, as more particularly described above, CMS and DAB retroactively applied that "rule" to Virginia and its DSH hospitals for SFYs 1997, 1998, and 1999. Such retroactive application of rules, even if

otherwise duly promulgated, is not authorized by the Social Security Act or otherwise and is therefore an action in excess of statutory jurisdiction in violation of 5 U.S.C. § 706(2)(C).

**RELIEF REQUESTED**

WHEREFORE, based on the foregoing, Plaintiff hereby prays for the following judgment and relief to be entered by the Court:

a) a declaration and finding that CMS disallowance of physician costs incurred by the Virginia hospitals furnishing services to uninsured and Medicaid eligible patients is arbitrary, capricious, contrary to law, unsupported by credible, substantial evidence and is otherwise invalid under the Administrative Procedure Act;

b) a declaration and finding that the DAB's decision upholding CMS disallowance of physician costs incurred by the Virginia hospitals furnishing services to uninsured and Medicaid eligible patients is arbitrary, capricious, contrary to law, unsupported by credible, substantial evidence and is otherwise invalid under the Administrative Procedure Act;

c) an order setting aside and reversing the DAB's decision;

d) a declaration and finding that the costs of physician services may be included in the DSH UCC limit in accordance with section 1923(g) of the Social Security Act, 42 U.S.C. § 1396r-4(g);

e) A declaration and finding that CMS, in creating a new and previously unarticulated legal standard regarding the allowability of including physician costs as part of a disproportionate share hospital's UCC calculation which is contrary to section 1923(g) of the Social Security Act, CMS regulations at 42 C.F.R. § 440.10 and § 440.20, the 1994

CMS Letter, and prior rulings from the courts, has created a new, substantive rule which has been promulgated without engaging in notice and comment rulemaking pursuant to 5 U.S.C. § 553 *et seq.*

f)  a finding and declaration that this new, substantive rule has been applied improperly in a retroactive manner by HHS;

g)  an order enjoining the Secretary of HHS and the Acting Administrator of CMS from asserting an interpretation of the pertinent statutory and regulator provision contrary to this Court's holding;

h)  award of interest to Virginia;

i)  award of costs and reasonable attorneys' fees to Virginia; and

j)  award of other such relief which the Court deems equitable, just or otherwise allowed by law.

Respectfully Submitted,

HOGAN & HARTSON LLP

_____
Jeffrey D. Pariser  (#462085)

HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-8689

Counsel for Plaintiff
Commonwealth of Virginia

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

Commonwealth of Virginia, Department of Medical Assistance Services, 600 E. Broad Street, Suite 1300, Richmond, VA 23219

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jeffrey D. Pariser
Hogan & Hartson LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

## DEFENDANTS

Michael O. Leavitt, in his official capacity as Secretary, U.S. Department of Health and Human Services, Washington, D.C. 20201; AND Kerry N. Weems, in his official capacity as Acting Administrator, Centers for Medicare and Medicaid Services, Washington, D.C. 20201

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

Jeffrey A. Taylor
United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
● 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ● 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

● **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ● 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Action under 5 U.S.C. § 553 and § 706 seeking reversal of a final agency decision by the HHS Dept'l Appeals Board, re: the federal Medicaid program.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint
JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  2/1/2008   SIGNATURE OF ATTORNEY OF RECORD  [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.