# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MEDICAL ASSISTANCE SERVICES,<br><br>       Plaintiff,<br><br>v.<br><br>MICHEAL O. LEAVITT, in his official capacity as SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>and<br><br>KERRY N. WEEMS, in his official capacity as ACTING ADMINISTRATOR, CENTERS FOR MEDICARE AND MEDICAID SERVICES of the United States Department of Health & Human Services,<br><br>       Defendants. | Civ. Action No. 08-0573 (RMC) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff hereby moves for summary judgment in its favor with respect to each of the claims asserted against Defendants in the Complaint. As demonstrated by the accompanying Statement of Material Facts as to Which There Is No Genuine Issue and the Memorandum of Points and Authorities, which are incorporated by reference herein, there are no genuine issues of material fact and based on the record before the Court, the Plaintiff is entitled to judgment as a matter of law.

Respectfully submitted,

HOGAN & HARTSON L.L.P.

By: /s/ Jeffrey Pariser

Jeffrey Pariser (#462085)
Michael F. Mason (#458541)
Ann M. Lichter (#496307)

HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Tel: (202) 637-5600
Fax: (202) 637-5910

*Attorneys for the
Commonwealth of Virginia*

Dated:  August 5, 2008

# CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2008, a true and correct copy of the foregoing was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Jeffrey Pariser
JEFFREY PARISER

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MEDICAL ASSISTANCE SERVICES, <br><br> Plaintiff, <br><br> v. <br><br> MICHEAL O. LEAVITT, in his official capacity as SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> and <br><br> KERRY N. WEEMS, in his official capacity as ACTING ADMINISTRATOR, CENTERS FOR MEDICARE AND MEDICAID SERVICES of the United States Department of Health & Human Services, <br><br> Defendants. | Civ. Action No. 08-0573 (RMC) |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL CIVIL RULE 7(H)

1.    The Medicaid program (Title XIX of the Social Security Act (the "Act")) was established in 1965 as a cooperative venture between the federal and state governments to assist states in providing medical care to eligible low-income individuals.  The primary objective of the Medicaid program is "to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care."  42 U.S.C.

1

§ 1396. Under the Medicaid program, the federal and state governments jointly share the cost of providing medical assistance to eligible low-income and disabled individuals. 42 U.S.C. §§ 1396, 1396b.

2.    Medicaid services are provided pursuant to state plans that must be reviewed and approved by the Secretary of HHS. 42 U.S.C. § 1396a.[1]

3.    Once a state plan is approved, the federal government "shall" reimburse the state for a percentage of its expenditures for medical assistance provided pursuant to its state plan. 42 U.S.C. §1396b. These payments are known as "federal financial participation" ("FFP"). The federal funding levels are established by a statutory formula which computes reimbursement rates for each state based on its federally-approved state plan. Id. The types of medical assistance that are reimbursable include, among others, inpatient hospital services, outpatient hospital services, physician services (including physician services furnished in a hospital), and nurse-midwife services. 42 U.S.C. § 1396d.

4.    The Omnibus Budget Reconciliation Act of 1981 ("OBRA 1981") amended the Act to require states to make available critically important supplemental funds to safety-net hospitals that serve large numbers of Medicaid and other low-income patients with special needs. Pub. L. No. 97-35, § 2173(B)(ii), 95 Stat. 357, AR at 00950; see 42 U.S.C. § 1396a(13)(A)(iv). Congress intended these supplemental funds to improve the financial stability of these "disproportionate share hospitals" ("DSHs") in order to preserve access to quality health care services for low-income patients:

> [s]uch hospitals, especially in urban areas, are often multi-faceted health care institutions, which provide many public health and social services to all residents of their area, in addition to serving

---

[1]    The Secretary has delegated this authority to CMS, a component of HHS. See 42 C.F.R. §§ 430.14, 430.15.

> as hospitals of last resort for the poor. Their sizeable Medicaid
> populations often require extra social and public health services.
> In addition, in many areas such hospitals also provide considerable
> care for indigent persons not eligible for Medicaid, who often have
> only partial or no health care coverage.

H.R. Rep. No. 97-158 at 295 (1981) (Budget Committee Report discussing provisions eventually

incorporated in Pub. L. No. 97-35). See AR at 01043. See also District of Columbia Dept. of

Human Servs., Departmental Appeals Board No. 1617, 1997 WL 377277 at *21 n.8 (April 29,

1997) (the "purpose of the DSH payments is to recognize that certain hospitals provide services

to a large population of Medicaid recipients and other low-income individuals and therefore are

faced with special financial needs").

5.      DSH payments supplement ordinary Medicaid funding; as a result, for the costs at issue

in this lawsuit, the only source of funding is the DSH program.  Stated another way, only costs

that are not compensated by the patient, insurance, another third party, Medicaid, or any other

program are eligible for DSH reimbursement.  Under the applicable statutes and the terms of its

State plan, Virginia could not have submitted the physician costs in question for reimbursement

under Medicaid, Medicare, or any other program.

6.      States have discretion in deciding which hospitals receive DSH payments and the level of

funds that those hospitals will receive, see 42 U.S.C. § 1396r-4, although there are certain limits.

First, section 1923(f) of the Social Security Act imposes a specific DSH funding limit (the "State

DSH Allotment") on each state for each federal fiscal year.  The State DSH Allotments are set by

statute, see 42 U.S.C. § 1396r-4(f)(2), and give Congress control over the overall level of federal

DSH funding that may be expended by each state.

7.      There is no dispute that all of the DSH payments at issue here were well within the State

DSH Allotment set by Congress for Virginia.

8.      Second, through the Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993")

(Section 1923(g) of the Act, 42 U.S.C. § 1396r-4(g)) (AR at 01028), Congress separately limited

the amount of DSH payments that can be paid to each DSH hospital for the uncompensated costs

incurred for treating Medicaid beneficiaries and the uninsured.  Pub. L. No. 103-66, § 13621,

107 Stat. 312, 629-633 (1993).  This hospital-specific DSH cap is referred to as the

uncompensated care cost limit (the "UCC limit").  The UCC limit generally equals the cost of

uncompensated medical care that the hospital provides to uninsured patients (i.e., costs less any

payments by those patients) plus the shortfall between costs and payments for the medical care

that the hospital provides to Medicaid patients.  42 U.S.C. § 1396r-4(g).  Specifically, the Act

provides that DSH payments cannot exceed:

> the costs incurred during the year of furnishing hospital services
> (as determined by the Secretary and net of payments under this
> subchapter, other than under this section, and by uninsured patients)
> by the hospital to individuals who either are eligible for medical
> assistance under the State plan or have no health insurance (or
> other source of third party coverage) for services provided during
> the year.

42 U.S.C. § 1396r-4(g)(1)(A).  Accordingly, hospitals may receive DSH payments up to the

extent of their shortfalls attributable to treating Medicaid and uninsured patients.

9.      Defendants have not promulgated regulations implementing the UCC limit enacted by

OBRA 1993.

10.     Defendants, acting through the Health Care Financing Administration ("HCFA"), the

predecessor to CMS, issued the 1994 CMS Letter dated August 17, 1994 to state Medicaid

directors which provided some guidance.  See AR at 01309.  The letter stated, in pertinent part,

that (1) "the legislative history of this provision makes it clear that States may include both

inpatient and outpatient costs in the calculation of the limit," and (2) "in defining 'costs of

services' under this provision, HCFA would permit the State to use the definition of allowable costs in its State plan, or any other definition, as long as the costs determined under such a definition do not exceed the amounts that would be allowable under the Medicare principles of cost reimbursement." <u>Id.</u> at 01312.  CMS reasoned that "this interpretation of the term 'costs incurred' is reasonable because it provides States with a great deal of flexibility up to a maximum standard that is widely known and used in the determination of hospital costs." <u>Id.</u>

11.     The letter did not expressly address whether the cost of physician care provided by DSH hospitals may be included in the UCC.

12.     Both "inpatient hospital services" and "outpatient hospital services" are separately defined in regulations to include physician services.

13.     The 1994 CMS Letter stated that HCFA planned to issue regulations to codify the new requirements, but "[u]ntil these regulations are published, this summary represents HCFA's interpretation of the new DSH requirements."  AR at 01309.

14.     To date, defendants have not issued regulations interpreting the UCC limit.  Nor have they ever promulgated a regulatory definition of the term "hospital services," including as that term relates to the hospital-specific DSH limits established by the statute.

15.     Virginia's State plan provisions in effect during the period relevant to CMS's disallowance (<u>i.e.</u>, state fiscal years ("SFYs") 1997 and 1998) implemented the UCC limit by providing:

> A payment adjustment during a fiscal year shall not exceed the sum of:
>
> > (a)    Medicaid allowable costs incurred during the year less Medicaid payments, net of disproportionate share payment adjustments, for services provided during the year, and
> >
> > (b)    Costs incurred in serving persons who have no insurance less payments received from those patients or from a third party on

5

behalf of those patients.  Payments made by any unit of the
Commonwealth or local government to a hospital for services
provided to indigent patients shall not be considered to be a source
of third party payment.

AR at 01258; id. at 01287.  CMS approved these State plans.

16.    As part of a routine audit initiative commencing in or about April 2001, the OIG audited

Virginia's payments to its two DSH hospitals – the University of Virginia Hospital ("UVA") and

Virginia Commonwealth University's Medical College of Virginia  Hospital ("MCVH") – for

State fiscal years ("SFYs") 1997 and 1998.  The OIG's stated objectives for both audits were to

determine if DSH payments made to the hospitals:  (1) "were calculated in accordance with the

approved State plan," and (2) "did not exceed the UCC as imposed by OBRA of 1993."  See AR

at 00181 and 00233.

17.    On August 13, 2002, the OIG issued two draft reports, one concerning UVA and one

concerning MCVH.  By letter dated November 13, 2002, Virginia responded to each draft report.

See AR at 00817.

18.    The OIG released final reports, dated April 24, 2003 and May 1, 2003 for MCVH and

UVA, respectively (the "MCVH Report" and the "UVA Report," together the "OIG Reports").

See AR at 00229 and 00178.

19.    In both final reports, the OIG concluded that Virginia's DSH payments to the hospitals

"were calculated in accordance with the State plan."  AR at 00186 and 00238.

20.    Notwithstanding that finding, the OIG concluded that Virginia should not have included

the hospitals' costs of physician care in the UCC calculations.  Id.

21.    Specifically, the OIG concluded that: (1) the physician costs were not incurred by the

hospitals, but were incurred by the physician practice groups that were separate legal entities;

6

and (2) the physician costs were not allowable because they were not consistent with Medicare

cost principles. Id. The latter conclusion relied on the OIG's finding that UVA and MCVH did

not include the physician costs in their cost reports submitted for Medicare purposes; the OIG

reasoned that without such a submission the hospitals could not properly include such costs

within the Medicaid UCC limit. AR at 00192 and 00246-47.

22.    The OIG recommended that CMS recoup the federal government's portion (FFP) of DSH

payments attributable to the physician costs incurred by the hospitals. The following table

provides a breakdown of the OIG's recommended disallowances:

| | SF 1997 | SF 1998 | Total |
|---|---|---|---|
| **UVA** | $1,459,632 | $3,300,753 | $4,760,385 |
| **MCVH** | $6,324,796 | $0 | $6,324,796 |
| **TOTAL** | $7,784,428 | $3,300,753 | **$11,085,181** |

See AR at 00190 and 00245.

23.    Virginia and university officials personally met with CMS representatives at least four

times in the latter part of 2003 to further discuss the issues associated with the hospitals'

physician costs.

24.    At a July 17, 2003 meeting, CMS officials focused on whether the physician's bill had

been generated by the hospital, and whether the physicians received their W-2 statements from

the hospitals, as these would be indications that they were hospital employees. AR at 01526.

25.    At a September 17, 2003 meeting, UVA and MCVH representatives and CMS

administrator Thomas Scully discussed the organization and relationship of the faculty practice

plans and the hospitals and whether the costs were actually incurred by the hospitals. See AR at

01522; id. at 01539.  CMS agreed to have a follow-up meeting to discuss the circumstances

under which CMS policy would allow the costs of physician services to be included in the

calculation of uncompensated care costs for purposes of Medicaid DSH payments.  Id.

26.    At the follow-up meeting on October 15, 2003, CMS official Charlene Brown explained

to the Virginia representatives that CMS's criteria for including physician costs in a hospital's

UCC calculation for purposes of Medicaid DSH payments depended on answering affirmatively

the questions:  "Is the physician an employee of the hospital, and do the revenues for the

physician services ultimately go to the hospital?"  See id. at 01526.  The discussion centered on

the connection between the hospital's employment of the physicians and the recovery of

physician costs as part of DSH payments.  See id. at 01540.

27.    On November 6, 2003, CMS representatives visited UVA and MCVH to learn more

about the hospitals' operations and relationships with their respective faculty practice groups.

28.    At these meetings and in subsequent correspondence throughout November and

December 2003, UVA and MCVH officials furnished the CMS staff with a significant amount of

information and documentation describing the relationship between the hospitals and the

physician practice groups.   See id. at 00288; id. at 00680; id. at 00752; id. at 01522; id. at 01538.

29.    Also as part of its communications with CMS, Virginia explained how it satisfied the

mandate in the 1994 CMS Letter that its costs would be allowable under Medicare principles of

cost reimbursement:

> in applying the Medicare principles of reimbursement to the determination
> of UCC costs, the physician billing practices that are relevant are how the
> physicians bill for services furnished to patients included on the Hospital's
> reports of costs for uncompensated care.  For those patients, the physicians
> at both Hospitals have agreed that they will not bill or collect from
> patients determined to be indigent and who are included in the report of
> uncompensated services.

See AR at 00911-12  (emphasis added).

30.    By letter dated September 8, 2005, CMS notified Virginia that it was disallowing

$11,085,181 in FFP for Medicaid DSH payments because the hospitals "overstated their UCC of

furnishing hospital services by including the UCC of independent physician groups." See id. at

00175.  CMS stated that "[t]he individual physicians that practiced as part of these groups were

not hospital employees…" and that "the physician groups are separate entities and their costs

should not have been included with the hospitals' uncompensated cost of furnishing hospital

services." Id. at 00175-76.  CMS made no reference and otherwise reflected no consideration of

the supplemental information the Virginia hospitals had provided to CMS, or to the discussions

and meetings between the CMS officials and the Virginia hospital representatives.

31.    On October 7, 2005, Virginia appealed the CMS disallowance to the DAB.  AR at 00021.

32.    Virginia argued that: (a) the hospitals incurred the costs of providing physician care to

indigent patients, (b) the DSH payments were made in accordance with its approved State plan;

(c) Virginia's interpretation of § 1923(g) of the Act was consistent with the statute and all

applicable CMS guidance; (d) Virginia's interpretation of §1923(g) is consistent with industry

practice, and (e) CMS failed to provide any public notice of its new interpretation that physician

costs may not be included in the calculation of a hospital's UCC.  Id. at 00045.

33.    In its brief in support of the disallowance, CMS addressed neither whether the physicians

were hospital employees nor whether the hospitals otherwise incurred the physician costs at issue.

Rather, for the first time CMS advanced new arguments, including that because "physician

services" are defined separately from "inpatient hospital services" and "outpatient hospital

services" under the Act, the costs of such services can never be included in the calculation of

DSH payments.  Id. at 00108.

34.    CMS argued that even if the statutory term "hospital services" is considered ambiguous, the 1994 CMS Letter interpreted the term and should be given deference. Id. at 00116-17. CMS further argued in its brief that the 1994 CMS Letter limited "hospital services" to "inpatient and outpatient costs." Id. at 00117. CMS also argued that the statement in the 1994 CMS Letter that the costs determined by the state may "not exceed the amounts that would be allowable under Medicare principles of cost reimbursement" also precluded Virginia from including physician costs as part of inpatient or outpatient hospital services for purposes of the calculation of the hospital's UCC because Medicare excludes physician services from the definition of "inpatient hospital services." Id.

35.    On May 18, 2007, the DAB upheld the disallowance. Id. at 00001. The DAB observed that "[t]he initial justification for the disallowance was that 'independent physician groups,' not the hospitals, had incurred the costs." Id. at 00008. The DAB stated, however, that CMS had "made no attempt to defend" that basis of the formal disallowance letter.

36.    The DAB accordingly focused instead on whether the costs were for "hospital services" under Section 1923(g)(1)(A). Id. The DAB held that by designating "hospital services" (which it defined as "inpatient hospital services" and "outpatient hospital services") and "physician services" as separate categories of medical assistance, Congress intended states to treat them "as distinct for coverage, payment, and other program purposes." AR at 00010. According to the DAB, "hospital services" as used in the UCC limit statute did not include physician services because they are designated in the statute as "separate categories of reimbursable medical assistance." Id. Specifically, "if a service is covered and paid for under the approved State plan as a 'physician's service,' it cannot simultaneously be recognized as a subset or type of 'hospital service.'" Id.

37.     Notably, the DAB expressly refused to address the regulatory definitions of outpatient or inpatient hospital services cited in the 1994 CMS Letter, see id. at 00013 n. 11.  Those terms include services provided "by or under the direction of a physician" or "under the direction of a physician," respectively.  42 C.F.R. §§ 440.20, 440.10.

38.     The DAB also expressly took "no view" whether a state Medicaid program may pay for services provided by physicians as "hospital services."  See id. at 00010 n.9.  Resolving this issue was unnecessary, it held, because "there is no evidence that Virginia's Medicaid program regarded the physician costs at issue here as allowable costs of inpatient hospital or outpatient hospital services."  Id. at 00013 n.11.  Further, since a "service cannot be classified as both a hospital service and a physician's service," see id. at 00010 n.9, Virginia could not include physicians' services within the UCC limit.

39.     The DAB's holding emphasized that Virginia did not properly classify the physician payments as being for "hospital services" in two additional places in its opinion.  Id. at 00013 (noting lack of evidence that "the disputed physician costs were regarded as allowable costs of inpatient or outpatient hospital services"); id. at 00014 (the evidence "indicates that the physician costs at issue relate to professional services that, when provided to Medicaid patients, were billed to Medicaid as 'physicians' services'").

40.      The DAB also held that the 1994 CMS Letter placed Virginia on adequate notice of CMS's statutory interpretation of "hospital services" prior to making the disallowed DSH payments, and that the interpretation in the letter was reasonable.  AR at 00012.

41.     Finally, the DAB held that Virginia failed to comply with the requirement in the 1994 CMS Letter that the costs "would be allowable" under Medicare cost principles, holding that

> what seems critical here is not whether the hospital actually elected to receive reasonable cost-based payment under Medicare but whether the

> hospital satisfied the critical regulatory conditions – having an agreement among all physicians not to bill for services, or having all physicians be hospital employees who are precluded from billing as a condition of employment—for a valid election.  Virginia has not alleged or shown that UVMC and MCVH satisfied those conditions.

Id. at 00015.

42.     In sum, the DAB held that "the physician costs at issue were not recognized by Virginia's Medicaid program as allowable costs of inpatient hospital or outpatient hospital services, nor could they have been considered allowable hospital costs under Medicare cost reimbursement principles."  AR at 00002.

43.     Since the DAB's decision, CMS has reclaimed the disallowed amount of $11,085,181, plus $884,458 in interest.

Respectfully submitted,

HOGAN & HARTSON L.L.P.


By:    /s/ Jeffrey Pariser
        Jeffrey Pariser (#462085)
        Michael F. Mason  (#458541)
        Ann M. Lichter  (#496307)

HOGAN & HARTSON L.L.P.
555 13th Street, N.W.
Washington, DC  20004
t: 202.637.8689
f: 202.637.5910

*Attorneys for the
Commonwealth of Virginia*

Dated: August 5, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2008, a true and correct copy of the foregoing was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Jeffrey Pariser
JEFFREY PARISER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Civ. Action No. 08-0573 (RMC)

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF
MEDICAL ASSISTANCE SERVICES,
Plaintiff,

v.

MICHEAL O. LEAVITT, in his official
capacity as SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

and

KERRY N. WEEMS, in his official capacity
as ACTING ADMINISTRATOR, CENTERS
FOR MEDICARE AND MEDICAID SERVICES
of the United States Department of Health &
Human Services,

Defendants.

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Jeffrey Pariser (#462085)
Michael F. Mason  (#458541)
Ann M. Lichter  (#496307)
HOGAN & HARTSON L.L.P.
555 13th Street, N.W.
Washington, DC  20004

Attorneys for the Commonwealth of
Virginia

Dated: August 5, 2008

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................ 1

STATEMENT OF FACTS .................................................................... 6
    A.    The Medicaid Program ................................................................ 6
    B.    The DSH Statutory and Regulatory Framework ..................... 7
    C.    Virginia's State Medicaid Plan .................................................. 10
    D.    The OIG Audit Findings, the CMS Disallowance, and the DAB's
        Final Decision ............................................................................ 11

ARGUMENT ...................................................................................... 17

I.    THE STATUTE AND REGULATIONS REQUIRE THE INCLUSION OF
    VIRGINIA'S COSTS FOR PHYSICIAN SERVICES IN THE UCC LIMIT ....... 19
    A.    The plain statutory language supports the inclusion of physicians'
        services ....................................................................................... 20
    B.    The 1994 CMS Letter does not provide a basis for CMS's
        disallowance of Virginia's physician costs from the UCC ...... 24
        1.    *No deference is due the 1994 CMS Letter* .................................. 24
        2.    *The 1994 CMS Letter, by its terms, includes "physicians*
               *services" within the UCC limit* .................................................. 26
        3.    *Virginia's submitted costs would be "allowable under the*
               *Medicare principles of cost reimbursement"* .............................. 29
    C.    Payment for physicians' services is required pursuant to Virginia's
        State plan ................................................................................... 34

II.    DEFENDANTS' DISALLOWANCE WAS ARBITRARY AND
    CAPRICIOUS, AND AN ABUSE OF DISCRETION ..................................... 36
    A.    CMS failed to provide any advance notice of its current interpretation
        of .............................................................................................. 37
    B.    Virginia relied on recovery of funds expended consistently with its
        State plan ................................................................................... 40
    C.    CMS's past statements and a prior DAB decision relevant to this issue
        are consistent with Virginia's position ..................................... 40
    D.    Dozens of other entities interpreted the UCC limit as Virginia did ........... 41

CONCLUSION ................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alaska Dept. of Health and Social Services,
   DAB No. 1919 (April 22, 2004) (Available at AR 01146) ...........................25, 28, 29, 33, 40

Alexander v. Choate,
   469 U.S. 287 (1985) ................................................................................................35

Beverly Enterprises v. Herman,
   130 F. Supp. 2d 1 (D.D.C. 2000)..........................................................................19

Bloch v. Powell,
   227 F. Supp.2d 25 (D.D.C. 2002)..........................................................................17

Blum v. Stenson,
   465 U.S. 886 (1984) ................................................................................................24

Bowen v. Georgetown University Hosp.,
   488 U.S. 204 (1988) ..........................................................................................19, 25

Burgess v. U.S.,
   128 S.Ct. 1572 (2008)........................................................................................26, 38

California Dept. of Health Services,
   DAB No. 1474 (1994) .............................................................................................36

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) ................................................................................................17

Christiansen v. Harris County,
   529 U.S. 576 (2000) ..........................................................................................19, 25

Consumer Electronics Ass'n v. F.C.C.,
   347 F.3d 291 (D.C. Cir. 2003)................................................................................23

District of Columbia Dept. of Human Servs.,
   DAB No. 1617 (April 29, 1997) (Available at AR 01198) .......................................7

Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.,
   541 U.S. 246 (2004) ................................................................................................21

Harris v. McRae,
   448 U.S. 297 (1980) ................................................................................................35

Louisiana Dept. of Health and Hospitals v. Centers for Medicare and Medicaid Services,
   346 F.3d 571 (5th Cir. 2003) ..................................................................................28

Morton v. Ruiz,
    415 U.S. 199 (1974) ...................................................................................... 19

National Treasury Employees Union v. Federal Labor Relations Authority,
    404 F.3d 454 (D.C. Cir. 2005).......................................................................37

Pennhurst State School & Hosp. v. Halderman,
    451 U.S. 1 (1981) ........................................................3, 17, 18, 21, 24, 35

Samaritan Health Service v. Bowen,
    811 F.2d 1524 (D.C. Cir. 1987).....................................................................37

Skidmore v. Swift & Co.,
    323 U.S. 134 (1944) ..........................................................................19, 24, 25

U.S. v. Mead Corp.,
    533 U.S. 218 (2001) ...................................................................................... 25

**STATUTES**

5 U.S.C. § 553 et seq. ...................................................................................44

5 U.S.C. § 706(2)(A) ...............................................................................20, 37

5 U.S.C. § 706(2)(A),(C) ...........................................................................3, 18

5 U.S.C. § 706(2)(C) ...............................................................................20, 24

42 U.S.C. § 1395x(b)(7) .........................................................................30, 31

42 U.S.C. § 1396 ..............................................................................................6

42 U.S.C. § 1396a ............................................................................................6

42 U.S.C. § 1396a(13)(A) ...............................................................................7

42 U.S.C. § 1396b ...................................................................................5, 6, 40

42 U.S.C. § 1396b(a)(1) ...............................................................................34

42 U.S.C. § 1396d(a) .....................................................................................23

42 U.S.C. §§ 1396d(a)(1), (2)(A), (3) .........................................................22

42 U.S.C. § 1396d(a)(5) ...............................................................................22

42 U.S.C. § 1396d ............................................................................................6

42 U.S.C. § 1396d(5)(A) ................................................................................... 3

42 U.S.C. § 1396r-4 ........................................................................................ 8

42 U.S.C. § 1396r-4(a)(1) ............................................................................ 24

42 U.S.C. § 1396r-4(f)(2) ................................................................................ 8

42 U.S.C. § 1396r-4(g) ............................................................................... 8, 44

42 U.S.C. § 1396r-4(g)(1) ............................................................................ 21

42 U.S.C. § 1396r-4(g)(1)(A) ...........................................................2, 9, 23, 35

42 U.S.C. § 1396r-4(j)(2)(C) ........................................................................ 21

Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ............................ 41

Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993") ........................... 8, 34, 40

Omnibus Budget Reconciliation Act of 1981 ("OBRA 1981") ................................. 7

## REGULATIONS

42 C.F.R. Part 482 ......................................................................................... 22

42 C.F.R. § 415.160(a) ............................................................................ 30, 31

42 C.F.R. §§ 430.14, 430.15 ............................................................................ 6

42 C.F.R. § 430.15(a) ..................................................................................... 10

42 C.F.R. § 440.2(b).  Part 441 ...................................................................... 22

42 C.F.R. § 440.10 ................................................................... 3, 4, 16, 27, 44

42 C.F.R. § 440.20 .......................................................... 3, 4, 16, 27, 28, 44

42 C.F.R. § 482.22 .................................................................................. 3, 22

42 C.F.R. § 489.24 (j) ................................................................................... 22

60 Fed. Reg. 61483, 61484 (Nov. 30, 1995) ..................................25, 28, 33, 39

70 Fed Reg. 502602, 50265 (Aug. 26, 2005) ........................................... 9, 41

72 Fed. Reg. 55158, 55159 (Sept. 28, 2007) ................................................. 42

**OTHER AUTHORITIES**

1994 CMS Letter (Available at AR 01309)............................................................................passim

Audit of California's Medicaid Inpatient Disproportionate Share Hospital Payment for
    Kern Medical Center (Available at AR 01321).........................................................29, 32, 41

Audit of California's Medicaid Inpatient Disproportionate Share Hospital Payments for
    Los Angeles County Hospitals (Available at AR 01384)..........................................29, 32, 41

H.R. Rep. No. 97-158 (1981) ..................................................................................................7

H.R. Rep. No. 103-11 (1993) ................................................................................................23

"Joint Comments of Fifteen States and State Medicaid Agencies" ...............................................43

"CAPH Comments on 2007 Proposed Rule" .............................................................................43

"NAPH Comments on 2007 Proposed Rule" .............................................................................43

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MEDICAL ASSISTANCE SERVICES,<br><br>Plaintiff,<br>v.<br><br>MICHEAL O. LEAVITT, in his official capacity as SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>and<br><br>KERRY N. WEEMS, in his official capacity as ACTING ADMINISTRATOR, CENTERS FOR MEDICARE AND MEDICAID SERVICES of the United States Department of Health & Human Services,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. Action No. 08-0573 (RMC) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Introduction**

In this lawsuit, plaintiff Commonwealth of Virginia, Department of Medical Assistance

Services ("Virginia" or "DMAS") seeks declaratory and injunctive relief pertaining to the federal

government's failure to pay its share of certain disproportionate share hospital ("DSH") costs

Virginia incurred for hospital services in State fiscal years 1997 and 1998. The expenses at issue

were incurred consistent with the approved Medicaid "State plan." Accordingly, under the

Medicaid statute, defendants are obligated to provide the federal share, known as federal

1

financial participation ("FFP"), for "the costs incurred during the year" by Virginia's designated DSH hospitals in "furnishing hospital services . . . by the hospital" to Medicaid beneficiaries and others without health insurance.  42 U.S.C. § 1396r-4(g)(1)(A).

Defendant Centers for Medicare and Medicaid Services ("CMS") has asserted shifting arguments purporting to support its refusal to pay its share – $11,085,181 – of the DSH costs actually incurred by Virginia in payments to physicians rendering hospital services.  CMS first claimed, following an audit by the Office of Inspector General (the "OIG") of defendant the United States Department of Health and Human Services ("HHS"), that Virginia's costs were not incurred "by the hospital[s]" and therefore could not be included in the calculation of Virginia's uncompensated costs limit ("UCC limit") established by statute.  See 42 U.S.C. § 1396r-4(g)(1)(A).  When it became clear to CMS during Virginia's appeal of the disallowance to the HHS Departmental Appeals Board ("DAB") that that this position was factually incorrect, the agency argued that services provided by physicians in hospitals to hospital patients are not "hospital services," and, therefore, the cost of physicians' services provided by hospitals can never be claimed as DSH expenditures.  This argument is inconsistent with the ordinary meaning of the statute, CMS's interpretation of the statute contained in a 1994 "Dear State Medicaid Director" letter (the "1994 CMS Letter"), related regulatory pronouncements by CMS, prior OIG audits, and prior decisions of the DAB.  It is also, not incidentally, inconsistent with the very purpose of the DSH program itself, which is designed to support hospitals that serve a disproportionate number of poor and uninsured patients so that those hospitals may continue to provide their patients with critically necessary "hospital services" such as physicians' services.

The DAB, while noting CMS's shift in position and declining to adopt CMS's interpretation of the statute, nonetheless affirmed CMS's disallowance on the grounds that the

1994 CMS letter provided "timely and adequate[]" notice that physician costs "would not be permitted in these circumstances." Administrative Record ("AR") at 00012. Virginia here appeals the DAB's decision.

For several reasons, the court should grant Virginia's motion for summary judgment and, among other relief (detailed below), vacate the DAB's decision and remand this matter to defendants with instructions that they provide FFP for the DSH payments at issue here.

First, contrary to the DAB's holding, FFP must be provided for costs incurred by disproportionate share hospitals, including costs incurred for services performed by physicians. Defendants' refusal to do so was in excess of their statutory authority, or at minimum arbitrary and capricious. See 5 U.S.C. § 706(2)(A),(C). The Medicaid statute mandates payments for "hospital services," the plain language meaning of which includes services provided by physicians in a hospital. There is no basis for excluding from the scope of that term services of physicians that are necessary for a hospital to operate. Virginia is a sovereign and the Supreme Court has emphatically stated that limitations on the use of federal grant funds need to be clear and a State may not be penalized when it is "unaware of the conditions or is unable to ascertain what is expected of it." Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 17 (1981).

Indeed, the Medicaid statute itself provides that "medical assistance" ordinarily eligible for FFP includes "physicians' services . . . whether furnished in the office, the patient's home, a hospital, or a nursing facility, or elsewhere." 42 U.S.C. § 1396d(5)(A) (emphasis added). Under defendants' own regulations, an institution cannot be a hospital unless it has an organized medical staff, including physicians, see 42 C.F.R. § 482.22, and inpatient and outpatient services must be provided by or under the direction of a physician. See 42 C.F.R. § 440.20, § 440.10. Yet

3

defendants insist that "hospital services" as used by Congress excludes the services of physicians, without which an institution cannot be a hospital and cannot furnish any services at all.

CMS's stated intent in its 1994 Letter was to provide "States with a great deal of flexibility." The 1994 CMS Letter provided that "States may include both inpatient and outpatient costs in the calculation" of recoverable DSH payments. AR at 01312 (emphasis added). The applicable regulatory definitions of inpatient and outpatient costs include physicians' costs. 42 C.F.R. § 440.20 (defining outpatient hospital services as those "furnished by or under the direction of a physician"); 42 C.F.R. § 440.10 (similarly defining inpatient hospital services as services "furnished under the direction of a physician"). Even if, as CMS recently has argued, those definitions do not include physicians' costs, CMS's reference to outpatient and inpatient costs constituted, by the terms of the 1994 CMS Letter, only part of what constitutes hospital services. CMS's use of the phrase "States may include" certain costs necessarily means that costs for additional categories of "hospital services" would also be allowed as well.

The 1994 CMS Letter also stated that DSH costs could be defined in "any" way so long as they do "not exceed the amounts that would be allowable under the Medicare principles of cost reimbursement." AR at 01312. The DAB erroneously held that the physicians' costs at issue here could not meet that standard because Virginia did not actually submit physicians' costs for Medicare reimbursement or include such costs on its Medicare cost reports. AR at 00016. But the 1994 CMS Letter does not require Virginia actually to submit its costs under Medicare in any fashion at all, let alone on a cost basis; instead, it requires only that the DSH costs be "allowable under the Medicare principles of reimbursement." Id. at 01312 (emphasis added). The physicians' costs at issue here meet that standard.

4

Fundamentally, the Medicaid statute provides that defendants "shall pay" FFP to the states for payments made pursuant to, and consistent with the terms of, a federally-approved state plan. 42 U.S.C. § 1396b. Virginia's State plans for the applicable fiscal years provide for a calculation of uncompensated care costs that includes physician costs incurred by its DSH hospitals, and the OIG determined that Virginia's "DSH payments were calculated in accordance with the State plan." AR 00186, 00238. Having approved the State plans, defendants must make good on their statutory obligation to pay FFP.

Even if there were some ambiguity whether the statute and regulations flatly require that FFP be paid for Virginia's expenditures on physicians' costs at its DSH hospitals – and there is not – it would be arbitrary and capricious, and also manifestly inequitable, to allow defendants to avoid their FFP obligation here. CMS's position that costs for physicians' services cannot constitute allowable "hospital costs" is newly found, even in the context of this litigation. Critically, CMS's argument in this case is the very opposite of CMS's previous position regarding physician costs, as set forth in regulatory pronouncements, as stated in the litigation context, and as enunciated by the DAB. Prior to this case, CMS had paid these costs; and it has not demonstrated why Virginia should now be treated differently from other states.

CMS's own conduct, both in this litigation and elsewhere, demonstrates that the disallowance of costs for physicians' services reflected a reversal of CMS's policy. Material policy changes having an impact in the millions of dollars may not be imposed retroactively, as CMS seeks to do here. Rather, such changes require notice and comment rulemaking.

## Statement of Facts

### A.        The Medicaid Program

The Medicaid program (Title XIX of the Social Security Act (the "Act")) was established in 1965 as a cooperative venture between the federal and state governments to assist states in providing medical care to eligible low-income individuals.  The primary objective of the Medicaid program is "to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care."  42 U.S.C. § 1396.  Under the Medicaid program, the federal and state governments jointly share the cost of providing medical assistance to eligible low-income and disabled individuals.  42 U.S.C. §§ 1396, 1396b.

Medicaid services are provided pursuant to state plans that must be reviewed and approved by the Secretary of HHS.  42 U.S.C. § 1396a.[1]  Once a state plan is approved, the federal government "shall" reimburse the state for a percentage of its expenditures for medical assistance provided pursuant to its state plan.  42 U.S.C. §1396b.  These payments are known as "federal financial participation" ("FFP").  The federal funding levels are established by a statutory formula that computes reimbursement rates for each state based on its federally-approved state plan.[2]  Id.  The types of medical assistance that are reimbursable include, among others, inpatient hospital services, outpatient hospital services, physician services (including physician services furnished in a hospital), and nurse-midwife services.  42 U.S.C. § 1396d.

---

[1]      The Secretary has delegated this authority to CMS, a component of HHS.  See 42 C.F.R. §§ 430.14, 430.15.

[2]      For the costs at issue, the FFP percentage was approximately 51 percent during the years in question.  See AR 00190 and 00238.

**B.**        **The DSH Statutory and Regulatory Framework**

The Omnibus Budget Reconciliation Act of 1981 ("OBRA 1981") amended the Act to

require states to make available critically important supplemental funds to safety-net hospitals

that serve large numbers of Medicaid and other low-income patients with special needs.  Pub. L.

No. 97-35, § 2173(B)(ii), 95 Stat. 808 (1981) (available at AR 00950); see 42 U.S.C. §

1396a(13)(A).  Congress intended these supplemental funds to improve the financial stability of

these "disproportionate share" hospitals ("DSHs") in order to preserve access to quality health

care services for low-income patients:

> [s]uch hospitals, especially in urban areas, are often multi-faceted
> health care institutions, which provide many public health and
> social services to all residents of their area, in addition to serving
> as hospitals of last resort for the poor.  Their sizeable Medicaid
> populations often require extra social and public health services.
> In addition, in many areas such hospitals also provide considerable
> care for indigent persons not eligible for Medicaid, who often have
> only partial or no health care coverage.

H.R. Rep. 97-158 at 295 (1981) (Budget Committee Report discussing provisions eventually

incorporated in Pub. L. No. 97-35) (available at AR 01043).  See also District of Columbia Dept.

of Human Servs., Departmental Appeals Board No. 1617, 1997 WL 377277 at *21 n.8 (April 29,

1997) (available at AR 01218) (the "purpose of the DSH payments is to recognize that certain

hospitals provide services to a large population of Medicaid recipients and other low-income

individuals and therefore are faced with special financial needs").

DSH payments supplement ordinary Medicaid funding and reimburse only

uncompensated costs; as a result, for the costs at issue in this lawsuit, the only source of funding

is the DSH program.  Stated another way, only costs that are not compensated by the patient,

insurance, another third party, Medicaid, or any other program are eligible for DSH

reimbursement.  Under the applicable statutes and the terms of Virginia's State plan, the

physician costs in question were not eligible for reimbursement under Medicaid, Medicare, or

any other program.

States have discretion in deciding which hospitals receive DSH payments and the level of

funds that those hospitals will receive, see 42 U.S.C. § 1396r-4, although there are two limits on

the amounts of DSH payments.  First, section 1923(f) of the Social Security Act imposes a

specific DSH funding limit (the "State DSH Allotment") on each state for each federal fiscal

year.  The State DSH Allotments are set by statute, see 42 U.S.C. § 1396r-4(f)(2), giving

Congress control over the level of federal DSH funding that may be expended by each state.

There is no dispute that all of the DSH payments at issue here were well within the State DSH

Allotment set by Congress for Virginia.

Second, through the Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993")

(Section 1923(g) of the Act, 42 U.S.C. § 1396r-4(g)), Congress separately limited the amount of

DSH payments that can be paid to each DSH hospital to the hospital's uncompensated costs

incurred for treating Medicaid beneficiaries and the uninsured.  Pub. L. No. 103-66, § 13621,

107 Stat. 312, 629-633 (1993).  This hospital-specific DSH cap is referred to as the

uncompensated care cost limit (the "UCC limit").  The UCC limit generally equals the cost of

uncompensated medical care that the hospital provides to uninsured patients (i.e., costs less any

payments by those patients) plus the shortfall between costs and payments for the medical care

that the hospital provides to Medicaid patients.  42 U.S.C. § 1396r-4(g).  Specifically, the Act

provides that DSH payments cannot exceed:

> the costs incurred during the year of furnishing hospital services
> (as determined by the Secretary and net of payments under this
> title, other than under this section, and by uninsured patients) by
> the hospital to individuals who either are eligible for medical

8

> assistance under the State plan or have no health insurance (or
> other source of third party coverage) for services provided during
> the year.

42 U.S.C. § 1396r-4(g)(1)(A) (emphasis added).  Accordingly, hospitals may receive DSH

payments up to the extent of their shortfalls attributable to treating Medicaid and uninsured

patients.

   In 1994, the defendants stated that they intended to proceed with notice and comment

rulemaking pursuant to the Administrative Procedure Act to set forth their interpretation of how

the statute should be applied.  AR at 00006.  Notwithstanding that stated intent, defendants have

failed to promulgate regulations implementing the UCC limit enacted by OBRA 1993.  Indeed,

defendants have not even issued a notice of proposed rulemaking with respect to the UCC

provisions of the law.[3]

   As a stop-gap measure, defendants, acting through the Health Care Financing

Administration ("HCFA"), the predecessor to CMS, issued the 1994 CMS Letter dated August

17, 1994 to state Medicaid directors providing some guidance.  See AR at 01309.  The letter

stated, in pertinent part, that (1) "the legislative history of this provision makes clear that States

may include both inpatient and outpatient costs in the calculation of the limit", and (2) "in

defining 'costs of services' under this provision, HCFA would permit the State to use the

definition of allowable costs in its State plan, or any other definition, as long as the costs

determined under such a definition do not exceed the amounts that would be allowable under the

Medicare principles of cost reimbursement."  Id. at 01312.  The Letter explained that "[t]he

---

[3]      After this dispute arose, defendants asserted in preamble language that the cost for
"hospital services" included in the UCC formula does not include the cost for physician services
furnished to hospital patients.  70 Fed Reg. 502602, 50265 (Aug. 26, 2005) (available at AR
01081).

Medicare principles are the general upper payment limit ["UPL"] under institutional payment under the Medicaid program." Id. CMS reasoned that "this interpretation of the term 'costs incurred' is reasonable because it provides States with a great deal of flexibility up to a maximum standard that is widely known and used in the determination of hospital costs." Id. The letter did not expressly address whether the cost of physician care provided by DSH hospitals may be included in the UCC, although, as discussed below, both "inpatient hospital services" and "outpatient hospital services" are separately defined in regulations to include physician services. CMS did not solicit any comments to its 1994 Letter.

C.      **Virginia's State Medicaid Plan**

Virginia's State plan provisions in effect during the period relevant to CMS's disallowance (i.e., State fiscal years ("SFYs") 1997 and 1998) implemented the DSH UCC limit by providing:

> A payment adjustment during a fiscal year shall not exceed the sum of:
>
> (a)   Medicaid allowable costs incurred during the year less Medicaid payments, net of disproportionate share payment adjustments, for services provided during the year, and
>
> (b)   Costs incurred in serving persons who have no insurance less payments received from those patients or from a third party on behalf of those patients.  Payments made by any unit of the Commonwealth or local government to a hospital for services provided to indigent patients shall not be considered to be a source of third party payment.

AR at 01258; id. at 01287.  CMS approved these State plans, signifying that they complied with federal law.  42 C.F.R. § 430.15(a).

10

**D.      The OIG Audit Findings, the CMS Disallowance, and the DAB's Final Decision**

As part of a routine audit initiative commencing in or about April 2001, the OIG audited Virginia's payments to its two DSH hospitals – the University of Virginia Hospital ("UVA") and Virginia Commonwealth University's Medical College of Virginia Hospital ("MCVH") – for SFYs 1997 and 1998.  The OIG's stated objectives for both audits were to determine if DSH payments made to the hospitals:  (1) "were calculated in accordance with the approved State plan," and (2) "did not exceed the UCC as imposed by OBRA of 1993."  See AR at 00181, 00233.  On August 13, 2002, the OIG issued two draft reports, one concerning UVA and one concerning MCVH.  By letter dated November 13, 2002, Virginia responded to each draft report. See AR at 00817.  The OIG released final reports, dated April 24, 2003 and May 1, 2003 for MCVH and UVA, respectively (the "MCVH Report" and the "UVA Report," together the "OIG Reports").  See AR at 00229, 00178.

Significantly, in both final reports, the OIG concluded that Virginia's DSH payments to the hospitals "were calculated in accordance with the State plan."  AR at 00186 and 00238. Notwithstanding that finding, the OIG concluded that Virginia should not have included the hospitals' costs of physician care in the UCC calculations.  AR at 00186, 00238.  Specifically, the OIG concluded that: (1) the physician costs were not incurred by the hospitals, but were incurred by the physician practice groups that were separate legal entities; and (2) the physician costs were not allowable because they were not consistent with Medicare cost principles.  Id. The latter conclusion relied on the OIG's finding that UVA and MCVH did not include the physician costs in their cost reports submitted for Medicare purposes; the OIG reasoned that without such a submission the hospitals could not properly include such costs within the Medicaid UCC limit.  AR at 00192, 00246-47.

11

The OIG recommended that CMS recoup the federal government's portion (FFP) of DSH payments attributable to the physician costs incurred by the hospitals.  The following table provides a breakdown of the OIG's recommended disallowances:

|  | SF 1997 | SF 1998 | Total |
|---|---|---|---|
| **UVA** | $1,459,632 | $3,300,753 | $4,760,385 |
| **MCVH** | $6,324,796 | $0 | $6,324,796 |
| **TOTAL** | $7,784,428 | $3,300,753 | **$11,085,181** |

See AR at 00190, 00245.

Recognizing that the OIG's conclusions were based on an incomplete understanding of the facts surrounding the relationship among the hospitals and their respective faculty practice plans, Virginia and university officials personally met with CMS representatives at least four times in 2003 to further discuss the issues associated with the hospitals' physician costs.  At a July 17, 2003 meeting, CMS officials focused on whether the physicians' bills had been generated by the hospital, and whether the physicians received their W-2 statements from the hospitals, as these facts would purportedly indicate that the physicians were hospital employees. AR at 01526.  At a September 17, 2003 meeting, UVA and MCVH representatives and CMS administrator Thomas Scully discussed the organization and relationship of the faculty practice plans and the hospitals and whether the costs were actually incurred by the hospitals.  See AR at 01522, 01539.  CMS agreed to have a follow-up meeting to discuss the circumstances under which CMS policy would allow the costs of physician services to be included in the calculation of uncompensated care costs for purposes of Medicaid DSH payments.  Id. at 01522, 01539.

At the follow-up meeting on October 15, 2003, CMS official Charlene Brown explained to the Virginia representatives that CMS's criteria for including physician costs in a hospital's UCC calculation for purposes of Medicaid DSH payments depended on answering affirmatively the questions: "Is the physician an employee of the hospital, and do the revenues for the physician services ultimately go to the hospital?" See id. at 01526. The discussion centered on the connection between the hospital's employment of the physicians and the recovery of physician costs as part of DSH payments. See id. at 01540.

On November 6, 2003, CMS representatives visited UVA and MCVH to learn more about the hospitals' operations and relationships with their respective faculty practice groups. At these meetings and in subsequent correspondence throughout November and December 2003, UVA and MCVH officials furnished the CMS staff with a significant amount of information and documentation describing the relationship between the hospitals and the physician practice groups. See id. at 00288; id. at 00680; id. at 00752; id. at 01522; id. at 01538.

Also as part of its communications with CMS, Virginia explained how its costs would be allowable under Medicare principles of cost reimbursement:

> in applying the Medicare principles of reimbursement to the determination of UCC costs, the physician billing practices that are relevant are how the physicians bill for services furnished to patients included on the Hospitals' reports of costs for uncompensated care. For those patients, the physicians at both Hospitals have agreed that they will not bill or collect from patients determined to be indigent and who are included in the report of uncompensated services.

See AR at 00911-12 (emphasis added).

By letter dated September 8, 2005, CMS notified Virginia that it was disallowing $11,085,181 in FFP for Medicaid DSH payments because the hospitals "overstated their UCC of furnishing hospital services by including the UCC of independent physician groups." See id. at

0175. CMS stated that "[t]he individual physicians that practiced as part of these groups were not hospital employees…" and that "the physician groups are separate entities and their costs should not have been included with the hospitals' uncompensated cost of furnishing hospital services." AR at 000175-76. CMS made no reference and otherwise reflected no consideration of the supplemental information the Virginia hospitals had provided to CMS, or to the discussions and meetings between the CMS officials and the Virginia hospital representatives.

On October 7, 2005, Virginia appealed the CMS disallowance to the DAB. Id. at 00021. Virginia argued, inter alia, that: (a) the hospitals incurred the costs of providing physician care to indigent patients, (b) the DSH payments were made in accordance with its approved State plan; (c) Virginia's interpretation of § 1923(g) of the Act was consistent with the statute and all applicable CMS guidance; and (d) Virginia's interpretation of §1923(g) is consistent with industry practice. Id. at 00045.

In its brief in support of the disallowance, CMS addressed neither whether the physicians were hospital employees nor whether the hospitals otherwise incurred the physician costs at issue. Rather, CMS advanced new arguments, including that because "physician services" are defined separately from "inpatient hospital services" and "outpatient hospital services" under the Act, the costs of such services can never be included in the calculation of DSH payments. Id. at 00108. CMS argued that even if the statutory term "hospital services" is considered ambiguous, the 1994 CMS Letter interpreted the term and should be given deference. Id. at 00116-17. CMS further argued in its brief that the 1994 CMS Letter limited "hospital services" to "inpatient and outpatient costs." Id. at 00117. CMS also argued that the statement in the 1994 CMS Letter that the costs determined by the state may "not exceed the amounts that would be allowable under Medicare principles of cost reimbursement" precluded Virginia from including physician costs

14

as part of inpatient or outpatient hospital services for purposes of the calculation of the hospital's

UCC because Medicare excludes physician services from the definition of "inpatient hospital

services." Id.

On May 18, 2007, the DAB upheld the disallowance. Id. at 00001. The DAB observed

that "[t]he initial justification for the disallowance was that 'independent physician groups,' not

the hospitals, had incurred the costs." AR at 00008. The DAB recognized, however, that CMS

had "made no attempt to defend" that basis of the formal disallowance letter. The DAB

accordingly focused instead on whether the costs were for "hospital services" under Section

1923(g)(1)(A). Id.

The DAB held that by designating "hospital services" (which it defined strictly as

"inpatient hospital services" and "outpatient hospital services") and "physician services" as

separate categories of medical assistance, Congress intended states to treat them "as distinct for

coverage, payment, and other program purposes." AR at 00010. According to the DAB,

"hospital services" as used in the UCC limit statute did not include physician services because

they are designated in the statute as "separate categories of reimbursable medical assistance." Id.

Specifically, "if a service is covered and paid for under the approved State plan as a 'physician's

service,' it cannot simultaneously be recognized as a subset or type of 'hospital service." Id.

Notably, the DAB expressly refused to address the regulatory definitions of outpatient or

inpatient hospital services cited in the 1994 CMS Letter, see AR at 00013 n. 11. Those terms

include services provided "by or under the direction of a physician" or "under the direction of a

physician," respectively. 42 C.F.R. §§ 440.20, 440.10.

The DAB also expressly took "no view" whether a state Medicaid program may pay for

services provided by physicians as "hospital services." See id. at 00010 n.9. Resolving this

issue was unnecessary, it held, because "there is no evidence that Virginia's Medicaid program regarded the physician costs at issue here as allowable costs of inpatient hospital or outpatient hospital services."  AR at 00013 n.11.  Further, since a "service cannot be classified as both a hospital service and a physician's service," see id. at 00010 n.9, Virginia could not include physicians' services within the UCC limit.  The DAB emphasized that Virginia did not properly classify the physician payments as being for "hospital services" in two additional places in its opinion.  Id. at 00013 (noting lack of evidence that "the disputed physician costs were regarded as allowable costs of inpatient or outpatient hospital services"); id. at 00014 (the evidence "indicates that the physician costs at issue relate to professional services that, when provided to Medicaid patients, were billed to Medicaid as 'physicians' services'").

The DAB also held that the 1994 CMS Letter placed Virginia on adequate notice of CMS's statutory interpretation of "hospital services" prior to making the disallowed DSH payments, and that the interpretation in the letter was reasonable.  AR at 00012.  Finally, the DAB held that Virginia failed to comply with the requirement in the 1994 CMS Letter that the costs "would be allowable" under Medicare cost principles, holding that

> what seems critical here is not whether the hospital actually elected to receive reasonable cost-based payment under Medicare but whether the hospital satisfied the critical regulatory conditions – having an agreement among all physicians not to bill for services, or having all physicians be hospital employees who are precluded from billing as a condition of employment—for a valid election.  Virginia has not alleged or shown that UVMC and MCVH satisfied those conditions.

Id. at 00015.

In sum, the DAB held that "the physician costs at issue were not recognized by Virginia's Medicaid program as allowable costs of inpatient hospital or outpatient hospital services, nor

could they have been considered allowable hospital costs under Medicare cost reimbursement principles." AR at 00002.

Since the DAB's decision, CMS has reclaimed the disallowed amount of $11,085,181, plus $884,458 in interest.

## **ARGUMENT**

Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Summary judgment can be appropriate in actions under the Administrative Procedure Act ("APA"), like this one. See, e.g., Bloch v. Powell, 227 F. Supp. 2d 25, 30-31 (D.D.C. 2002). Here, Virginia is entitled to summary judgment because the matter must be heard on the basis of the administrative record and the only matters at issue are questions of law.

Under any standard, the DAB's decision in this case should be reversed. Significantly, the standard of review in this case differs from most cases involving agency action. The plaintiff in this case is a sovereign, and the Supreme Court has emphasized that clarity is required when the terms of a federal grant program are at issue. Pennhurst, 451 U.S. 1. The federal statute at issue in Pennhurst contained some express conditions on funding for a federal grant program to states for mental health services. It also included language in the nature of a "bill of rights" for mental patients. The appellate court had interpreted the statute as giving a private cause of action for violations of the rights of mental patients stated in the statute. The Supreme Court reversed and held that states can be bound only by clear terms of the law:

17

> [L]egislation enacted pursuant to the spending power is
> much in the nature of a contract: in return for federal funds,
> the States agree to comply with federally imposed
> conditions. The legitimacy of Congress' power to legislate
> under the spending power thus rests on whether the State
> voluntarily and knowingly accepts the terms of the
> "contract." . . . There can, of course, be no knowing
> acceptance if a State is unaware of the conditions or is
> unable to ascertain what is expected of it. Accordingly, if
> Congress intends to impose a condition on the grant of
> federal moneys, it must do so unambiguously. . . . By
> insisting that Congress speak with a clear voice, we enable
> the States to exercise their choice knowingly, cognizant of
> the consequences of their participation.

Id. at 17 (emphasis added).

The Pennhurst standard applies here. As in Pennhurst, this case involves a federal-state

grant program (here, Medicaid) whereby the federal government provides funds to participating

states to help fund a program for a targeted population. Virginia must prevail on its claims

unless defendants can show that the statute "unambiguously" put Virginia on notice that the

hospital costs for physician services at issue in this case could not reasonably be viewed as costs

for "hospital services." Neither that statute nor CMS's interpretations meet the Pennhurst

standard for clarity.

Even if Pennhurst were inapplicable here, defendants still cannot prevail under the

traditional standard of review in APA cases. Under the APA, a reviewing court should set aside

a final agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with the law," or where it is "in excess of statutory jurisdiction,

authority, or limitations." 5 U.S.C. §§ 706(2)(A),(C). Where, as here, "[an] agency's finding

concerns a purely legal question . . . the court reviews the finding de novo to ensure the agency

does not exceed its authority." Beverly Enters., Inc. v. Herman, 130 F. Supp. 2d 1, 13 (D.D.C.

2000).

Significantly, because the 1994 CMS Letter was not subject to formal notice-and-comment rulemaking, "it is entitled to respect" only to the extent that it is persuasive. Christiansen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).[4] Further, as demonstrated below, CMS's position in this case is inconsistent with prior CMS policy and DAB decision that interpreted physician services as included in the term "hospital services." That inconsistency weighs heavily against deference. Morton v. Ruiz, 415 U.S. 199, 237 (1974) (holding that the weight accorded to an administrative interpretation depends, among other things, upon its "consistency with earlier and later pronouncements" and rejecting an agency interpretation that was inconsistent with both its other statements and congressional intent, and that had not been formally published in accord with the APA) (citing Skidmore, 323 U.S. at 140). Indeed, CMS took inconsistent positions on this particular matter while it was at the agency level. No deference is warranted for an agency interpretation that "appears to be nothing more than an agency's convenient litigating position." Bowen v. Georgetown University Hosp., 488 U.S. 204, 213 (1988).

## I.

### The Statute and Regulations Require the Inclusion of Virginia's Costs for Physician Services in the UCC Limit

The question for decision in this case is whether Virginia's payments for costs that the hospitals incurred in providing physician services to indigent patients may be included within the UCC limit. The answer is yes.

- The ordinary meaning of hospital services includes physicians' services. A facility cannot even meet defendants' definition of "hospital" without having physicians. Similarly, defendants' regulations require that hospitals furnish inpatient and outpatient

_____

[4]    As noted above, CMS has not promulgated regulations addressing either the UCC limit or its interpretation of the term "hospital costs" in the UCC statute.

services by or under the direction of a physician.  And Congress's use of the broad term "hospital services," which is not otherwise defined in the statute, further supports an interpretation consistent with its ordinary meaning.  See Point I.A., infra.

- The 1994 CMS Letter supports the inclusion of physicians' services.  See Point I.B., infra.

-  Physicians' services were included within the UCC calculation under the State plan reviewed and approved by CMS, and validated by OIG.  See Point I.C., infra.

We demonstrate in this Section that the applicable Medicaid statute requires the inclusion of the costs of providing physicians' costs in hospitals within the UCC limit, and therefore defendants' disallowance of Virginia's physicians' costs was in excess of their statutory authority, in violation of the APA.  5 U.S.C. § 706(2)(C).  At a minimum, defendants' refusal to provide the requested FFP was arbitrary and capricious.  5 U.S.C. § 706(2)(A).

A.     The plain statutory language supports the inclusion of physicians' services.

The UCC limit statute provides that DSH payments cannot exceed "the costs incurred during the year of furnishing hospital services (as determined by the Secretary[5] and net of payments under this title . . .) by the hospital" to either Medicaid beneficiaries or those without health insurance.  42 U.S.C. § 1396r-4(g)(1)(A).

For several reasons, "hospital services," as used in the UCC limit, should be interpreted to include physicians' services.

First, the ordinary meaning of the term "hospital services" includes physicians' services.  Even the DAB acknowledged that Virginia's submission was consistent with the plain meaning of the UCC limit.  It held that "the services of physicians are often provided in hospitals and might reasonably be considered a subset or component of hospital services in that ordinary

---

[5]     The statute gives the Secretary the ability to "determine" the submitted costs.  The OIG reviewed Virginia's hospital costs in this case and found them to be "in accordance with the State plan."  AR at 00136 and 00238.

sense." AR at 00008. Nonetheless, it ruled that "the context surrounding section 1923(g) [42 U.S.C. § 1396r-4(g)(1)] indicates that Congress intended the term 'hospital services' to have a technical or specialized legal meaning." Id. In so doing, the DAB relied principally on 42 U.S.C. § 1396r-4(j)(2)(C), which, it held, limited the definition of hospital services to inpatient and outpatient hospital services. Id. at 00009.[6] But that statute was not enacted until 2003 (as part of the Medicare Prescription Drug Improvement and Modernization Act) – years after Virginia incurred the costs at issue in this case.

Second, nothing in the DSH statute excludes the cost of providing physicians' services; indeed, such costs may not be excluded absent an "unambiguous" directive from Congress. See Pennhurst, 451 U.S. at 17 ("if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously"). In the case of indigents, who are the beneficiaries of this statutory provision, "hospital services" will ordinarily involve the services of physicians who are employed by the hospital or who have an arrangement with the hospital to provide such services without billing the patient. While "hospital services" certainly includes services other than physician services, to exclude physicians' services from the scope of "hospital services" would gut the plain meaning of Congress's directive to provide hospital care for those without insurance. Consistent with fundamental principles of statutory construction, the plain language meaning should be given effect. See Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist., 541 U.S. 246, 252 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (citations omitted).

---

[6]  In any event, as demonstrated below, inpatient and outpatient hospital services have been defined by CMS to include physicians' services. See Point I.B.2, infra.

Third, defendants' own regulations confirm that the generally-understood meaning of "hospital services" as including physician services" applies in the Medicaid context. Among other things, CMS has created "conditions of participation" that an institution must meet to be treated as a hospital for Medicaid (and Medicare) purposes. See generally 42 C.F.R. Part 482. Under these regulations, a facility cannot qualify as a hospital without having an organized medical staff of physicians. 42 C.F.R. § 482.22. Medicaid regulations also require that inpatient and outpatient services be provided by or under the direction of a physician. 42 C.F.R. § 440.20, § 440.10. And defendants' regulations require hospitals to have physicians present or available in order to comply with the statutory requirement that hospitals treat all patients presenting to their emergency departments without regard to the patients' ability to pay. See 42 C.F.R. § 489.24 (j).

Defendants' regulations thus provide (1) an institution cannot be a hospital without physicians; (2) a hospital cannot furnish services to inpatients or outpatients without a physician; and (3) physicians must be available to provide emergency services. These regulations simply cannot be squared with defendants' present interpretation, in this lawsuit, that "hospital services" do not include physicians' services.

Fourth, physicians' services is a defined term in the Medicaid statute, and it is specifically defined to include physicians' services provided in "a hospital." 42 U.S.C. § 1396d(a)(5). Significantly, this definition is contained in the statutory provision describing covered "medical assistance" for which FFP is available.[7] Other covered medical assistance described in the statute includes "inpatient hospital services" and "outpatient hospital services,"

---

[7]     In fact, the regulations implementing these statutory provisions state that "[e]xcept as limited in part 441, FFP is available in expenditures under the State plan for medical or remedial care and services as defined in this subpart." 42 C.F.R. § 440.2(b). Part 441 of the regulations does not contain any limitations excluding FFP for physician services provided in a hospital.

as well as laboratory and x-ray services. See 42 U.S.C. §§ 1396d(a)(1), (2)(A), (3). All of these

services are commonly provided within the rubric of "hospital services."

Had Congress meant to limit the scope of covered costs, rather than using the broad

clause "costs incurred .. in furnishing hospital services," it easily could have utilized more

specific language by listing specific types of statutorily-defined medical assistance falling within

the DSH limit.[8] Or it could have specifically defined "hospital services." That Congress did not

make either of these choices reflects its intent that "hospital services" be construed broadly. See

Consumer Electronics Ass'n v. F.C.C., 347 F.3d 291, 298 (D.C. Cir. 2003) (noting that "the

Supreme Court has consistently instructed that statutes written in broad, sweeping language

should be given broad, sweeping application" and refusing to employ legislative history to

construct a more narrow reading of the statutory language) (citing New York v. F.E.R.C., 535

U.S. 1, 22 (2002); PGA Tour, Inc. v. Martin, 532 U.S. 661, 689 (2001)).

Fifth, Congress's intent in enacting the UCC limit was to prevent hospitals from

obtaining DSH payments that exceeded their costs. H.R. Rep. No. 103-11 at 211-213 (1993),

reprinted in 1993 U.S.C.C.A.N. 1088, 1524. Such conduct is not at issue in this case. More to

the point, construing "hospital services" to exclude "physicians' services" does nothing to fulfill

Congressional intent in imposing the limit. Again, there is no longer any dispute in this case that

the Virginia DSH hospitals did incur these costs, and that they have not been reimbursed for

these incurred costs.

Finally, Virginia's interpretation of the statute is consistent with Congressional intent.

The DSH statute was enacted to ensure that hospitals are able to provide medical care to indigent

---

[8]      The provisions in 42 U.S.C. § 1396d(a) listing various types of reimbursable "medical
assistance" were part of the Act at the time Congress enacted the UCC limit in 42 U.S.C. §
1396r-4(g)(1)(A).

patients.  42 U.S.C. § 1396r-4(a)(1).  The DSH program does this by providing funding to help

make up for the shortfall incurred by DSH hospitals in caring for such patients.  Medical care

provided by physicians is a key component of the care that hospitals provide to indigent (and

other) patients.  Congress's intent that DSH meaningfully assist hospitals can be honored only

through the plain language construction of the broad "hospital services" term it used in the

statute.  See Blum v. Stenson, 465 U.S. 886, 896 (1984) (where resolution of a question of

federal law turns on statute and intention of Congress, court looks first to statutory language and

then to legislative history if statutory language is unclear).

      For these reasons, the term "hospital services" must be construed to include

physician services.

    **B.**      **The 1994 CMS Letter does not provide a basis for CMS's disallowance of
Virginia's physician costs from the UCC.**

        *1. No deference is due the 1994 CMS Letter.*

      As an initial matter, the Court should not defer to defendants' interpretation of the UCC

limit, either as stated in the 1994 CMS Letter or in the new interpretation it has advanced in this

litigation.

      First, under Pennhurst, even Congress may not impose an additional "condition on the

grant of federal moneys" unless it does so "unambiguously."  Pennhurst, 451 U.S. at 17.  Since

Congress did not do so here, defendants lack the statutory basis to interpret the UCC limit to

exclude physicians' costs.  For that reason alone the Court should vacate the DAB's decision.

See 5 U.S.C. § 706(2)(C).

      Even if Pennhurst does not control the decision in this case, the limited Skidmore

deference that would apply here in the absence of formal notice-and-comment rulemaking, see

Christiansen v. Harris County, 529 U.S. 576, 587 (2000) (quoting Skidmore, 323 U.S. at 140), is limited further still because CMS's crabbed interpretation of "hospital costs" is not persuasive in light of the plain statutory language. See Point 1A, supra.

 Further, CMS's shifting positions effectively eliminate any remaining basis for deference. CMS previously allowed physicians' services to be included within the meaning of hospital services.  See Alaska Dept. of Health and Social Services, DAB No. 1919, 2004 WL 1038088 at *20 (April 22, 2004 ) ("Alaska DAB Decision," available at AR 01146) ("CMS did not deny that laboratory, physician, pharmacy and diagnostic services are of a kind that may constitute inpatient or outpatient services when furnished under care of a physician to patients of a hospital, even though these services are also separately defined"); 60 Fed. Reg. 61483, 61484-85 (Nov. 30, 1995) (stating in final rule revising the nurse-midwife definition that "nurse-midwife services are similar to physician services in that they may be billed in their own distinct category or alternatively may be billed under other categories such as hospital or clinic services") (available at AR 01067).  Defendants now contend, however, that physicians' services could never be considered hospital services for purposes of the Medicaid program.  No deference is warranted an agency interpretation that "appears to be nothing more than an agency's convenient litigating position." Bowen, 488 U.S. at 213 (rejecting agency's interpretation of its retroactive rulemaking authority where its litigation position differed from its past pronouncements interpreting the statute); see U.S. v. Mead Corp., 533 U.S. 218, 228 n.8 (2001) ("The consistency of an agency's position is a factor in assessing the weight that position is due") (quoting Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993)).

 In sum, in construing the statute, the Court should not defer to defendants' interpretations.

**2.    *The 1994 CMS Letter, by its terms, includes "physicians services" within the UCC limit.***

For several reasons, the 1994 CMS Letter must be read to include physicians' services within the UCC limit.

First, the 1994 CMS Letter interprets the statute expansively, noting that it intends to "provide States with a great deal of flexibility up to a maximum standard" in submitting costs. AR at 01312. Indeed, states were advised that "HCFA would permit the State to use the definition of allowable costs in the State plan, or any other definition," so long as it complied with the maximum standard. Id. Thus, states were free to submit costs even where such costs were defined differently than in the state plan; that state plan definition is plainly a safe harbor. The "maximum standard" itself was defined broadly as "the amounts that would be allowable under the Medicare principles of cost reimbursement." Id.

Second, aside from the "maximum standard" (discussed in more detail below), the 1994 CMS Letter sets no limits on what can be included in "hospital services." To be sure, the 1994 CMS Letter stated that "States may include both inpatient and outpatient costs in the calculation" of recoverable DSH payments. AR at 01312 (emphasis added). But CMS's use of the word "include" is significant because that term ordinarily means "not limited to." See Burgess v. U.S., 128 S.Ct. 1572, 1578, n.3 (2008) ("The word 'includes' is usually a term of enlargement, and not of limitation.") (citation omitted). Consequently, the only reasonable interpretation of the 1994 CMS Letter is that the UCC limit provides for payment of at least "inpatient and outpatient costs." By its terms, the 1994 CMS Letter suggests that other costs may be included. And significantly, the 1994 CMS Letter does not state that "physicians' services" must be excluded from allowable costs, or otherwise even suggest that CMS so interprets the UCC limit.

26

Third, even if it were possible to interpret the clause "includes inpatient and outpatient costs" to mean "is limited to" such costs, as CMS has argued, physicians' services would still be included in allowable costs. Both "inpatient hospital services" and "outpatient hospital services," as defined in CMS regulations, include physicians' services to hospital patients.[9] Indeed, including costs of physicians' services within the UCC limit is consistent with various CMS and DAB pronouncements prior to this litigation.

CMS Medicaid regulations define "inpatient hospital services" as services that (1) "[a]re ordinarily furnished in a hospital for the care and treatment of inpatients;" and (2) are "furnished under the direction of a physician." 42 C.F.R. § 440.10 (emphasis added). Physician services certainly fall within the types of services that are "ordinarily furnished in a hospital for the care and treatment of inpatients." Likewise, such services are commonly "furnished under the direction of a physician," most obviously, where a team of doctors provides medical services to a patient. And even when only one physician provides services to a patient, that physician has used his or her medical judgment to decide what treatment is appropriate. Such services are provided "under the direction of a physician."

Similarly, the regulations define "outpatient hospital services" to mean "preventive, diagnostic, therapeutic, rehabilitative or palliative services that [a]re furnished to outpatients . . . by or under the direction of a physician . . . and are furnished in an institution that . . . is licensed or formally approved as a hospital." 42 C.F.R. § 440.20 (emphasis added). This definition

---

[9]    The DAB agreed that "the 1994 [CMS Letter] does not categorically prohibit a hospital from including physician costs in its payment limit calculation." Its further statement that the 1994 CMS Letter may nonetheless have limited the meaning of "hospital costs" relies entirely on the tautology that the 1994 CMS Letter allows the inclusion of a cost "only if it was, or could be regarded as, an allowable cost of an inpatient or outpatient hospital service." AR at 00011-13.

plainly includes physician services: the specific services outlined are of the type provided by physicians, and the definition includes services "furnished by" physicians.[10]

Both CMS and the DAB previously recognized that individual terms such as "hospital services" and "physician services" are not mutually exclusive. For example, in a final rule revising the nurse-midwife definitions and discussing categories of service under Medicaid, CMS described Medicaid categories of service as "separate" but not "mutually exclusive," specifically advising that "nurse-midwife services are similar to physician services in that they may be billed in their own distinct category or alternatively may be billed under other categories such as hospital or clinic services." 60 Fed. Reg. 61483, 61484-85 (Nov. 30, 1995) (emphases added) (also available at AR 01069).

Likewise, the DAB explained in a 2004 decision that "[n]umerous services which may meet the definitions of inpatient or outpatient hospital services are also themselves defined separately, such as laboratory and x-ray services, physician's services, pharmacy services, and diagnostic services." Alaska DAB Decision, 2004 WL 1038088 at *20 (emphasis added). In that case, the DAB noted that "CMS did not deny that physician, laboratory, pharmacy and diagnostic services are of a kind that may constitute inpatient or outpatient services when furnished under care of a physician to patients of a hospital, even though these services are also separately defined." Id. (emphasis added).[11]

---

[10]    The definition of outpatient hospital services also allows a Medicaid agency to "exclude from the definition of 'outpatient hospital services' those types of items and services that are not generally furnished by most hospitals in the State." 42 C.F.R. § 440.20(a)(4). This language suggests the outpatient hospital services must include the "types of items and services" that are "generally furnished" by most hospitals. Physicians' services surely are included within the broad category of services that are "generally furnished" by most hospitals.

[11]    In Louisiana Dept. of Health and Hospitals v. Centers for Medicare and Medicaid Services, 346 F.3d 571, 577 (5th Cir. 2003), the Fifth Circuit rejected CMS's argument that rural health clinic services and outpatient hospital services were mutually exclusive. The court held

28

In fact, previous agency decisions demonstrate that costs for physician services are specifically reimbursable and are within the UCC.  In at least two other audits, the HHS OIG has specifically concluded that medical centers could properly include the costs of medical services provided by physicians in the calculation of UCC.  See AR at 01338, Audit of California's Medicaid Inpatient Disproportionate Share Hospital Payment for Kern Medical Center, State Fiscal Year 1998 (September 17, 2002) (the "Kern Audit"); AR at 01402, Audit of California's Medicaid Inpatient Disproportionate Share Hospital Payments for Los Angeles County Hospitals, State Fiscal Year 1998 (May 2003) (the "Los Angeles Audit").

The language of the 1994 CMS Letter, the definitions of the outpatient and inpatient services that form a subset of that Letter's interpretation of allowable costs, CMS's regulatory pronouncements, the recent Alaska DAB Decision, and the OIG's decisions in the Kern and Los Angeles Audits all include physicians' services within the definition of outpatient and inpatient hospital services.  And these consistent interpretations also square with the plain language of the statute.  In sum, costs of physicians' services are allowable under the UCC.

> **3.**     ***Virginia's submitted costs would be "allowable under the Medicare principles of cost reimbursement."***

For several reasons, defendants cannot avoid their FFP obligations based on a claim that Virginia's submitted costs for physicians' services are not "allowable under the Medicare principles of cost reimbursement."  AR at 01312.

First, the 1994 CMS Letter explained that "[t]he Medicare principles are the general upper payment limit ["UPL"] under institutional payment under the Medicaid program."  Id.  In

---

that rural health clinic services could be included in "hospital services" even though Louisiana recognized in its State plan that rural health clinic services and outpatient hospital services were "distinct categories of services."  Id. at 577.

other words, the "Medicare principles of cost reimbursement" define an aggregate limit for the amount of costs that may be claimed, but they do not limit whether certain types of costs may be included in the calculation of the UCC. There is nothing in the 1994 CMS Letter, or in any subsequent agency interpretations, that suggests the "Medicare principles" could impose limits beyond the aggregate limit on amount expressed in the UPL. There is no dispute, moreover, that Virginia's costs at issue here were within both the general UPL and Virginia's State DSH Allotment. Virginia has satisfied the terms of the 1994 CMS Letter.

This holds true even if additional "Medicare principles" beyond the UPL specified by the 1994 CMS letter were to apply. Indeed, both the Act and CMS regulations allow teaching hospitals, such as UVA and MCVH, to elect to claim for Medicare purposes the costs of physicians' services. See 42 U.S.C. § 1395x(b)(7) (teaching hospitals may elect to receive payment on a cost basis for physicians' professional services to hospital patients); 42 C.F.R. § 415.160(a) (allowing teaching hospitals to claim for Medicare purposes the costs of medical and surgical services of physicians "in lieu of fee schedule payments that might otherwise be made for these services"). Thus, Medicare cost principles, as enunciated in the Act and in CMS regulations, allow a teaching hospital to seek the costs for physicians' services, so long as the hospital does not also seek fee schedule payments for those costs. Virginia has done just what the statute provides with regard to the DSH costs at issue here.

The DAB nonetheless held that Virginia failed to meet the "Medicare cost principles" standard for two reasons. First, it held that Virginia did not show it was prepared actually to bill Medicare for its reasonable costs because the hospitals did not satisfy "the critical regulatory

30

conditions" to do so. AR at 00015.[12] This is incorrect. By its terms, the 1994 CMS Letter did
not require Virginia actually to bill physician services to Medicare on a cost basis; rather, it only
required that Virginia's costs submitted to Medicaid for payment under the UCC be "consistent
with Medicare principles." AR 01312 (emphasis added). Indeed, Medicare itself provides for
alternative methods of payment for physicians' services provided in a hospital; payment can be
sought on a cost basis, or on a fee-for-service basis. 42 U.S.C. § 1395x(b)(7); 42 C.F.R. §
415.160(a). So long as the hospital chooses one or the other it has complied with "Medicare
principles." The DAB's reading of the 1994 CMS Letter would require a hospital's Medicaid
payments to be tied not to "Medicare principles" but to the hospital's actual Medicare requests
for payment. This renders meaningless the use of the term "Medicare principles" in the 1994
CMS Letter, and is incorrect.

Virginia thus was not required to meet the "regulatory conditions" cited by the DAB –
i.e., "having an agreement among all physicians not to bill for services, or having all physicians
be hospital employees who are precluded from billing as a condition of employment," AR at
00015. But even if those "regulatory conditions" applied, the DAB's decision was incorrect for
two reasons. First, contrary to the DAB's holding, the physicians at UVA and MCVH had, in
fact, agreed "that they will not bill or collect from patients determined to be indigent and who are

---

[12]     The DAB's ruling is inconsistent on this point. The DAB stated, on the one hand, that it
was not "critical" whether the hospital actually elected to receive reasonable cost-based payment
under Medicare; instead, what mattered was "whether the hospital satisfied the critical regulatory
conditions." AR at 00015. At the same time however, those regulatory conditions – "having an
agreement among all physicians not to bill for services, or having all physicians be hospital
employees who are precluded from billing as a condition of their employment," id., apply only
where, unlike here, a hospital is actually billing to Medicare. In short, by applying those
conditions, DAB did exactly what it purported not to do:  it disallowed Virginia's costs on the
grounds that Virginia was not prepared to actually submit to Medicare based on Medicare cost
principles. (In any event, as discussed immediately below, the DAB was wrong with regard to
the facts. It was undisputed that Virginia's physicians agreed not to bill for the relevant services.)

31

included in the report of uncompensated services" – i.e., those patients with regard to whom DSH funding was potentially available. See AR at 00911-12. The DAB's suggestion to the contrary is simply wrong. Moreover, the "regulatory conditions" cited by the DAB are imposed by Medicare to ensure that it is not billed twice for the same services. Thus, if any "Medicare principle" can be derived from the regulatory conditions upon which the DAB relied, it is that states should not be paid under both of the alternative methods of Medicare reimbursement – once on a cost-based submission, and once on a fee-for-service submission – for the same service provided by a physician. But the only way that a state can obtain payments for the uncompensated costs of physicians' services at issue here is by claiming its costs for such services under its DSH uncompensated care limit. Paying Virginia's physicians' costs is fully consistent with the Medicare principle prohibiting double-billing for services.

The DAB's affirmance of the disallowance also relied heavily on Virginia's billing of the services in question as "physicians' services." AR at 00011, 00016. This hypertechnical rationale for disallowing Virginia's costs here stands in stark contrast to the Kern and Los Angeles Audits, in which defendants allowed physicians' costs to be included in UCC even though they had not been included at all as reimbursable costs by the hospitals. See AR at 01338 (Kern Audit noting that "although professional medical services costs were not included in the reimbursable cost category of KMC's Medicare Cost Report, they may be reimbursed as physician services under the Medicare Part B program" and therefore physician costs are a "recognizable hospital cost" that should be included in the calculation of the UCC limit); id. at 01402 (Los Angeles Audit applying Medicare principles of cost reimbursement to add physician costs into the calculation of the UCC limit even though the hospitals did not include professional medical service costs in the reimbursable cost category of their Medicare cost report).

32

The DAB's reliance on this technical "misclassification" argument allowed it to avoid addressing the legal arguments that are at the heart of this case. The DAB declined to address a critical issue in this lawsuit – i.e., whether "the statute permits a state Medicaid program to cover or pay for a particular service furnished by a physician as a 'hospital service' rather than as a "physician's service." Id. at 00010 n.9. Likewise, the DAB held that there was "no need to discuss" the critical question whether the regulatory definitions of inpatient or outpatient hospital services included physician services. Id. at 00013 n.11.

DAB's refusal to address these issues is telling. As demonstrated above, the answers to the questions DAB avoided put the lie to defendants' arguments here: elsewhere CMS has acknowledged that physicians' services can be paid as hospital services and that the regulatory definitions of outpatient and inpatient hospital services include physicians' services. See 60 Fed. Reg. 61483, 61484-85 (Nov. 30, 1995) (stating in final rule that nurse-midwife services, like physicians' services, may be billed as hospital services); Alaska DAB Decision, 2004 WL 1038088 at *20 ("CMS did not deny" that physician services "may constitute inpatient or outpatient services"). The DAB no doubt knew that resolution of these questions inexorably led to a finding that Virginia was entitled to FFP for its costs of physicians' services. Worse still from DAB's perspective, resolving these issues would have created precedent that is inconsistent with defendants' current efforts further to cabin the UCC – a result that would have been embarrassing, and likely costly, for defendants.

Virginia submitted its costs of physicians' services in full compliance with "Medicare principles of cost reimbursement." Because Virginia met the standard enunciated in the 1994 CMS Letter, defendants may not disallow DSH payments for the costs of physicians' services incurred by the Virginia DSH hospitals.

33

C.    **Payment for physicians' services is required pursuant to Virginia's State plan.**

The Act unambiguously provides that the Secretary "shall pay to each State" with an approved state plan the federal share (i.e., FFP) "of the total amount expended during such quarter as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1).

Defendant CMS reviewed and approved Virginia's State plans for SFYs 1997 and 1998. In fact, Virginia's State plans for the applicable SFYs expressly addressed the UCC limitation for DSH payments. The plans include a section titled "OBRA 1993 § 13621 Disproportionate Share Adjustment Limit" providing that the DSH payment adjustment would "not exceed the sum of" (a) Virginia's net "Medicaid allowable costs" and (b) Virginia's net "[c]osts incurred in serving persons who have no insurance." AR at 01258 (1996 State Medicaid Plan, Attachment 4.19A, p. 5); id. at 01287 (1997 State Medicaid Plan, Attachment 4.19A, p. 4). In its audit, the OIG concluded that Virginia's DSH payments to the hospitals -- including, perforce, its payments for the costs of "physicians' services" – "were calculated in accordance with the State plan." AR at 00186, 00238. Because the DSH payments complied with Virginia's approved State plan, defendants "shall pay" the federal share.

To hold otherwise would be inconsistent with the plain terms of the Act. It also would be unfair to Virginia. The purpose of CMS's state plan review process is to ensure that both the federal government and the state understand the extent of, and limitations on, FFP for the state's Medicaid program, so that the state comprehends the extent of its Medicaid obligation and can

plan accordingly.[13]  The federal-state cooperative funding relationship has been described by the
Supreme Court to be a contractual one.  See Pennhurst, 451 U.S. at 17 (supra at 18).

    Pennhurst is instructive here for two reasons.  First, it confirms that where, as here, a state
has made expenditures in reliance on the federal government's commitment to provide
appropriate matching funds in accord with a federally-approved state plan, it is arbitrary and
capricious for a federal agency to impose new requirements without any prior notice.  Second,
and as importantly, defendants cannot credibly contend that the UCC limit statute, 42 U.S.C. §
1396r-4(g)(1)(A), is "unambiguous" in excluding physicians' costs.  Cf. Pennhurst, 451 U.S. at
17.  As explained above, see Point 1.A, supra, the contrary is true:  the statute "unambiguously"
includes those costs.

    In its briefing to the DAB, CMS sought to avoid its state plan obligations on two grounds,
neither of which has merit. First, CMS contended that the OIG's approval "merely reflected the
fact that [Virginia] compared its payment to the UCC claimed" by UVA and MCVH.  AR at
00076-77.  But the OIG's findings speak for themselves:  the first stated objective of its audit
was "to determine if DSH payments made to [UVA and MCVH] for SFYs 1997 and 1998 . . .
were calculated in accordance with the approved State plan," see AR at 00181, 00233; and the
OIG answered that question plainly and affirmatively.  AR at 00186, 00238.

    CMS also complained that the State plan should have separately stated that physicians'
costs were included.  See AR at 00126.  This argument fails for three reasons.  First, Virginia had
no reason to highlight costs for physicians' services in its State plan because, prior to this

---

[13]    Notably, participation in Medicaid is voluntary.  Harris v. McRae, 448 U.S. 297, 301
(1980).  The Act also provides significant flexibility with regard to the precise composition of
State plans.  See Alexander v. Choate, 469 U.S. 287, 303 (1985) ("The Act gives the States
substantial discretion to choose the proper mix of amount, scope, and duration limitations on
coverage, as long as care and services are provided in 'the best interests of the recipients.'")
(citing 42 U.S.C. § 1396a(a)(19)).

litigation, CMS had never indicated that such costs were not allowable.  Second, the 1994 CMS

Letter did not require states to define the costs of services for purposes of the DSH limit in its

state plan.  That Letter provided that states could "use the definition of allowable costs in its

State plan, or any other definition, as long as the costs determined under such a definition do not

exceed the amounts that would be allowable under the Medicare principles of cost

reimbursement."  AR 01312 (emphasis added).  Third, any reasonable interpretation of the

statement in Virginia's State plan that it would submit for DSH payment "costs incurred in

serving persons who have no insurance" would include physicians' costs.

The DAB agreed with CMS and held that Virginia should have separately stated that it

was including physicians' costs.  AR at 00017.  That is incorrect, both for the reasons just stated

and because the DAB itself acknowledged that even if there were some ambiguity in Virginia's

State plan, the defendants must defer to the State's reasonable interpretation of the plan.  Id.

(citing California Dept. of Health Services, DAB No. 1474, at 3 (1994)).  There can be no

serious dispute that including physicians' costs in "costs incurred in serving persons who have no

insurance" was a reasonable interpretation.  And if CMS had any questions about the meaning of

that broadly-worded phrase, CMS should have raised them during the state plan approval process.

Defendants' knowing approval of Virginia's State plan, and Virginia's submission of

physician costs for DSH reimbursement consistent with that plan, together mandate that

defendants provide FFP for Virginia's DSH hospital physician costs.

## II.

## Defendants' Disallowance Was Arbitrary
## and Capricious, and an Abuse of Discretion

Even if the statute and the 1994 CMS Letter both did not plainly provide that Virginia could include costs for "physicians' services" within the UCC limit, defendants should be prohibited from disallowing those costs because their decision to do so was arbitrary, capricious, and an abuse of discretion. Defendants' treatment of Virginia's submissions must be consistent with the statute, which, as demonstrated above, requires the payment of broadly-worded "hospital costs" and was intended to help keep DSH hospitals' doors open to the uninsured and the poor. It must also be consistent with defendants' guidance and their past practices. See e.g., National Treasury Employees Union v. Federal Labor Relations Authority, 404 F.3d 454 (D.C. Cir. 2005) ("any agency's 'unexplained departure from prior agency determinations' is inherently arbitrary and capricious in violation of APA § 706(2)(A)") (citation omitted)); Samaritan Health Service v. Bowen, 811 F.2d 1524, 1530 (D.C. Cir. 1987) (agency's refusal to reimburse the hospital for emergency room physicians' on-call fees was unreasonable given the lack of persuasive force of the Medicare policy manual and the agency's conflicting earlier and later pronouncements). CMS's recent disallowance cannot meet this test.

A.    **CMS failed to provide any advance notice of its current interpretation of the 1994 CMS Letter.**

As demonstrated above, the 1994 CMS Letter can only be read to allow the inclusion of costs for physicians' services in the UCC limit. See Point 1.B.2, supra. But even if defendants may be able to craft a tortured reading of the 1994 CMS Letter, in the context of this litigation, that supports their current interpretation of the UCC limit, they cannot credibly claim that the 1994 CMS Letter put Virginia on reasonable notice of that position. Virginia's position was either the only tenable interpretation of the Letter; or, at worst, the only reasonable one.

37

The 1994 CMS Letter contains three clauses that are critical to CMS's interpretation. First, "States may include both inpatient and outpatient costs in the calculation" of the UCC limit." AR at 01312.  CMS now reads this statement to mean that "inpatient and outpatient" costs are the <u>only</u> costs that may be included.  But that is not a reasonable interpretation; and even if "may include" is somehow ambiguous – it is not – Virginia's plain language interpretation was surely reasonable.  <u>See</u> <u>Burgess</u>, 128 S.Ct. at 1578 n.3.

Second, CMS's current contention that physician costs may never be included in the UCC limit cannot be squared with the 1994 CMS Letter's promise that defendants' interpretation "provides States with a great deal of flexibility up to a maximum standard that is widely known." AR at 01312.  In fact, as demonstrated herein, the "maximum standard" enunciated by CMS in the 1994 Letter – "the amount that would be allowable under the Medicare principles of cost reimbursement" – <u>includes</u> costs for physicians' services under the circumstances here.  <u>See</u> Point 1.B.3.b, <u>supra</u> (citing 42 U.S.C. § 1395x(b)(7) (teaching hospitals may elect to receive payment on a cost basis for physicians' professional services to hospital patients); 42 C.F.R. § 415.160(a) (allowing teaching hospitals to claim for Medicare purposes the costs of medical and surgical services of physicians )).  Virginia's costs are thus well within the scope of the "flexibility" that the 1994 CMS Letter promised to provide.  <u>Limiting</u> allowable costs to exclude costs that are within what "Medicare principles of cost reimbursement" provide – as defendants seek to do here – makes a mockery of the "flexibility" promised in the 1994 CMS Letter.

Third, the 1994 CMS Letter purported to set a standard for the <u>Medicaid</u> UCC limit by reference to what "would be allowable under the Medicare principles of cost reimbursement." Under Medicare, teaching hospitals (like UVA and MCVH) may submit physicians' services either (1) on a cost basis; or (2) pursuant to a fee schedule.  The DAB ignored the evidence that

38

Virginia actually did submit its costs on an allowable Medicare cost basis (pursuant to the statute and regulations described immediately above); rather, in upholding defendants' disallowance, the DAB held that Virginia did not meet this standard because Virginia was not prepared actually to submit its Medicare physicians' services on a cost basis.  AR at 00017.  But the 1994 CMS Letter uses expansive language, allowing a state to use "the definition of allowable costs in its State plan, or any other definition" so long as the costs "would be allowable" under "Medicare principles of cost reimbursement."  AR at 01312 (emphasis added).  The DAB's ruling turns this expansive language on its head to impose a new limitation on states:  namely, that in order to comply with the UCC limit applicable to Medicaid DSH payments, they must submit their physicians' services to Medicare on a cost basis.  Virginia could not reasonably have been expected to anticipate that defendants would concoct a new requirement through this tortured reading of the 1994 CMS Letter.

Prior to the SFYs in question, CMS gave states no reason to anticipate that physician costs could not be included within the UCC.  Nor did CMS advise that states must specifically enumerate the inclusion of physician costs (or any other costs) in order for such costs to be includible, as the DAB decision would require.  Indeed, there are other categories of costs that could be billed separately under the regular Medicaid program or that may be billed as part of hospital services, such as laboratory and x-ray services, and nurse-midwife services.  See 60 Fed. Reg. 61483, 61484 (Nov. 30, 1995).  CMS did not suggest that states needed to make a choice as to how to bill such services.  Requiring such a choice by the states would make no sense, because the only way hospitals can obtain reimbursement for the costs in question is to treat such costs as part of hospital services.  This is so because the costs reimbursed through the DSH program and included within the UCC limit are by definition for services that are not otherwise paid by

39

Medicaid, the patient or some other third-party payor. It would not occur to a state, in preparing

its state plan, that it should specify what items it would treat as hospital services (as opposed to

fee schedule services). Indeed, Medicaid would pay for the physicians' services here, if at all,

only as part of DSH reimbursement.

### B.    Virginia relied on recovery of funds expended consistently with its State plan.

Virginia also reasonably expected that its physicians' costs would be allowable because

those costs were submitted pursuant to its approved State plan. 42 U.S.C. § 1396b. As

demonstrated above, see Point 1.C., Virginia's State plan included a section entitled "OBRA

1993 § 13621 Disproportionate Share Adjustment Limit" which provided that Virginia intended

to submit "Medicaid allowable costs" and "[c]osts incurred in serving persons who have no

insurance." AR at 01258. Virginia reasonably believed that this language put defendants on

notice that it intended to submit physicians' costs within the UCC. In fact, the OIG concluded

that Virginia's payments for the very costs at issue here were "calculated in accordance with the

State plan." AR at 00186, 00238. Under the circumstances, it was eminently reasonable for

Virginia to have expected it would be reimbursed for the federal share of such costs.

### C.    CMS's past statements and a prior DAB decision relevant to this issue are consistent with Virginia's position.

The clearest evidence that Virginia reasonably decided to include costs for physician

services within the UCC limit is defendants' own statements that physician services could be

considered hospital services. In 1995, CMS issued a final rule stating that nurse-midwife services

"are similar to physician services in that they may be billed in their own distinct category or

alternatively may be billed under other categories such as hospital or clinic services." 60 Fed.

Reg. 61483, 61484-85 (Nov. 30, 1995). The more recent Alaska DAB Decision described

40

CMS's admission that physician services "constitute inpatient or outpatient services when furnished under care of a physician to patients of a hospital." 2004 WL 1038088 at *20. The DAB agreed, holding that physicians' services "may meet the definitions of inpatient or outpatient hospital services." Id. And the HHS OIG, in both the 2002 Kern Audit and the 2003 Los Angeles Audit, concluded that medical centers could properly include the costs of medical services provided by physicians in the calculation of UCC – even when those costs had not been included in the reimbursable cost category of the Medicare Cost reports submitted by the hospitals. AR at 01338 (Kern Audit); id. at 01402 (Los Angeles Audit).

Virginia's decision to include the costs was consistent with CMS guidance at the time Virginia incurred the costs and submitted them for reimbursement.

### D.    Dozens of other entities interpreted the UCC limit as Virginia did.

On August 26, 2005, CMS issued a proposed rule (the "2005 Proposed Rule") implementing the new DSH auditing and reporting requirements contained in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. In the preamble to the 2005 Proposed Rule, CMS stated that "[t]he uncompensated care costs of providing physician services cannot be included in the calculation of the hospital-specific DSH limit." 70 Fed. Reg. 50262, 50265 (Aug. 26, 2005) (available at AR 01081).[14] Every one of the 59 comments on the proposed rule received from states, hospital associations, and individual hospitals that addressed this issue disagreed with CMS's new policy. AR at 01446-88. Most significantly, the commenters stated that CMS's statement was contrary to existing Medicaid law and regulations and CMS policy guidance. These commenters, like Virginia, understood the UCC limit to include the costs of providing physicians' services. Although these comments were part of the

---

[14]    CMS's statement is neither further discussed nor included in the proposed rule itself.

record in the DAB (and are part of the Administrative Record here), CMS has never been able to

explain how its position can be reconciled with these uniform and consistent comments.[15]

     More recently, CMS has issued a new proposed regulatory definition of outpatient

hospital services "[b]ecause the regulatory definition of outpatient hospital services is so broad,

there is a high possibility of overlap between outpatient hospital services and other covered

benefits." 72 Fed. Reg. 55158, 55159 (Sept. 28, 2007) (the "2007 Proposed Rule"). CMS

specifically noted that "there have been instances of claims for payment of physician services as

outpatient hospital services." Id. CMS has thus acknowledged that the regulatory definitions

and guidance in effect during the fiscal years in question were broad enough that multiple

hospitals have treated physician services as part of hospital services for the purpose of Medicaid

reimbursement.

     The 2007 Proposed Rule purports to have the effect of excluding federal payment for

such services. Virtually all of the nearly 100 comment letters received in response to the 2007

Proposed Rule opposed CMS's new definition of outpatient hospital services, and many of them

specifically noted that CMS's exclusion of physician services was contrary to longstanding

policy and not required by the Medicaid statute.[16] For example, the California Association of

Public Hospitals and Health Systems (CAPH) noted that CMS's new definition was a

"substantive policy change" because "[b]y its terms, the [current] definition [of outpatient

hospital services] expressly enables a state to include in the scope of outpatient hospital services

physician services…..among other services, that are provided by facilities defined and

---

[15]    On a practical level, the commenters noted that many states and hospitals currently include physician services as UCC; and that excluding such services from the UCC limit them will have significant adverse consequences for safety net hospitals and the indigent patients they serve. See AR at 01446-88.

[16] The comments are publicly available on the CMS website: http://www.cms.hhs.gov/erulemaking/eccmsr/list.asp?listpage=8.

recognized as hospital facilities under state law." See CAPH Comments on 2007 Proposed Rule (Exhibit 1 hereto) at 3 (emphasis added). Similarly, the National Association of Public Hospitals and Health Systems commented that CMS's new rule would exclude services a state is currently treating as outpatient hospital services for the purposes of the hospital's DSH cap, including specifically physician services. See NAPH Comments on 2007 Proposed Rule (Exhibit 2 hereto) at 3 (emphasis added). Likewise, fifteen states and state Medicaid agencies commented in a joint letter that the proposed definition would invalidate the long-standing practice of including physician services as part of outpatient hospital services. See "Joint Comments of Fifteen States and State Medicaid Agencies" (Exhibit 3 hereto) at 4.

The public comments demonstrate that many other hospitals and states interpreted the statute and the 1994 CMS Letter just as Virginia did. With its issuance of the 2007 Proposed Rule, CMS appears finally to recognize that if it is going to change its interpretation of the UCC limit, it must go through notice and comment rulemaking. But any such change now cannot be applied retroactively to Virginia's cost submissions in SFYs 1997 and 1998.

## Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment should be granted, and the court should issue an order (1) declaring that defendants' disallowance of physician costs incurred by the Virginia hospitals furnishing services to uninsured and Medicaid eligible patients is arbitrary, capricious, contrary to law, in excess of statutory jurisdiction, unsupported by credible, substantial evidence and is otherwise invalid under the Administrative Procedure Act; (2) declaring that the DAB's decision upholding defendants' disallowance of physician costs incurred by the Virginia hospitals furnishing services to uninsured and Medicaid eligible patients

is arbitrary, capricious, contrary to law, in excess of statutory jurisdiction, unsupported by credible, substantial evidence and is otherwise invalid under the Administrative Procedure Act; (3) reversing and setting aside the DAB's decision; (4) declaring that the costs of physician services may be included in the DSH UCC limit in accordance with 42 U.S.C. § 1396r-4(g); (5) declaring that CMS, in creating a new and previously unarticulated legal standard regarding the allowability of including physician costs as part of a disproportionate share hospital's UCC calculation, which is contrary to 42 U.S.C. § 1396r-4(g), CMS regulations at 42 C.F.R. § 440.10 and § 440.20, the 1994 CMS Letter, prior CMS rulemaking, and prior rulings from the DAB and audit findings of the OIG, has created a new, substantive rule that has been promulgated without engaging in notice and comment rulemaking pursuant to 5 U.S.C. § 553 et seq.; (6) declaring that this new, substantive rule has been applied improperly in a retroactive manner by defendants; (7) enjoining defendants from asserting an interpretation of the pertinent statutory and regulatory provisions contrary to this Court's holding; (8) ordering defendants to reinstate Virginia the $11,085,181 in DSH payments and $884,458 in interest that defendants have wrongfully reclaimed; (9) awarding interest to Virginia; (10) awarding costs and reasonable attorneys' fees to Virginia; and (11) awarding such other relief which the Court deems equitable, just or otherwise allowed by law.

Dated: August 5, 2008

                              Respectfully submitted,

                              HOGAN & HARTSON L.L.P.


                              By:___ /s/ Jeffrey Pariser_____
                                    Jeffrey Pariser (#462085)
                                    Michael F. Mason  (#458541)
                                    Ann M. Lichter  (#496307)

HOGAN & HARTSON L.L.P.
555 13th Street, N.W.
Washington, DC  20004
t: 202.637.8689
f: 202.637.5910

*Attorneys for the
Commonwealth of Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2008, a true and correct copy of the foregoing was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Jeffrey Pariser
JEFFREY PARISER

45

**PLAINTIFF'S EXHIBIT 1**

**CAPH COMMENTS**

**ON 2007 PROPOSED RULE**



# CALIFORNIA ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS

October 25, 2007

VIA FEDERAL EXPRESS

Mr. Kerry N. Weems, Acting Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS-2213-P
Mail Stop C4-26-05
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Re:    **Comments on Proposed Rule CMS-2213-P**
       **Medicaid Program; Clarification of Outpatient Clinic and**
       **Hospital Facility Services Definition and Upper Payment Limit**

Dear Mr. Weems:

        On behalf of the California Association of Public Hospitals and Health Systems ("CAPH"), I am writing to express our concerns with, and opposition to, the proposed Medicaid rule regarding the definition of outpatient clinic and hospital facility services and the upper payment limit for these services. We appreciate the opportunity to advise the Centers for Medicare & Medicaid Services ("CMS") of the substantial effects that its proposed rule would have on California's public health care safety net. CAPH urges you to withdraw this rule.

        This proposed rule, if finalized, would likely result in the reduction of critical health care services that public hospitals are uniquely qualified to provide, thereby limiting services and health care access—a result directly contrary to the purpose of the Medicaid program. CAPH represents 20 public hospitals, health care systems and academic medical centers, located in 16 counties in California. Our hospitals are a cornerstone of the State's health care system. Public hospitals operate nearly 60% of California's top-level trauma centers, which are state-of-the-art emergency medical units that treat the most catastrophic, life-threatening injuries. Our members participate in the Medicaid program by providing a comprehensive range of services to a substantial portion of the State's Medicaid population. While our members account for only 6 percent of the acute care hospitals in California, they consistently provide over 35 percent of hospital care to the State's Medicaid beneficiaries, 50 percent of the hospital care to California's uninsured, and over 80 percent of the State's hospital care to the medically indigent.

As an initial matter, the rule directly contravenes the May 25, 2007 congressional moratorium that prohibits CMS from taking any action to promulgate or implement provisions that impose cost limits on providers operated by units of government or that restrict payments for graduate medical education ("GME") under the Medicaid program.

In addition, the rule purports to make a "clarifying" change to the definition of hospital outpatient services. However, CMS makes it clear in the preamble that its intent is to apply this definition to restrict the services that may be reimbursed as hospital outpatient services under a state Medicaid program. This restriction is a substantive policy change that would go far beyond a mere "clarification." Namely, the new definition would apply to both governmentally operated and privately operated facilities, and would inappropriately limit the flexibility granted to the states under the Medicaid statute to specify the services and payment methodologies for their Medicaid programs.

The rule also would establish two methodologies for calculating the upper payment limit ("UPL") for hospital outpatient services for privately operated facilities, based on a reasonable estimate of the amount that would be paid for the services under Medicare payment principles. CAPH objects to this proposed change as it has an interest in the continued viability of private safety net providers, and is concerned that CMS may later attempt to apply this flawed methodology to governmentally operated facilities.

## I.    The Rule Violates The Congressional Moratorium.

The proposed rule is one of several in a series of significant policy changes CMS has charted to redefine the Medicaid program. Specifically, CMS has acted to restrict payments to safety net providers under the guise of assuring that payments are consistent with "efficiency" and "economy." In each case, CMS has defiantly refused to acknowledge the most important requirement that payments assure "quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . ."[1]

Congress consistently has had to rebuff these attempts, most recently in May of this year, with the congressional moratorium on actions aimed at reducing Medicaid payments.[2] Under the moratorium, CMS is prohibited from taking any action (through promulgation of regulation, issuance of regulatory guidance, or other administrative action) for a period of one year to (a) promulgate or implement any rule or provisions similar to those contained in the proposed rule on cost limits for providers operated by units of government that was published on January 18, 2007[3]; or (b) to promulgate or implement any rule or provisions restricting payments for GME under the Medicaid program. The rule contravenes all aspects of the moratorium.

In the preamble to the proposed rule, CMS states that the proposed provisions are "completely different policy matters" than those set forth in the cost limit rule. CMS, however, is keenly aware of Congress' intent in imposing the moratorium, which was to protect payment levels for safety net providers. The proposed rule at issue here attempts to limit the scope of

---

[1]  Soc. Sec. Act § 1902(a)(30)(A); 42 U.S.C. § 1396a(a)(30)(A).

[2]  Section 7002(a)(1)(B) of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act of 2007 (Pub. Law No. 110-28), signed by the President on May 25, 2007.

[3]  72 Fed. Reg. 2236 (Jan. 18, 2007).

services that can be included in the category of hospital outpatient services under the Medicaid program, thereby essentially prohibiting states from paying hospitals appropriately higher rates for the services they render, and reducing the flexibility to do so under the UPL. Thus, the proposed rule represents a different means of accomplishing the same thing CMS attempted to accomplish in the cost limit rule, namely the reduction of Medicaid payments for governmentally operated providers. CMS' promulgation of the rule is contrary to the intent of Congress and is in effect a violation of the moratorium.

The rule also directly violates the moratorium on the promulgation of any rule that would restrict payments for GME under the Medicaid program. The proposed rule would exclude reimbursement for GME based on the changes to the method by which the UPL would be calculated. In particular, under the rule the UPL for privately operated facilities would be based on either the Medicare cost-to-charge ratio in Worksheet C, Column 9 of the Medicare cost report, or on the Medicare payments-to-charges ratio from Worksheet E, Part B and Worksheet D, Part V of the Medicare cost report. This methodology excludes the costs and payments for interns and residents, and would result in the denial of payment for GME costs in direct contravention of the moratorium. CMS, however, ignores the fact that the rule would eliminate this component of payment under the Medicaid program.

Furthermore, the proposed rule would result in the exact same revisions to 42 C.F.R. § 447.321(a) contained in the January 18, 2007 proposed cost limit rule and the May 29, 2007 final rule [4] that delineate the three categories of hospitals and clinics for application of the UPL. In particular, both the cost limit rule and this proposed rule revise the category for non-state government facilities from "non-State government-owned or operated facilities" to "non-State government operated facilities." This change would therefore implement CMS' definition of providers operated by units of local government that are subject to the cost limits, which is barred by the moratorium.

As the proposed rule contravenes the moratorium in every way, CMS should withdraw it.

## II.     Specific Comments On Proposed Rule.

### A.     The Rule Constitutes A Substantive Policy Change That Is Not Supported By The Medicaid Statute Or Congressional Intent.

In the preamble to the proposed rule, CMS states that the existing regulatory definition of hospital outpatient services is broad. In particular, under the current definition set forth in 42 C.F.R. § 440.20(a), hospital outpatient services are defined as "preventive, diagnostic, therapeutic, rehabilitative, or palliative services" that are furnished to outpatients by or under the direction of a physician or dentist by a hospital that meets the requirements for participation in Medicare. By its terms, the definition expressly enables a state to include in the scope of outpatient hospital services physician services, rehabilitation services, home health agency services, and physical therapy services, among other services, that are provided by facilities defined and recognized as hospital facilities under state law.

CMS expresses concern that the definition creates "overlap" between outpatient hospital services and other covered benefits. However the precise concern is never articulated in

---

[4]  72 Fed. Reg. 29748 (May 29, 2007).

the preamble. This definition originally was promulgated for purposes of describing those Medicaid benefits and services that states could provide and for which they can receive federal financial participation. In this context, overlap with other service categories was expected. Specifically, when the definition was revised to allow states the flexibility to *exclude* services as outpatient hospital services in 1983, CMS noted that "States would still be required to cover the other mandatory services (such as physicians services) and some optional services when they are provided in the outpatient hospital setting . . . ."[5]

CMS seems to suggest that there is a potential for a provider to receive duplicate payments for the same service provided, but gives no example of how this could even occur. In any case, a duplicate payment can always be recovered under existing laws, so a rule change in that regard is unnecessary. Instead, it becomes readily apparent that CMS' real concern is not with "overlap;" rather it simply does not approve of state payment methodologies that provide greater reimbursement when services, such as physician services, are rendered by hospitals. CMS appears poised to use the revised definition to preclude states from establishing rates that appropriately differentiate services provided by hospitals from services provided by other provider types, such as physician offices. There is nothing in the regulatory history, however, to suggest the definition of hospital outpatient services was intended to restrict or otherwise govern state payment methodologies. CMS' intentions to apply the revised definition in this matter, as expressed in the preamble, is a new and substantive policy.

CMS attempts to justify the change to the definition of hospital outpatient services by stating that it would make the definition of such services consistent with the intent of Congress in enacting Section 1905(a)(2) of the Act.[6] This statutory provision was enacted in 1965, and has not been significantly amended. CMS references no legislative history or other support for any congressional intent behind the enactment of Section 1905(a)(2)(A) that is consistent with the proposed rule. Furthermore, CMS has amended the regulation regarding Medicaid hospital outpatient services several times since Section 1905(a)(2) was enacted over 40 years ago, but has never previously suggested that different payment methodologies for services rendered in different settings were inappropriate or that the definition of hospital outpatient services must be the same under Medicare and Medicaid.

CMS' attempt to substantively change existing policy is very apparent when viewed in light of <u>Louisiana Department of Health and Hospitals v. CMS</u>.[7] In that case, CMS initially advised Louisiana that if it were to create a process to license or formally approve hospital-based rural health clinics as hospital outpatient departments, then the uncompensated care costs for hospital outpatient services could be included in the disproportionate share hospital ("DSH") calculation. After the state acted in accordance with CMS' guidance, the agency, in a complete reversal of its previous position, concluded that the services provided by rural health clinics that were licensed or approved as hospital outpatient departments under state law did not fall within the meaning of hospital outpatient services, and disapproved the State Plan. The court ruled that CMS' action, in light of the existing regulatory definition and the agency's earlier position, was arbitrary and capricious. The facts in the <u>Louisiana</u> case clearly demonstrate that CMS has not followed a consistent interpretation of hospital outpatient services for Medicaid, and that the position reflected in the preamble is fairly recent. While administrative agencies

---

[5] 48 Fed. Reg. 10378, 10380 (Mar. 11, 1983).
[6] 42 U.S.C. § 1396d(a)(2)(A).
[7] 346 F.3d 571 (5th Cir. 2003).

may in appropriate cases change their interpretation of a statutory or regulatory term, the agency must acknowledge that this is in fact what it is doing, rather than simply referring to such changes as "clarifications" that "would not significantly alter current practices."

The key components of the revised definition, that the definition of Medicaid hospital outpatient services conform with the Medicare scope of covered outpatient services, and that the Medicare provider-based requirements be applied, also are significant departures from prior CMS policy that create uncertainty for existing payment methodologies. The application of standards developed exclusively for Medicare program purposes is not appropriate for Medicaid payment purposes. First, there are numerous services that are specifically excluded from Medicare coverage that may be covered by a state under its Medicaid program. These services include dental services, vision care, foot care and immunizations.[8] As these services are not covered by Medicare, they are not paid by Medicare under the Outpatient Prospective Payment System ("OPPS") or under an alternative payment methodology, and therefore would have to be excluded from hospital outpatient services for Medicaid purposes. That these services are not covered by Medicare does not provide a basis for prohibiting them from being reimbursed as hospital outpatient services under Medicaid.

The treatment of dental services is one example of CMS' failure to thoroughly think through the inherent differences between the two programs. Under the Medicare statute and regulations, dental services are specifically excluded from coverage unless the procedure requires inpatient hospitalization.[9] Accordingly, there is no Medicare coverage or payment for hospital outpatient services for dental care, whether under the OPPS or under an alternate payment methodology. In contrast, the Medicaid statute and regulations provide that dental services are one of the optional services that a state may choose to cover under its Medicaid program.[10] In the rule, CMS proposes no change to the Medicaid definition of hospital outpatient services as including services furnished to outpatients by or under the direction of a dentist.[11] However, the proposed rule would eliminate all dental services from the Medicaid definition of hospital outpatient services because they are not within the scope of services that would be paid as outpatient services by Medicare. If that is CMS' intent, then it is unclear why it did not remove the reference to services "furnished by or under the direction of a . . . dentist" from the definition of hospital outpatient services, as that part of the regulation would be mere surplusage and of no meaning if the rule is adopted.

Second, the Medicare provider-based requirements were established specifically for the Medicare payment methodology for outpatient services. In past guidance on the Medicare provider-based rules, CMS has given states flexibility to determine whether to apply the Medicare provider-based rules to Medicaid outpatient services. In 2001, CMS indicated that states "have considerable flexibility to determine appropriate payment rates in their State Medicaid plans and could adopt higher payment rates" for services at freestanding facilities.[12] Later, CMS expressly rejected a suggestion that it prohibit states from applying the provider-based criteria in determining payment under Medicaid. Rather, CMS stated that "a State may

---

[8]   42 U.S.C. § 1395y(a); 42 C.F.R. § 411.15.

[9]   42 U.S.C. § 1395y(a)(12); 42 C.F.R. § 411.15(i).

[10]   42 U.S.C. §§ 1396a(a)(10) and 1396d(a)(10); 42 C.F.R. § 440.100.

[11]   42 C.F.R. § 440.20(a)(2).

[12]   Provider Based Issues Frequently Asked Questions, FAQ #10 (July 2001).

adopt payment methods that do not differentiate between facilities that meet the provider-based requirement and those that do not. To the extent that States amend their State plans to contain such payment methods, we do not object to these actions. However, we do not believe it would be consistent with State flexibility to prohibit States *that wish to apply* provider-based criteria in making their payment decisions from doing so."[13]

CMS historically has recognized that states have flexibility in determining whether to apply the Medicare provider-based requirements for Medicaid hospital outpatient services. We believe this is appropriate given that the Medicare provider-based rules were developed for Medicare services and not for Medicaid services. Indeed, some states have established provider-based requirements, while others have not. In some cases, states have adopted provider-based requirements which are actually more stringent than the Medicare requirements. The proposal to apply the Medicare provider-based requirements to all Medicaid outpatient services make little sense given the different methodologies used by states to pay for hospital outpatient services. It is not clear how CMS concluded that only one state would be affected by the proposed rule. For these reasons, we believe CMS should not alter the Medicaid definition by applying the Medicare scope of covered hospital outpatient services and the Medicare provider-based requirements.

**B.     The Proposed Restrictions On Medicaid Hospital Outpatient Services Would Inappropriately Limit The Flexibility Granted To The States.**

In the preamble, CMS acknowledges the states' broad flexibility to establish payment methodologies and rates. Notwithstanding this acknowledgment, one of CMS' key rationales for the proposed rule is to prohibit states from providing increased payment rates for services rendered by hospitals, more specifically, "payment for identical services of a higher amount under the outpatient hospital benefit." CMS gives no basis for its claim that the services it seeks to exclude from hospital outpatient services are "identical" to services rendered in other settings, nor does it give any reason as to why the higher payment amounts are inappropriate.

The approach taken by CMS in the proposed rule is fundamentally flawed. In particular, the regulation at 42 C.F.R. § 440.20, like all of the regulations in Part 440, is a coverage regulation that sets forth the services that must or may be covered by the states, and which will be eligible for federal financial participation. None of the regulations in Part 440 specify or otherwise address how states must structure their payment methodologies to reimburse for the services in question. Instead, states have flexibility to design the method or methods to pay for the services covered under the State Plan, for example on the basis of reasonable costs, fee screens, or under a prospective payment system. CMS' attempt in the proposed rule to graft a payment limitation on a coverage rule, by stating that only certain services can be covered and reimbursed as hospital outpatient services, is illogical and inappropriate.

The rule would significantly curtail the flexibility currently granted to the states. In 1987, CMS amended the definition of hospital outpatient services to add current 42 C.F.R. § 440.20(a)(4), which permits Medicaid agencies to exclude from the definition of outpatient hospital services those types of items and services that are not generally furnished by most hospitals in the state. At the time it promulgated Section 440.20(a)(4), CMS stated that this revision was intended to provide states with greater flexibility to exclude any optional services

---

[13]  67 Fed. Reg. 49982, 50083 (Aug. 1, 2002) (emphasis added).

that are not generally furnished by most hospitals in the state, and that this determination would be left to the states.[14] The proposed rule, which would restrict, rather than enhance, the flexibility granted to the states, is contrary to CMS' previous actions. Furthermore, it is unclear what purpose Section 440.20(a)(4) would serve if the proposed rule is promulgated, as it is difficult to see which services a Medicaid program could exclude under this provision.

Under the proposed revision, Medicaid hospital outpatient services would be limited to those services which "are not covered under the scope of another Medical Assistance service category under the State Plan." Although the meaning of this provision is not entirely clear, it appears to indicate that a state could not pay a higher rate that is reflective of services rendered by a hospital if the services also happen to fall within another service category under the state's Medicaid program. CMS' position that the services are "identical" is without merit and disregards a state's determination that the rate is appropriate for a particular provider type or setting in which the services were provided.

Services provided in hospital outpatient settings are not necessarily identical to services provided in other locations. Hospitals, particularly public hospitals, provide a broader range of services than other providers, and are essential in ensuring that services are available to the Medicaid population at least to the same extent that they are available to the general population. It is appropriate for states to make higher payments to hospitals to reimburse them for their higher costs and to encourage them to make a wide variety of services available.[15]

In California, physician services provided in hospital outpatient departments are treated as hospital outpatient services, for which the hospital receives rates that reflect an additional component for facility costs in conjunction with the rate for professional services. Additionally, many public hospitals in the State operate outpatient clinics that do not satisfy the Medicare provider-based requirements but are currently recognized by the state as provider-based under the applicable state Medicaid payment provisions. These outpatient clinics meet all of the State's licensing requirements as components of the acute care hospital, and receive Medicaid reimbursement for outpatient hospital services. The application of the Medicare provider-based rules would create payment inequities as these providers would not be appropriately compensated for furnishing outpatient hospital services, resulting in potential service reductions and restricting access to vulnerable patient populations. To the extent CMS' proposal would prohibit these types of payment methodologies, it would limit states' flexibility to make payments under their programs that best promote the provision of services to their Medicaid population.

It is a fundamental principle of administrative law that an agency must provide a reasoned basis for its action consistent with applicable law. Hospitals have relied on the payments received under the current regulation, and CMS has not provided a valid reason for the proposed change that takes into consideration its impact on payments. Accordingly, the rule should be withdrawn.

---

[14] 48 Fed. Reg. 10378, 10380 (Mar. 11, 1983) (notice of proposed rule); 52 Fed. Reg. 47926, 47930 (Dec. 17, 1987) (notice of final rule).

[15] 42 U.S.C. 1396a(a)(30)(A).

## C.    The Rule Will Restrict Disproportionate Share Hospital Payments.

CMS cites the <u>Louisiana Department of Health and Hospitals</u> case to illustrate the need for "clarification" of the outpatient services definition. However, CMS makes no mention of any impact the rule will have on DSH payments, even though the core issue in that case was CMS' narrow application of the definition of hospital outpatient services to limit what the state could pay DSH facilities under the hospital-specific OBRA 1993 limit. The court in that case ruled that the uncompensated care costs incurred by hospital-based rural health centers (which were on the hospitals' licenses) with respect to uninsured patients appropriately were included as hospital costs for purposes of determining DSH payments. The court found the narrower definition CMS attempted to apply was inappropriate and contrary to congressional intent. The proposed rule change, applied in the context of the OBRA 1993 limit, would effectuate the restriction on DSH payments that was rejected by the court.

CMS' current attempt to narrow the scope of services to which DSH payments can be applied is contrary to congressional intent. The notion of "traditional" outpatient hospital services was not contemplated by Congress in the DSH context; rather, the legislative history shows that Congress intended otherwise, particularly with respect to public hospitals. Congress enacted the DSH requirement to ensure that inpatient hospital rates take into account the special costs of hospitals whose patient populations are "disproportionally composed of individuals who are either provided medical assistance under the State plan, or who have no source of third-party payment for such services." In doing so, Congress expressly recognized the broad range of services provided by public hospitals:

> Such hospitals, especially in urban areas, are often *multi-faceted* health care institutions, which provide many public health and social services to all residents of their area, in addition to serving as hospitals of last resort for the poor. Their sizable Medicaid populations often require extra social and public health services. In addition, in many areas such hospitals also provide considerable care for indigent persons not eligible for Medicaid, who often have only partial or no health care coverage. Nor do many such hospitals collect more than a small proportion of their overall revenues from non-public sources. . . . The Committee is also concerned that hospitals with large outpatient departments be reimbursed at levels for inpatient care that permit active participation in the Medicaid program and will encourage continuity of care in the treatment of Medicaid beneficiaries.[16]

Thus, Congress clearly contemplated that DSH payments would support the comprehensive range of services provided by public hospital systems, and that, as a policy matter, doing so would assure access and availability of services for Medicaid beneficiaries.

Consistent with this earlier legislative intent, the federal statute establishing the OBRA 1993 limit uses the general term "hospital services" with respect to the "costs incurred"

---

[16] OBRA 1981, Energy & Commerce Comm., Report of the Committee on the Budget, H.R. Rep. No. 158, Vol. II, 97th Cong., 1st Sess., pp. 295-296 (emphasis added).

by DSH facilities.[17]  It does not exclude the uncompensated costs of physician services, or services provided by hospital-based federally qualified health centers ("FQHCs").  There is no requirement that the uncompensated services, particularly those rendered to the uninsured, belong to a mutually exclusive category of services described within the state plan, nor is there any reference to the Medicare scope of outpatient services.

  The proposed rule change, if applied by CMS to limit which hospital services could be recognized in determining uncompensated care costs for DSH purposes, including the OBRA 1993 limit, would deprive hospitals of substantial costs for which DSH funds could be available.  Among the major categories of uncompensated hospital services that no longer would be recognized are physician services, home health services, physical, speech and occupational therapy services, services provided by hospital-based FQHCs, and services provided by outpatient and clinic components of the hospital that are recognized as hospital-based under state law, but not for Medicare payment purposes.  Public hospitals would be particularly hard hit, because they provide a wide range of services out of necessity to serve their disadvantaged populations.  These safety net providers rely heavily on DSH payments that are made in recognition of these hospital services.

  Several California public hospitals operate hospital-based FQHCs.  These are typically hospital outpatient departments or other hospital-based clinics, which are part of a provider network that receives Section 330 grant funding under the Health Care for the Homeless program.[18]  Under this particular grant, clinics can receive waivers of the various governance requirements that may otherwise preclude the clinics from satisfying the Medicare provider-based criteria.[19]  These clinics qualify as FQHCs, and receive payment for Medicaid covered services under the Medicaid State Plan FQHC payment methodology.[20]  The uncompensated care costs incurred by these hospital-based FQHCs that are associated with services to the uninsured appropriately are recognized for DSH payment purposes, including the calculation of the OBRA 1993 limits.  CMS cites no policy reason for why the outpatient hospital services provided to the *uninsured* must be mutually exclusive of other Medicaid service categories.

  Similarly, out of necessity, some California public hospitals operate clinics that are recognized as hospital-based under the state's licensing laws.  As discussed above, these clinics are essential to ensuring accessible care to Medicaid and other low-income populations.  Consistent with current law, the state has recognized these clinics as hospital outpatient clinics, and has reimbursed them accordingly under the State Plan, even though for Medicare purposes these clinics are not reimbursed as provider-based.  The uncompensated care costs incurred by these hospital clinics for services to the uninsured are appropriately recognized for DSH payment purposes.

  With respect to physician services, we note that, effective July 1, 2005, California's State Plan methodology for DSH was substantially modified in conjunction with a five year Section 1115 demonstration project.  Among other things, physician costs are no longer included for DSH payment purposes.  However, the uninsured uncompensated care costs for public hospitals that are "lost" under the new DSH methodology currently are being recognized

---

[17]  Soc. Sec. Act § 1923(g)(1)(A); 42 U.S.C. § 1396r-4(g)(1)(A).
[18]  Pub. Health Ser. Act § 330(h); 42 U.S.C. § 254b(h).
[19]  Pub. Health Ser. Act § 330(k)(3)(H); 42 U.S.C. § 254b(k)(3)(H).
[20]  Soc. Sec. Act § 1905(l)(2)(B); 42 U.S.C. § 1396d(l).

under a safety net funding pool distribution established by the demonstration. Though California voluntarily made these modifications as a condition of the demonstration, the hospitals expect and need these costs to continue to be funded, by DSH payments or otherwise, when the demonstration term ends. The proposed rule will therefore significantly impact California public hospitals.

As discussed above, CMS' revised definition of outpatient hospital services is not long-standing policy. The preamble itself notes that the current definition is very broad, which can overlap with other service categories, except to the extent that the outpatient hospital services are provided by hospitals, *i.e.*, in the hospital's licensed facilities or by its licensed sub-providers. It is a definition that has existed since nearly the inception of the Medicaid program, and Congress is presumed to act with contextual knowledge of existing regulation and policy. The interpretation reflected in the proposed rule did not exist at the time the DSH payment requirements were enacted, or when the OBRA 1993 limits were imposed. CMS provides no justification as to why the rule change is warranted for DSH purposes.

### D.     The Calculation Methodology For The Upper Payment Limit Is Flawed.

The UPL currently in place restricts Medicaid payments to a reasonable estimate of the amount that would be paid for the services furnished by the group of facilities under Medicare payment principles.[21] The proposed rule purports to retain this limit for privately operated facilities, and, as structured, the changes to the rule assume that the cost limit provisions applicable to governmentally operated facilities are in effect. If, however, the cost limit rule is subject to further delay by Congress or is otherwise not implemented, governmentally operated facilities could be subject to the same UPL calculations set forth in the rule for privately operated facilities. This would result because under current Section 447.321(b)(1), the aggregate Medicaid payments to any of the categories of hospitals may not exceed the UPL described in Section 447.321(b)(1), which is the subject of this rule change.

The proposed rule sets forth two methodologies for states to determine the upper payment limit, both of which rely on Medicare and Medicaid charge ratios. One methodology involves a calculation of the estimated Medicare cost of the services in question, while the other methodology involves an estimate of the Medicare payment amount for the services. These methodologies contain significant flaws.

One flaw is the exclusion of the costs and payments for interns and residents from the Medicare charge and payment data. This exclusion will understate the estimated amount that Medicare would pay for the services. The Medicare program separately pays for the costs of interns and residents through the GME and Indirect Medical Education ("IME") payments as part of the inpatient hospital payments, but these payments also cover services provided in outpatient areas. Thus, the Medicare cost report excludes the costs of interns and residents from the cost-to-charge ratios on Worksheet C and Worksheet D, Part V of the Medicare cost report. Similarly, the Medicare payments for interns and residents are excluded from the Medicare hospital outpatient payments on Worksheet E, Part B. The exclusion of the costs of and payments for interns and residents will result in an incorrect calculation of the total Medicare cost-to-charge and payment-to-charge ratios. Furthermore, as noted above, the proposed

---

[21]   42 C.F.R. § 447.321(b)(1).

methodology, which would exclude GME and IME costs, constitutes an implementation of the GME rule that is the subject of the congressional moratorium.

Second, there is a potential for mismatching under the methodologies set forth in the rule. The rule does not specify whether the charges are to be based on the date of service, date of payment, or date that the charge was submitted. Many hospitals experience substantial delays in generating all of the charges for Medicaid patients due to the significant delays in establishing eligibility. In California, there are frequently long delays in obtaining Medi-Cal eligibility determinations, especially for disabled persons. Furthermore, many outpatient hospital services require approval through a Treatment Authorization Request ("TAR") before they can be billed, and there are often significant delays in obtain TAR approval of the service. As a result of these and other factors, there are substantial delays in identifying the actual Medicaid charges. Thus, the UPL could be understated because it is determined using incomplete Medicaid data. It is unclear whether a state will be allowed to update the UPL using more complete data for the period at issue. CMS should clarify the charges to be used in calculation, specify whether there will be reconciliations of such charges, and ensure that there is appropriate matching of the UPL to Medicaid charges and payments.

The proposed methodologies also do not take into account the alternative charge structures that have been allowed by Medicare. For example, some hospitals use an all-inclusive charge system, whereby separate charges are not assigned to each service or item provided during an outpatient visit. Instead, each outpatient visit, and most of the ancillary care associated with the visit, is assigned to one of several different service levels based on the general quantity of services provided or the nature of the department or clinic in which the visit occurred. Thus, hospitals using all-inclusive rate structures do not maintain the level of charge detail that is typically used for cost apportionment. In these cases, hospitals have been permitted to complete their Medicare cost reports by using alternative statistics, such as relative value units ("RVUs"), instead of charges. CMS should expressly permit hospitals with alternative charge structures to utilize an alternative system for the upper payment limit calculation, instead of the cost-to-charge or payment-to-charge methodologies set forth in the rule.

The substantial flaws in the proposed methodologies require immediate attention by CMS and additional input from the states and hospitals, before any changes can be implemented. Additionally, CMS should confirm in the final rule that these methodologies will not apply to governmentally operated facilities, and that payments to these facilities will continue to be governed by the standards that were in effect prior to this rule change.

## III.    Regulatory Impact Statement.

CMS has determined that no regulatory impact analysis ("RIA") is necessary under Executive Order (E.O.) 12866. To justify this determination, CMS states that an RIA must be performed if the impact of a proposed rule would reach $100 million in any year, and then states that the impact of the proposal would not reach that threshold.

The $100 million per year impact, however, is only one of the several grounds under E.O. 12866 when an RIA must be performed. Under E.O. 12886, an agency must also prepare an RIA even when the annual costs would be projected at less than $100 million if its proposal would, among other things, impose an "adverse, material affect on the economy, a sector of the economy, productivity, competition, jobs, . . . public health . . . state, [or] local . . . governments [or] communities." E.O. 12866 §3. In light of CMS' failure to consider and evaluate its proposal regarding these other factors, it should withdraw the rule and perform an

RIA. In particular, CMS in its RIA should address and quantify the impact that the proposed limitation on hospital outpatient services would have on the Medicaid DSH limits for governmentally operated and privately operated providers. CMS has an obligation to recognize these impacts and quantify them.

In the Regulatory Impact Statement discussion, CMS indicates that it has a lack of available data to calculate the fiscal impact of the rule, but that it does not believe the rule would have significant economic effects. It is unclear whether CMS overlooked the impact of the rule on DSH payments, or simply concluded without thorough analysis that there would be no such impact. In either case, CMS' complete silence on these critical points renders its compliance with E.O. 12886 in question.

Furthermore, outside the issue of E.O. 12886, the rulemaking notice is inadequate as a matter of law due to CMS' failure to provide the public and potentially impacted parties with accurate information regarding the likely impact of the rule. CMS presumably is relying upon some cost estimates to reach the conclusion that its proposal will have minimal impacts, yet CMS has not identified those cost estimates so that interested parties can review and provide comments on them. This is basic legal error. See Chamber of Commerce v. SEC, 443 F.3d 890, 904 (D.C. Cir. 2006). Similarly, CMS' failure to recognize the significant economic impacts discussed above makes its proposal legally defective. Id. at 905 (vacating agency rules where agency had erroneously stated in its proposal that economic impacts would be "minimal"). And more fundamentally, an agency rule that is based upon a fundamental misunderstanding of its impact would represent a quintessential failure of "reasoned decisionmaking." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983).

CMS also ignores the burden that would be placed on states to revise their regulations concerning hospital outpatient services and possibly to revise their state Medicaid Plans. In light of the inadequate notice regarding the rule's likely impact, CMS should withdraw it.

## IV.    Conclusion

The proposed regulations will adversely affect the ability of CAPH members to continue to provide critically needed health services to the most needy in California. The rule would limit the state flexibility guaranteed by the Medicaid statute to establish their payment methodology. The loss of federal funding for the health care safety net in California under this rule will be detrimental to providers and the people they serve. Therefore, CAPH urges you to withdraw this proposed rule.

Sincerely,

*Melissa Stafford Jones*

Melissa Stafford Jones
President & CEO

**PLAINTIFF'S EXHIBIT 2**

**NAPH COMMENTS**

**ON 2007 PROPOSED RULE**

TF 32



1301 Pennsylvania Avenue, NW
Suite 950
Washington, DC 20004
202 585 0100 tel / 202 585 0101 fax
www.naph.org

October 29, 2007

Mr. Kerry N. Weems
Acting Administrator
Centers for Medicare and Medicaid Services
Department of Health and Human Services
Hubert H. Humphrey Building, Room 445-G
200 Independence Avenue, SW
Washington, D.C.  20201

**Ref: CMS-2213-P — Medicaid Program; Clarification of Outpatient Clinic and Hospital Facility Services Definition and Upper Payment Limit**

Dear Mr. Weems:

The National Association of Public Hospitals and Health Systems (NAPH) writes to express our serious concern regarding the issuance of the above-referenced Proposed Rule.[1]  This Rule (1) unnecessarily narrows the definition of outpatient hospital services, with a significant but unacknowledged impact on disproportionate share hospital (DSH) payments; and (2) is overly prescriptive in dictating upper payment limit (UPL) methodologies for private outpatient hospitals and clinics.  Of more concern, however, the Proposed Rule violates a recent legislative moratorium[2] (the Moratorium) on implementation of a cost limit on payments to governmental providers or restrictions on Medicaid graduate medical education (GME) payments.  For these reasons, NAPH urges CMS to withdraw the Proposed Rule immediately.[3]

NAPH represents more than 100 metropolitan area safety net hospitals and health systems. Our members are the primary hospital providers of care in their communities for Medicaid recipients, receiving on average 35% of their net revenues from Medicaid, and for many of the more than 46 million Americans without insurance.  Member hospitals represent only 2% of the acute care hospitals in the country but provide 25% of the uncompensated hospital care.  As a result, these hospitals rely upon Medicaid disproportionate share hospital (DSH) and other supplemental payments, including supplemental outpatient payments, for survival; without supplemental payments, overall NAPH member margins would drop to a negative 10.5 percent.  NAPH members serve a

---

[1] 72 Fed. Reg. 55158 (Sep. 28, 2007).
[2] U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, Section 7002(a).
[3] NAPH does not concede through submission of these comments that CMS has the authority to propose these provisions, nor to request, receive or review related comments, during the period of the Moratorium.

critical role in their communities of ensuring access to ambulatory care for uninsured and Medicaid patients. In 2004, NAPH members provided more than 29 million non-emergency outpatient visits, which represented more than one-third of all ambulatory care visits at safety net providers (including community health centers). Of the non-emergency visits at NAPH members, approximately 59 percent were for specialty care services and 41 percent for primary care services. The vast majority of this ambulatory care is reimbursed as outpatient hospital services.

The attached comments detail the following policy and technical concerns with the Proposed Rule:

- CMS has violated the congressional Moratorium and, in any event, failed to clarify how this Proposed Rule interacts with the Moratorium.

- The Proposed Rule will have a potentially significant impact on DSH payments, which CMS does not acknowledge.

- The Proposed Rule discourages hospitals from expanding important ambulatory care services.

- The Proposed Rule ignores significant differences in the scope and purposes of the Medicaid and Medicare programs in requiring coterminous coverage of outpatient hospital services, and in any event requires clarification.

- CMS' definition of outpatient hospital services to exclude services otherwise covered by the State Plan is not required by the Medicaid statute and is inconsistent with language in the preamble to the Proposed Rule.

- The overly prescriptive proposed outpatient UPL excludes the costs of interns, residents and supervising physicians, potentially resulting in millions of dollars in losses for providers in certain states, reduces state flexibility, and does not capture all Medicare-covered costs.

- The proposed private clinic UPL prohibits cost-based reimbursement without justification and includes a circular definition of the UPL for otherwise excluded dental services.

Because the Proposed Rule violates the Moratorium, CMS is legally obligated to withdraw it, and we urge you in the strongest terms to do so immediately. Congress enacted the Moratorium specifically to prevent CMS from taking "any action" to develop new policies in areas in which this Proposed Rule purports to regulate. Moreover, the Proposed Rule is bad policy, and would have a significant negative financial impact on both governmental and private hospitals serving Medicaid and uninsured patients. Coming in the wake of several other regulations issued by CMS that would impose large cuts on these hospitals—including the rule imposing a governmental provider cost limit and restricting sources of non-federal share funding,[4] the rule to eliminate Medicaid funding for graduate medical education,[5] and the proposed rule which has never been

---

[4] 72 Fed. Reg. 29748 (May 29, 2007).
[5] 72 Fed. Reg. 28930 (May 23, 2007).

finalized adopting narrow new DSH policies[6]—CMS' latest administrative action would be devastating to public, teaching and other safety net hospitals. Cumulatively these rules would eviscerate the health care safety net as well as jeopardize care for all Americans in communities across the country.

NAPH urges CMS to step back and consider the cumulative effect of its ever more restrictive Medicaid policies on the nation's safety net and the patients who rely on it for care. In addition to covering care for eligible populations, Medicaid supports an institutional safety net of health care providers that are critical to the well-being of their communities. If enacted, these rules would mean that such providers will no longer be able to train the next generation of doctors and health care professionals, to serve as the health care backbone of local emergency response systems, to provide critical yet under-reimbursed specialized services such as trauma care, burn care, neonatal intensive care and emergency psychiatric care, or to provide access where none would otherwise exist for the nation's poor, uninsured and underinsured individuals. Absent a more thorough analysis of real world implications of proposed policies and their impact on the health care system, we are relying on Congress to stop these policies in their tracks. We urge you to withdraw this regulation and all of the above mentioned pending regulations immediately. We need policies that strengthen, rather than dismantle, essential components of our nation's health care infrastructure.

If you have any questions, please contact Barbara Eyman or Charles Luband of NAPH counsel Powell Goldstein LLP at (202) 347-0066.

Respectfully,

Larry S. Gage
President

---

[6] 70 Fed. Reg. 50262 (Aug. 26, 2005).



1301 Pennsylvania Avenue, NW
Suite 950
Washington, DC 20004
202 585 0100 tel / 202 585 0101 fax
www.naph.org

October 29, 2007

COMMENTS BY THE NATIONAL ASSOCIATION OF PUBLIC HOSPITALS AND HEALTH SYSTEMS
ON PROPOSED RULE: CMS-2213-P-Medicaid Program; Clarification of Outpatient
Clinic and Hospital Facility Services Definition and Upper Payment Limit

**Prepared on Behalf of NAPH by Powell Goldstein LLP**

## MAJOR POLICY CONCERNS

### I. The Issuance of the Proposed Rule Directly Violates the Recently Adopted Congressional Moratorium.

CMS' action in issuing the above-referenced Proposed Rule[1] violates a recent legislative moratorium[2] (the Moratorium) prohibiting "any action" to implement a rule to impose a cost limit on Medicaid payments to governmental providers (CMS-2258-FC, the Cost Limit Rule)[3] or similar provisions, or any rule restricting payments for Medicaid graduate medical education (GME). For this reason alone, the rule should be withdrawn immediately.

### A. The Proposed Rule violates the Medicaid GME provision of the Moratorium.

The Proposed Rule effectively prohibits states from including GME costs in the outpatient UPL, thereby narrowing states' flexibility to support GME through outpatient payments and thus violating the Moratorium. The language of the Moratorium prohibits CMS from "tak[ing] any action (through promulgation of regulation, issuance of regulatory guidance, or other administrative action) to ... promulgate or implement any rule or provisions restricting payments for graduate medical education under the Medicaid program."[4] CMS' detailed new requirements for calculating cost for purposes of the outpatient hospital UPL excludes GME costs from the equation, essentially prohibiting states from providing outpatient-related GME payments.[5] Because states have never before been prohibited from providing outpatient GME support, CMS' proposal directly violates the Moratorium.

---

[1] 72 Fed. Reg. 55158 (Sep. 28, 2007).
[2] U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, Section 7002(a).
[3] 72 Fed. Reg. 29748 (May 29, 2007).
[4] Pub. L. No. 110-28, Section 7002(a).
[5] A more complete discussion of how CMS' proposed UPL methodology precludes states from reimbursing outpatient related GME costs is contained in technical section II.A.1. below.

1

**B. The Proposed Rule violates the Moratorium by reissuing regulatory provisions contained in the Cost Limit Rule.**

In the Proposed Rule, CMS reissued regulatory language from the final Cost Limit Rule redefining the categories of providers (state, non-state governmental and private) subject to upper payment limits (UPLs).[6] The outpatient UPL in effect at the time of the Moratorium applied to three categories of providers: "State government-owned or operated facilities ... Non-State government-owned or operated facilities ... [and] Privately-owned and operated facilities."[7] The Cost Limit Rule amended these categories to "State government operated facilities ... Non-State government operated facilities ... [and] Privately operated facilities," essentially removing all references to ownership.[8] The language of the Moratorium prohibits CMS from "tak[ing] any action (through promulgation of regulation ...) to ... finalize or otherwise implement provisions contained in the [Cost Limit Rule] ...."[9] In proposing to reissue the revised category language from the Cost Limit Rule in this Proposed Rule, CMS has violated Congress' directive not to take any action to implement any provision of that rule.

**C. The Moratorium violations completely disregard the clearly-expressed views of Congress on Medicaid policy.**

These violations of the Moratorium continue a pattern in which CMS has ignored Congress' statutory direction and contravened legislative intent regarding proper interpretation of the Medicaid Act. President Bush's FY 2007 and 2008 budget requests contained several Medicaid policy proposals to be implemented through administrative action.[10] Some of the proposals had previously been proposed as legislative measures but Congress declined to act on them.[11] In response to the administrative proposals, an overwhelming majority of both the House and Senate expressed public opposition to CMS' plans.[12] CMS moved forward nonetheless in issuing proposed cost limit and GME regulations. Congress responded swiftly by adopting the Moratorium in both areas, which was initially vetoed as part of a larger supplemental appropriations bill,[13] and later

---

[6] *See* 42 C.F.R. § 447.321(a), as revised by the final Cost Limit Rule, 72 Fed. Reg. at 29835, and reissued in the Proposed Rule, 72 Fed. Reg. at 55165-66.
[7] 42 C.F.R. § 447.321(a).
[8] 42 C.F.R. § 447.321(a), as revised by 72 Fed. Reg. 29748, 29835 (May 29, 2007).
[9] U.S. Troop Readiness, Veterans' Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, Section 7002(a).
[10] Budget of the United States Government, Fiscal Year 2007, at 125-27; Budget of the United States Government, Fiscal Year 2008, at 68-69.
[11] Budget of the United States Government, Fiscal Year 2005, at 149-50; Budget of the United States Government, Fiscal Year 2006, at 143; Letter from Michael O. Leavitt, Secretary of HHS, to the Honorable Richard B. Cheney, President, United States Senate, August 5, 2005 (transmitting legislative language to Senate implementing the fiscal year 2006 proposals); Letter from Michael O. Leavitt, Secretary of HHS, to the Honorable J. Dennis Hastert, Speaker of the House of Representatives, August 5, 2005 (transmitting legislative language to House of Representatives implementing the fiscal year 2006 proposals).
[12] In 2006, 55 Senators and 300 Members of the House publicly opposed the cost limit and IGT restrictions. In 2007, 65 Senators and 263 Members of the House have gone on record against these proposals and the proposed GME restrictions.
[13] H.R. 1591, 110th Congress (2007).

2

included in a revised bill that the President signed.[14]  In an apparent rush to regulate and "beat the clock," CMS issued the final cost limit rule on May 25, 2007, the very day that CMS knew the President would sign the Moratorium into law.  NAPH believes the issuance of the Final Rule itself violates the Moratorium, as by its terms the Moratorium took effect at 12:01 AM on May 25, the date of enactment.[15]  Legalities aside, however, it is disconcerting to NAPH that an agency would deliberately disregard the clearly-expressed views of Congress in this manner.  Unfortunately, the issuance of the Proposed Rule appears to indicate a troubling pattern.

## II. The Proposed Rule Will Have a Potentially Significant Impact on DSH Payments.

Perhaps the most damaging aspect of this Proposed Rule is its indirect impact on disproportionate share hospital (DSH) reimbursement for private and governmental hospitals alike—an impact that is not even acknowledged by CMS.  NAPH is concerned that to the extent the proposed outpatient hospital definition excludes services a state is currently treating as outpatient hospital services, CMS will take the position that the uncompensated care costs associated with those services could no longer be included in a hospital's DSH cap.  Our members report that their states are currently including the costs of services that would be excluded under the proposed definition, including dental care (primarily care to children as required under the Medicaid EPSDT benefit), routine vision, psychiatric, observation, and physician services, and provider-based FQHC services.[16]

NAPH opposes any narrowing that will reduce the resources available to safety net hospitals to provide access to care for Medicaid and uninsured patients.  The DSH program, over the years, has become the "lifeblood" for many safety net hospitals.  DSH payments help to offset some of the unreimbursed costs that hospitals incur in caring for uninsured patients, but the adequacy of DSH allotments is declining as costs climb and insurance coverage drops. As a percentage of Medicaid expenditures, DSH has fallen dramatically in the last decade, declining from 14 percent of overall Medicaid expenditures in 1993 to approximately 6 percent in 2004.  CMS has already proposed a rule that would cut back on what it would allow to be considered costs for DSH payment purposes.[17]  Policy changes in DSH payments directly affect the ability of these hospitals to provide access to care for Medicaid and uninsured patients.

If this proposal would in fact narrow the costs reimbursable through DSH, CMS may have significantly underestimated the fiscal impact of the Proposed Rule, which it determined would not have "significant economic effects."[18]  In that case, this Proposed

---

[14] Pub. L. No. 110-28, Section 7002(a).

[15] See, e.g., Arnold v. United States, 13 U.S. (9 Cranch) 104, 119 (1815); United States v. Casson, 434 F.2d 415, 419 (D.C. Cir. 1970).

[16] In the case of provider-based FQHC services, hospitals that have established FQHCs, which are paid at clinic rather than hospital rates, include the uncompensated costs of providing these services in their DSH cap.

[17] 70 Fed. Reg. 50262 (Aug. 26, 2005).

[18] 72 Fed. Reg. at 55158, 55164 (Sep. 28, 2007).

Rule potentially should have been a major rule, requiring a longer period after final publication before implementation and certainly warranting a longer comment period than 30 days.

### III. The Proposed Rule Discourages Hospitals from Expanding Important Ambulatory Care Services.

In prohibiting states from reimbursing certain ambulatory services provided by hospitals as outpatient hospital services, CMS is effectively reducing the reimbursement rate for those services because reimbursement for non-hospital services cannot include hospital overhead. In addition, CMS has stated that hospitals may not receive DSH reimbursement for non-hospital services. Therefore, a narrowing of the definition of outpatient hospital services is essentially a cut in hospital Medicaid reimbursement. Moreover, restrictive upper payment limit policies similarly have a direct impact on hospital funding. The cut discourages safety net hospitals from providing exactly the type of community-based primary and preventive ambulatory care services that have proved so effective in driving down health care costs yet are in short supply in so many states. NAPH questions the policy basis for such a proposal.

NAPH members and similarly situated hospitals play a critical role in the provision of outpatient services, particularly for low-income Medicaid and uninsured patients. In response to increasing demand for accessible ambulatory care, NAPH hospitals have established elaborate networks of off-campus, neighborhood clinics with expanded hours, walk-in appointments, assigned primary care providers and access to appropriate follow-up and specialty care. In 2004 alone, 89 NAPH member hospitals provided 29 million non-emergency outpatient visits, with ambulatory care volume increasing by 49 percent between 1993 and 2003. These 89 hospital systems alone provided over one-third of all outpatient visits provided by safety net hospitals and community health centers (the other two-thirds were provided by 914 HRSA community health centers). The specialty ambulatory care provided by NAPH members is often the only such care available for patients referred from community health centers and other federally funded primary care clinics.

As explained in more detail below, this Proposed Rule narrows the definition of outpatient hospital services in multiple ways, many of which would have the effect of reducing reimbursement for the very ambulatory care services that states have sought to encourage our members to provide. It is inconceivable that CMS would adopt this policy when it admits that it has found no actual violations or problems with current state practices.[19]

---

[19] 72 Fed. Reg. at 55164 ("As part of our review process, we have determined that only one of the 32 States currently defines non-hospital services as part of the outpatient hospital Medicaid State plan service benefit. . . We believe the fiscal impact would be minimal.").

4

LEGAL AND TECHNICAL ISSUES

In addition to our broad policy concerns, NAPH has several technical concerns and questions about the Proposed Rule:

**I. Narrowing the Definition of Outpatient Hospital Services** *(II. D. Background, Medicaid Outpatient Hospital Services Definition; III.B. Provisions of the Proposed Rule, Proposed § 440.20)*

The Proposed Rule would limit the scope of services included in the definition of outpatient hospital services by: (1) excluding any services not reimbursed as outpatient hospital services under Medicare; (2) excluding services provided by entities that are not provider-based departments of a hospital; and (3) excluding services covered elsewhere in the State Plan. This proposed narrow definition will result in less support for safety net hospitals and potentially significant losses in DSH funding. If, however, CMS insists on adopting a more precise definition, we believe that more clearly specifying that outpatient hospital services must be provided in a provider-based setting would adequately address any potential concerns.

**A. CMS should remove the requirement to align Medicaid outpatient hospital services with Medicare, or at the very least provide necessary clarification.**

*1.    Medicaid and Medicare legitimately include a different range of services in the outpatient hospital services benefit.*

CMS justifies the requirement to include only Medicare-reimbursed outpatient hospital services as "provid[ing] greater consistency between the two federally funded programs" and aligning Medicaid outpatient hospital services with the "industry-accepted class of services" recognized as outpatient hospital under Medicare regulations.[20] Given the separate statutory authority for the Medicare and Medicaid programs, it is unclear why "consistency" would provide a sufficient statutory basis for this regulation. Moreover, NAPH questions the policy basis for insisting on rigid, coterminous definitions when the two programs are very different in scope, have very different purposes and cover different populations, with Medicaid's focus on providing services to low-income populations with differing needs. For example, Medicare completely excludes from coverage services such as dental care for children or vaccinations that policymakers have determined are critical to the health of Medicaid populations. Medicare also does not include outpatient hospital reimbursement for vision, psychiatric services and observation that state Medicaid programs have seen the value of reimbursing at a hospital rate to meet specific needs of their patient populations.

***Recommendation: The Proposed Rule should be amended to eliminate the requirement that the Medicaid definition be no broader than the Medicare definition.***

---

[20] *Id.* at 55161.

5

2.    *CMS should provide clarification regarding reimbursement as an outpatient hospital service under alternate payment methodologies.*

If CMS retains this requirement, additional clarification is necessary for states and providers on how to determine whether a service is reimbursed as an outpatient hospital service under an alternate Medicare payment methodology sufficient to be included under the proposed definition. For example, physician services provided in an outpatient hospital setting could conceivably be considered to be reimbursed as an outpatient hospital service—they are reimbursed under the physician fee schedule as the professional component of outpatient hospital services, which is an alternative payment methodology—but CMS explicitly excludes them from the proposed definition. Laboratory services are similarly reimbursed under a fee schedule, yet are explicitly included as outpatient hospital services under the proposed definition.[21]

**Recommendation: CMS should provide clarification as to the scope of services paid under alternate Medicare payment methodologies as outpatient hospital services that would be included under this proposed definition.**

3.    *CMS should clarify the interpretation of Medicare OPPS regulations as they apply to the proposed definition.*

Title 42, Section 419.2(b) of the Code of Federal Regulations (CFR), as referenced in proposed section 440.20(a)(4)(i),[22] sets out an illustrative, but not exclusive, list of costs that may be included in the outpatient prospective payment system (OPPS).[23] Additional provisions list costs explicitly excluded from outpatient prospective payment rates,[24] and services excluded from payment under the hospital OPPS.[25]

**Recommendation: CMS should confirm that costs for services not explicitly excluded from the OPPS are therefore includable (assuming that these services meet the other proposed criteria).** If this is the case, NAPH requests that CMS clarify how it will permit states to factor these other costs into the highly prescriptive private hospital outpatient UPL.

---

[21] *See id.* (stating that "[f]or example, States may cover and reimburse prosthetic devices, prosthetics, supplies, and orthotic devices, durable medical equipment, and clinical diagnostic laboratory services as outpatient hospital services."). In addition, there is concern that Medicare criteria for coverage of hospital versus non-hospital laboratory services are themselves complicated and that more detailed guidance is necessary to determine appropriate Medicaid coverage.

[22] Proposed 42 C.F.R. § 440.20(a)(4)(i), *Id.* at 55165.

[23] 42 C.F.R. § 419.2(b) ("these costs include, but are not limited to…").

[24] *Id.* § 419.2(c).

[25] *Id.* § 419.22.

6

Title 42, Section 419.20(b) of the CFR also excludes certain categories of hospitals from the Medicare hospital OPPS.[26]

*Recommendation: CMS should clarify that Medicaid outpatient hospital services in these categories of hospitals are includable under the proposed definition.*

**B. CMS should remove the exclusion of services covered elsewhere under the State Plan from the definition, or at the very least provide necessary clarification.**

The Proposed Rule would further exclude from the outpatient hospital services definition those services that are covered and paid "under the scope of another Medical Assistance service category under the State Plan,"[27] though states "may continue to cover any service that is authorized under section 1905(a) of the Act within the State Plan under a coverage benefit that is distinct from outpatient hospital services."[28]

       *1.    This exclusion is not required by the language of the Medicaid statute.*

Nothing in the language or the history of the Medicaid statute requires categories of covered services to be discrete and mutually exclusive. Indeed, the U.S. Court of Appeals for the Fifth Circuit implicitly rejected mere reliance on a service being referenced in a different enumerated category from outpatient hospital services under section 1905(a)(2) of the Act as sufficient reasoning for excluding the service from the regulatory definition of outpatient hospital services.[29] Because CMS' proposed insistence on discrete categories prohibits hospitals from receiving full outpatient hospital reimbursement for services that are clearly provided by outpatient hospital departments, CMS should abandon this unnecessary requirement.

*Recommendation: CMS should amend the Proposed Rule to allow services covered elsewhere in the State Plan to be included in the outpatient hospital definition when provided to individuals receiving care in hospital outpatient settings.*

       *2.    CMS' proposed definition appears inconsistent and requires clarification.*

If CMS nonetheless chooses to retain this requirement, CMS should clarify apparent inconsistencies between the requirement and preamble language listing outpatient hospital services under the proposed definition. CMS explicitly provides that "states may

---

[26] *Id.* § 419.20(b) (excluding Maryland hospitals, critical access hospitals, hospitals located outside of the 50 states, DC and Puerto Rico, and hospitals of the Indian Health Service).
[27] Proposed 42 C.F.R. § 440.20(a)(4)(iii), 72 Fed. Reg. at 55165.
[28] 72 Fed. Reg. at 55161.
[29] *Louisiana Dep't of Health and Hosps. v. CMS.*, 346 F.3d 571 (5th Cir., 2003) ("CMS analyzes the term 'hospital services' [as used in the DSH statute] with the premise that 'outpatient hospital services' and 'rural health clinic services' are mutually exclusive. CMS notes: (1) federal statutes and regulations distinguish the terms in at least two places, see 42 U.S.C. §§1396d(a)(2) (enumerating categories of medical assistance services, including outpatient hospital services and rural health clinic services)…CMS assumes, without explanation, that any service that a RHC renders may never be considered an outpatient hospital service even if the service fits within the regulatory definition of 'hospital outpatient service.'").

NAPH Comments CMS-2213-P
October 29, 2007

cover and reimburse prosthetic devices, prosthetics, supplies, and orthotic devices, durable medical equipment, and clinical diagnostic laboratory services as outpatient hospital services."[30]  Yet, prosthetic devices,[31] laboratory services,[32] and rehabilitative services[33] are each separate benefit categories under section 1905(a) of the Social Security Act.  NAPH agrees that these services should be encompassed by the outpatient hospital services definition; however, states and providers require consistent guidance in order to apply this requirement to other services.

### C.    Other details of the proposed definition require further clarification.

Our members also seek more specific clarifications related to the following aspects of the proposed outpatient hospital definition:

- CMS should confirm that rehabilitative services currently considered outpatient hospital services under Medicare would continue to be considered outpatient hospital services under Medicaid, clarifying potentially inconsistent guidance in the preamble and proposed regulations.[34]

- CMS should clarify that this Proposed Rule, in conjunction with current inpatient service regulations, would not prohibit state Medicaid agencies from reimbursing hospitals for services provided discharged patients waiting for an available skilled nursing facility (SNF) bed as hospital services (either outpatient or inpatient) under the state plan.[35]

---

[30] 72 Fed. Reg. at 55161.

[31] *See* SSA § 1905(a)(12) (42 U.S.C. § 1396d(a)(12) ("prescribed drugs, dentures, and prosthetic devices...").

[32] *See id.* § 1905(a)(3) (42 U.S.C. § 1396d(a)(3)) ("other laboratory and X-ray services").  It is possible that this reference could be interpreted to include only those services other than lab services provided as outpatient hospital services in (a)(2) (or inpatient in (a)(1)), and therefore that outpatient hospital lab services are not a distinct service category.

[33] *See id.* §§ 1905(a)(11) ("physical therapy and related services"), 1905(a)(13) ("other diagnostic, screening, preventive, and rehabilitative services...").

[34] The text of proposed section 440.20(a) explicitly defines outpatient hospital services to continue to include "rehabilitative services," and Medicare reimburses hospitals under an "alternate payment methodology" for therapy provided by hospital outpatient departments, in accordance with proposed section 447.321(a)(4)(i).  In the preamble, however, CMS states that rehabilitative services may be an example of "non-traditional outpatient hospital services."  72 Fed. Reg. at 55160; *see also* 72 Fed. Reg. at 55159 ("outside the normal responsibility of outpatient hospitals").

[35] In at least one state, the Medicaid program pays hospitals based on a SNF rate for these patients, though Medicare apparently does not reimburse hospitals for these services.  Covering these services under the Medicaid SNF benefit does not adequately address the issue for these hospitals, as they may then be faced with the substantial administrative burden of pursuing state licensure as a SNF in order to provide what would newly be defined as "non-hospital" services to these patients.

## II. Restriction of the Outpatient Hospital and Clinic Upper Payment Limits
*(II.E. Background, Upper Payment Limits—Proposed Rule; II.B. Provisions of the Proposed Rule)*

### A. The proposed outpatient hospital UPL methodologies are too prescriptive.

NAPH objects to the limitations that the Proposed Rule would impose on state flexibility in calculating the upper payment limit for outpatient hospital services provided by private hospitals. The flexibility available under the current regulation[36] permits states to accurately capture the costs (or payments) made to hospitals for outpatient care while ensuring compliance with statutory requirements. CMS could clarify the requirements for calculating the UPL by describing examples of acceptable methodologies, i.e. cost-to-charge and payment-to-charge calculations, without precluding the use of other methodologies. A state should be permitted to develop another methodology more tailored to its circumstances if it is a reasonable approximation of what would be paid under Medicare payment principles.

> *1.     CMS should permit adjustments to the Medicare allowable costs on the cost report.*

The Proposed Rule would require that services appear on the outpatient-specific Medicare cost report worksheets in order to be included in the outpatient hospital UPL,[37] and would not permit adjustment of these costs.[38] NAPH is extremely concerned that in dictating the specific sections of the Medicare cost report that a state may use in calculating cost information for the outpatient UPL, CMS effectively excludes GME costs from the outpatient costs that a state can include. The preamble explicitly references the "cost-to-charge ratios as found on Worksheet C, Column 9. . . of the CMS 2552-96."[39] However, the cost-to-charge ratios contained at Worksheet C, Column 9 are calculated by taking information from Worksheet B, Column 27—which explicitly excludes all costs related to interns, residents, and supervising physicians. Given that Medicare pays for GME separately from outpatient (and inpatient) reimbursement, it makes sense that for Medicare purposes these costs would not be included in the outpatient cost-to-charge ratios. Similarly, the Medicare outpatient cost-to-charge ratio also excludes costs for teaching physicians for those hospitals that have chosen the election under Title 42, Section 415.160 of the CFR. Although Medicare reimburses these costs separately, they remain outpatient hospital costs that should be reimbursable through Medicaid. Federal law does not prohibit states from covering these costs as part of Medicaid outpatient reimbursement.

---

[36] *See* 42 C.F.R. § 447.321. Under current regulations, CMS has avoided a specific formal UPL, and instead negotiated UPL methodologies with states as long as payments to all private hospitals on an aggregate basis do not exceed a "reasonable estimate of the amount that would be paid for services furnished by the group of facilities under Medicare payment principles."
[37] Proposed 42 C.F.R. § 447.321(b)(1)(i)(A), 72 Fed. Reg. at 55166.
[38] 72 Fed. Reg. at 55162.
[39] *Id.*

9

***Recommendation: CMS should clarify that outpatient costs related to interns, residents, and supervising physicians, as well as costs related to cost-based reimbursement for teaching physicians, can be included in calculating the private outpatient hospital UPL.[40]***

In addition, some members have expressed concern that the cost report references specified by CMS may not be capturing all Medicare-covered outpatient hospital payments and charges, specifically related to physical therapy and durable medical equipment. ***NAPH requests that CMS review these references to ensure that the payments and charges for all outpatient hospital services reimbursed by Medicare under the OPPS or alternative methodologies are captured by these references.***

2.    *CMS must make allowances for "flat rate" hospitals that have exceptions for Medicare cost reporting purposes.*

CMS' methodology, by prescriptively referencing the Medicare cost report methodology, is particularly inappropriate where Medicare has permitted exceptions to its cost report methodology. In particular, Medicare has allowed "flat rate" hospitals with alternative charge structures to complete their Medicare cost report by using statistics to allocate costs instead of using the cost-to-charge methodology usually used in the Medicare cost report. The rationale for these exceptions is because the cost-to-charge calculation does not make sense where the charge structure is not consistently maintained. A payment-to-charge ratio would be similarly distorted. CMS' inflexible proposed UPL methodologies appear not to not allow an exception where Medicare itself has allowed an exception from the rigorous use of charges.

***Recommendation: CMS should allow states to use an alternative methodology to calculate the UPL related to flat rate hospitals.***

3.    *CMS should clarify that the cost methodology proposed for UPL calculations does not apply to DSH cost limits.*

CMS should confirm that the cost calculation described in this Proposed Rule for the purposes of calculating an outpatient hospital UPL is not mandatory for purposes of calculating either the DSH limit or the limit under the Cost Limit Rule. DSH explicitly covers a full range of covered and uncovered Medicaid services for both Medicaid recipients and the uninsured, and the restrictions imposed on the calculation of hospital costs for purposes of the outpatient UPL would be completely inappropriate with respect to DSH.

***Recommendation: CMS should confirm that this role has no impact on DSH limit calculations.***

---

[40] We reiterate the point made earlier, that the exclusion of intern, resident, and supervising physician costs from the UPL violates the Moratorium.

## B. Elimination of Cost-Based Reimbursement for Private Clinics

NAPH is extremely concerned that the limited methodologies permitted for calculating the UPL for private clinic services under the Proposed Rule would in effect prohibit states from paying private clinics cost-based rates. [41] CMS provides no justification for allowing a cost-based UPL for hospitals but not clinics, simply stating that "Medicare does not typically pay for clinic services on the basis of cost as reported by the facility."[42] Furthermore, CMS does not appear to have considered that a cost-based UPL would be the most reasonable for services, such as dental services, that are not reimbursed under Medicare. Instead, CMS' proposed dental component of the UPL, defining the UPL as "that amount that Medicaid would pay," [43] is circular and, in effect, is no limit at all.

*Recommendation: CMS should revise the proposed regulation to permit a cost-based UPL for private clinics.*

## C. Other UPL Clarifications

1. *The Proposed Rule fails to clarify the scope of the category of private providers that would be subject to the UPL during the period of the Moratorium.*

This Proposed Rule would apply a more restrictive UPL to "privately operated facilities," defined under Section 447.321 as revised by the cost limit rule. CMS should clarify that if this rule is finalized during the period of the Moratorium, the proposed, restrictive UPL will apply only to those hospitals and clinics considered private prior to issuance of the Cost Limit Rule. Specifically, ***CMS should clarify that the more flexible governmental UPL, not this revised UPL, will continue to apply to state or non-state government-owned and privately operated facilities until the expiration of the Moratorium.***[44]

2. *CMS should clarify that the provisions of this Rule will apply prospectively.*

CMS claims in the preamble that they currently require compliance with one of these outpatient hospital UPL methodologies when states submit State Plan Amendments related to outpatient hospital services.[45] CMS should clarify that the requirements of this Proposed Rule will only be prospectively applied after proper issuance of a final rule. Given the significant policy changes required by this proposed rule, it would be improper to implement these requirements without notice and comment rulemaking.

---

[41] *See* Proposed 42 C.F.R. § 447.321(b)(1)(ii), 72 Fed. Reg. at 55166.
[42] 72 Fed. Reg. at 55163.
[43] Proposed 42 C.F.R. § 447.321(b)(1)(ii)(C), *Id.* at 55166.
[44] We reiterate the point made above that CMS' modifications to the categories of providers subject to the UPL violates the Moratorium.
[45] 72 Fed. Reg. at 55162.

PLAINTIFF'S EXHIBIT 3

JOINT COMMENTS OF

FIFTEEN STATES AND

STATE MEDICAID AGENCIES

*16*

BEFORE THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Proposed Medicaid Program Rules on | ) |
| | ) |
| OUTPATIENT HOSPITAL AND | ) |
|   CLINIC SERVICES | ) |
| | ) |
| CMS 2213-P | ) |
| | ) |

## JOINT COMMENTS OF FIFTEEN STATES AND STATE MEDICAID AGENCIES

These comments are submitted on behalf of the agencies and officials responsible for administering the Medicaid program in the States of Alaska, Connecticut, Illinois, Maryland, Michigan, Missouri, New Jersey, Oklahoma, Pennsylvania, South Dakota, Tennessee, Utah, Vermont, Washington and Wisconsin ("Commenting States") in response to the proposed rule amending the definition of outpatient hospital services in the Medicaid regulations. 72 Fed. Reg. 55158 (Sept. 28, 2007). The deadline for comment imposed by the Centers for Medicare & Medicaid Services (CMS) is plainly inadequate for a rule that, if finalized, would have far-reaching and significantly burdensome effects on State Medicaid programs. Moreover, in the limited time the Commenting States have had to review the proposed rule, it has become clear that CMS's proposed amendments to the outpatient hospital services definition and the upper payment limit (UPL) are misguided.

I.    CMS should have allowed at least a 60-day comment period

       Provision of rule commented upon: The proposed rule was published in the Federal Register on September 28, 2007, and the deadline for comment is October 29, 2007 – the first business day following a 30-day period starting on the date of publication. 72 Fed. Reg. at

55158. CMS states that "[t]he provisions proposed in this regulation address completely

different policy matters than those set forth in CMS–2258–FC," which is subject to a

congressionally imposed moratorium. *Id.* at 55160. CMS further states that the proposed rule

"does not impose information collection and recordkeeping requirements." *Id.* at 55164. CMS

claims that its proposed rule "would not significantly alter current practices in most States," that

the rule will not have "significant economic effects," and that only one State "could be affected

by this rule." *Id.* at 55164-65. Finally, CMS states that the proposed rule will not have

significant effects within the meaning of Executive Order 12866, the Regulatory Flexibility Act,

section 1102(b) of the Social Security Act ("Act"), the Unfunded Mandates Reform Act, or

Executive Order 13132. *Id.* at 55165.

       A 30-day comment period is plainly inadequate: The proposed rule, if finalized,

threatens to affect State Medicaid programs in major ways. At the very least, the rule will

impose substantial new administrative burdens on all States. A comment period of at least 60

days should have been allowed.

       First, CMS ignored the mandatory 60-day notice and comment requirement of the

Paperwork Reduction Act. CMS's conclusory assertion that its proposed rule does not impose

information collection and recordkeeping requirements is undercut by the proposed rule itself.

The revisions to the UPL regulation alone create major new information collection requirements

involving hospital and clinic cost reports and Medicare fee schedules. The proposed rule plainly

"concern[s] [a] proposed collection of information" within the meaning of the Paperwork

Reduction Act, 44 U.S.C. § 3506(c)(2)(A); *id.* § 3502(3)(A), and warrants a mandatory 60-day

notice and comment period, *id.* § 3506(c)(2)(A).

CMS also should have permitted a 60-day comment period under other authorities. A comment period of at least 60 days is the default under Executive Order 12866, § 6(a)(1) (Sept. 30, 1993), *Regulatory Planning and Review, as amended by* Exec. Orders 13258 (Feb. 26, 2002) and 13422 (Jan. 18, 2007) (providing that "each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days"). Given the wide-ranging application and substantial administrative burdens of the proposed rule, it was improper for CMS to provide for a comment period only *half* as long as the period proper for *any* proposed regulation.

Any change to the definition of outpatient hospital services will plainly apply to each and every State, not just the one unnamed State mentioned by CMS. And any change to the manner in which the UPL must be calculated for hospital outpatient services and clinics will also apply to each and every State. These changes are far from minor. The UPL methodology proposed by CMS, especially with respect to clinics, is immensely complex. It would require States to obtain, process, and provide to CMS information that is orders of magnitude more complicated and detailed than what is required under the current regime.

The proposed rule cannot seriously be characterized as anything other than major. It is "significant" within the meaning of numerous authorities, such as Executive Order 12866 § 3(f) (defining "significant regulatory action" as "any regulatory action that is likely to result in a regulation that may . . . adversely affect in a material way . . . a sector of the economy, . . . public health or safety, or State, local, or tribal governments or communities" or that may "[r]aise novel legal or policy issues arising out of legal mandates"); the Regulatory Flexibility Act; section 1102(b) of the Social Security Act; the Unfunded Mandates Reform Act of 1995; Executive Order 13132; and the Administrative Procedure Act, 5 U.S.C. §§ 801, 804(2).

3

That CMS permitted a comment period of only 30 days indicates either that CMS does not understand the scope of its own proposed rule or that CMS hopes States will fail to realize the full effects of the rule until it is too late for them to comment on it. Neither possibility is acceptable. The proposed rule is complicated and important, and States and other affected entities should be given more time to understand how they might be affected and to comment.

II.     The proposed rule is misguided in a number of respects.

Given the short period of time provided to assess and comment upon the rule, the Commenting States briefly describe the following concerns that have so far been identified:

A.     The Proposal Would Prohibit the Use of All-Inclusive Rates. Despite the flexibility given to States in the Social Security Act in defining the scope of services and in setting reimbursement rates, the proposed rule would appear to invalidate the long-accepted practice, followed in some States, of paying all-inclusive rates for outpatient hospital services. The all-inclusive rate is paid to the hospital and includes a professional service component. Under such a system, the physician cannot bill Medicaid separately. States frequently use the all-inclusive rate as a means of controlling costs.

By excluding professional services from the definition of outpatient hospital services, the new rule would apparently prohibit all-inclusive rates and require States to pay physicians and other professionals separately from the facility, requiring amendments to long-standing state reimbursement methodologies. The proposed rule does not point to any statutory reason or public policy that would support that position. Both are mandatory services under Section 1905(a) of the Social Security Act and nothing in the Act requires that they be separately reimbursed.

4

   B.  <u>The importation of the Medicare definition of outpatient services into Medicaid is</u>

<u>inappropriate.</u>  The Medicare definition of outpatient services is targeted to the elderly and

disabled who are enrolled in that program.  By contrast, Medicaid targets younger, broader, and

more vulnerable patients who face barriers to access to care and are therefore more likely than

Medicare patients to use a hospital in their community as their "medical home."  The Medicare

definition of outpatient services is too narrow and does not appear to include services that in

many States have traditionally covered as outpatient hospital services for the Medicaid

population, including dental and vision services and some types of preventive care.  Because of

the difference in the patient base, application of the Medicare definition of outpatient service will

have a particular adverse impact on children's hospitals.

   C.  <u>The proposed rule penalizes hospitals that seek to serve people in their</u>

<u>communities by excluding services provided in outpatient clinics that are not departments of the</u>

<u>hospitals.</u>  In order to deter inappropriate use of expensive hospital emergency room services and

to better serve their patients, many hospitals have established outpatient clinics, and receive

support for those services through Medicaid outpatient hospital reimbursement or

disproportionate share hospital payments for the costs of serving the low-income uninsured.  To

the extent that the new rule was intended to shut off that type of reimbursement, it reflects

spectacularly poor public policy that reduces the ability of hospitals to reach out and serve

patients in less expensive, more convenient, and more clinically appropriate settings.

   D.  <u>The UPL calculation for outpatient hospital services improperly excludes</u>

<u>graduate medical education (GME) costs, in violation of congressional mandate.</u>  On May 25,

2007, as part of the US Troop Readiness, Veterans Care, Katrina Recovery, and Iraq

Appropriations Act of 2007, Congress prohibited the Secretary of Health and Human Services

5

from taking "any action" to "finalize or otherwise implement" any regulation prohibiting

Medicaid reimbursement for GME costs. The cost-to-charge and payment-to-charge ratios in the

proposed rule are defined to exclude GME costs. Accordingly, the proposed UPL is in violation

of the congressional mandate.

      E.     <u>The UPL calculation for clinic services is extremely burdensome and complex,</u>

<u>and its application may result in Medicaid rates that cannot assure access to services.</u> Currently,

there are a number of States that do not regularly conduct UPL calculations for clinic services or

have used cost as a proxy for the UPL. The proposed rule no longer permits that approach but

instead would require States to calculate a clinic UPL by making a comparison on a procedure-

by-procedure basis to the amount Medicare pays for equivalent services. This entails pulling

information from thousands of lines on Medicare's detailed fee schedules, and by making

additional complex adjustments to these numbers to remove components that CMS contends are

not reimbursable as clinic services under Medicaid.

      Clinics are important service providers in the Medicaid program, and for that reason

many are reimbursed at or near cost, similar to the federally-imposed requirement for federally-

qualified health centers and rural health clinics. To the extent that Medicare reimbursement is

less than costs, the proposed UPL calculations could lead to a reduction in Medicaid payments to

these important providers.

      F.     <u>The rule implicates the moratorium on CMS's implementation of the Cost Limit</u>

<u>for Providers Operated by Units of Government.</u> On January 18, 2007, CMS published its

proposed regulation on Cost Limits for Providers Operated by Units of Government, 72 Fed.

Reg. 2236. On May 25, 2007, as part of the US Troop Readiness, Veterans Care, Katrina

Recovery, and Iraq Appropriations Act of 2007, Congress prohibited the Secretary of Health and

6

Human Services from taking "any action" to "finalize or otherwise implement" the regulation proposed on January 18, 2007. Pub. L. No. 110-28, § 7002 (2007). Four days after that instruction, the final rule was published in the Federal Register, with a purported effective date of July 30, 2007.

Although CMS has stated its intent to comply with the moratorium provision, it is apparent that the current proposal will significantly affect reimbursement to hospitals and clinics of all types, including those operated by units of government. CMS–2258–FC, which is subject to a moratorium, purports, among other things, to "clarif[y] the documentation required to support a Medicaid certified public expenditure" and to "limit[] Medicaid reimbursement for health care providers that are operated by units of government to an amount that does not exceed the health care provider's cost of providing services to Medicaid individuals." 72 Fed. Reg. 29748, 29748 (May 29, 2007). The proposed rule would alter the definition of outpatient hospital services, thereby altering the costs and expenditures that CMS would deem acceptable under CMS–2258–FC. Thus, CMS's claim that the proposed rule concerns matters different from those addressed in CMS–2258–FC is patently incorrect.

III.    <u>Conclusion</u>

For the reasons discussed above, the Commenting States urge CMS to withdraw the proposed rule.  Should CMS insist upon proceeding with the proposed rule, the Commenting States urge CMS to reissue the proposed rule with at least a 60-day comment period, and to substantially modify its proposal in accordance with the foregoing comments.

Respectfully submitted,

Caroline M. Brown
Leah Pogoriler
Covington & Burling LLP
1201 Pennsylvania Ave, N.W.
Washington, D.C. 20004-2401
(202) 662-6000

Attorneys for the Commenting States

October 29, 2007

8

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA, DEPARTMENT OF MEDICAL ASSISTANCE SERVICES, )<br><br>Plaintiff, )<br>v. )<br><br>MICHEAL O. LEAVITT, in his official capacity as SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, )<br><br>and )<br><br>KERRY N. WEEMS, in his official capacity as ACTING ADMINISTRATOR, CENTERS FOR MEDICARE AND MEDICAID SERVICES of the United States Department of Health & Human Services, )<br><br>Defendants. ) | Civ. Action No. 08-0573 (RMC) |

## PROPOSED ORDER

Upon consideration of the Plaintiff's Motion for Summary Judgment, the memoranda in support thereof and in opposition thereto, and the entire record herein, it is hereby:

ORDERED that the Plaintiff's Motion for Summary Judgment is GRANTED; and it is further

ORDERED that Defendants' disallowance of physician costs incurred by the Virginia hospitals furnishing services to uninsured and Medicaid eligible patients was arbitrary, capricious, contrary to law, unsupported by credible, substantial evidence and is otherwise invalid under the Administrative Procedure Act, 5 U.S.C. § 706(2); and it is further

1

ORDERED that the Departmental Appeals Board's Decision No. 2084 upholding Defendants' disallowance of physician costs incurred by the Virginia hospitals furnishing services to uninsured and Medicaid eligible patients was arbitrary, capricious, contrary to law, unsupported by credible, substantial evidence and is otherwise invalid under the Administrative Procedure Act, 5 U.S.C. § 706(2); and it is further

ORDERED that Departmental Appeals Board Decision No. 2084 is hereby set aside and reversed; and it is further

ORDERED that the costs of physician services may be included in the DSH UCC limit in accordance with 42 U.S.C. § 1396r-4(g); and it is further

ORDERED that defendant Centers for Medicare and Medicaid Services ("CMS"), in creating a new and previously unarticulated legal standard regarding the allowability of including physician costs as part of a disproportionate share hospital's UCC calculation, which is contrary to 42 U.S.C. § 1396r-4(g), CMS regulations at 42 C.F.R. § 440.10 and § 440.20, the 1994 CMS Letter, prior CMS rulemaking and prior rulings from the Departmental Appeals Board and the audit findings of the Office of the Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS"), has created a new substantive rule which has been promulgated without engaging in notice and comment rulemaking pursuant to 5 U.S.C. § 553 et seq.; and it is further

ORDERED that this new, substantive rule has been applied improperly in a retroactive manner by Defendants; and it is further

ORDERED that Defendants are enjoined from asserting an interpretation of the pertinent statutory and regulatory provisions contrary to this Court's holding; and it is further

2

ORDERED that Defendants reinstate to Virginia the $11,085,181 in DSH payments that they have wrongfully reclaimed; and it is further

ORDERED that Defendants award statutory interest to Virginia, from the date on which Defendants reclaimed the $11,085,181 until the date those monies are reinstated; and it is further

ORDERED that Defendants pay costs and reasonable attorneys' fees to Virginia.

Entered this _____ day of _____, 2008.

_____
The Hon. Rosemary M. Collyer
United States District Judge

3