## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COMMONWEALTH OF VIRGINIA,** ) | |
| **DEPARTMENT OF MEDICAL** ) | |
| **ASSISTANCE SERVICES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08-573 (RMC)** |
| ) | |
| **CHARLES E. JOHNSON,**[1] **Acting** ) | |
| **Secretary, U.S. Department of Health &** ) | |
| **Human Services,** ***et al.,*** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

Two public hospitals in the Commonwealth of Virginia provide health care services to a disproportionate share of Medicaid and certain uninsured low-income patients and Virginia seeks supplemental Medicaid reimbursement from the Centers for Medicare & Medicaid Services ("CMS") of the U.S. Department of Health and Human Services ("HHS"). Since 1981, Congress has provided such supplemental funds to safety-net hospitals that serve large numbers of Medicaid and other eligible patients. Congress intended these supplemental funds to improve the financial stability of these "disproportionate share hospitals" ("DSHs") and to preserve access to health care services for eligible indigent patients. In this case, Virginia and CMS dispute whether, in the context of care for the indigent, reimbursable "hospital services" include physician services at these two public hospitals. Virginia seeks a reimbursement payment of $11,085,181, as the federal share for

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Charles E. Johnson is substituted as Acting Secretary for his predecessor, Michael O. Leavitt, Secretary of the U.S. Department of Health and Human Services.

its payments for physician services in 1997 and 1998 that have been disallowed by CMS.  The Court

concludes that HHS's disallowance of Virginia's reimbursement payment was proper.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

The Medicaid program (Title XIX of the Social Security Act ("SSA"), 42

U.S.C. § 1396 *et seq.*, also referred to as the "Medicaid Act" or the "Medicaid statute") was

established in 1965 as a cooperative venture between the federal and state governments to assist

states in providing medical care to eligible individuals.  *Harris v. McRae*, 448 U.S. 297, 301 (1980);

*see also Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *Atkins v. Rivera*, 477 U.S. 154, 156

(1986).  The primary objective of the Medicaid program is "to furnish (1) medical assistance on

behalf of families with dependent children and of aged, blind, or disabled individuals, whose income

and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation

and other services to help such families and individuals attain or retain capability for independence

or self-care."  42 U.S.C. § 1396.  Federal and state governments jointly share the cost of providing

medical care to eligible low-income and disabled individuals.  *See id.*; *id.* § 1396b.

Each state administers its own Medicaid program pursuant to a state Medicaid plan

which must be reviewed and approved by the Secretary of HHS.  42 U.S.C. §§ 1396, 1396a.  If the

state's Medicaid plan is approved by the Secretary, the state generally becomes eligible to receive

federal matching funds, or "federal financial participation" ("FFP") for a percentage of the amounts

"expended . . . as medical assistance under the State plan."  *See id.* § 1396b(a)(1); *see also  id.*

§ 1396d(b).  Federal funding levels are established by a statutory formula which computes

reimbursement rates for each state, based on that state's federally-approved state plan.  *See id.*

§ 1396b.  The types of "medical assistance" that are reimbursable by the federal government include, among others, inpatient hospital services, outpatient hospital services, dental services, prescription drugs, and physician services (including those furnished in a hospital).  *Id.* § 1396d.

The Omnibus Budget Reconciliation Act of 1981 ("OBRA 1981") amended the SSA to require states to make available supplemental funds to safety-net hospitals that serve large numbers of Medicaid and other low-income patients with special needs.  *See* Pub. L. No. 97-35, § 2173(B)(ii), 95 Stat. 357 (codified at 42 U.S.C. § 1396a(13)(A)(iv)).  The intent was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients:

> [s]uch hospitals, especially in urban areas, are often multi-faceted health care institutions, which provide many public health and social services to all residents of their area, in addition to serving as hospitals of last resort for the poor. Their sizable Medicaid populations often require extra social and public health services.  In addition, in many areas such hospitals also provide considerable care for indigent persons not eligible for Medicaid, who often have only partial or no health care coverage.

H.R. Rep. No. 97-158, at 295 (1981) (Budget Committee Report discussing provisions eventually incorporated in Pub. L. No. 97-35), *available at* AR 01043.  Only costs that are *not* otherwise paid for by the patient, insurance, another third party, Medicaid, or any other program are eligible for DSH reimbursement.  Such reimbursements are called "payment adjustments."  *See* 42 U.S.C. § 1396r-4(c).

States have discretion in deciding which hospitals receive DSH payments and the level of funds that those hospitals will receive, *see* 42 U.S.C. § 1396r-4, although there are certain limits.  First, section 1923(f) of the SSA imposes a specific DSH funding limit (the "State DSH Allotment") on each state for each federal fiscal year.  *See id.* § 1396r-4(f)(2).  Thus, Congress

controls the overall level of federal DSH funding state-by-state.  There is no dispute that all of the

DSH payments at issue here were well within the State DSH Allotment set by Congress for the

Commonwealth of Virginia for the respective time frames.

   Second, through the Omnibus Budget Reconciliation Act of 1993 ("OBRA 1993"),

Congress separately limited the amount of DSH payments that can be paid to each DSH hospital for

the uncompensated costs incurred for treating Medicaid beneficiaries and the indigent uninsured.

Pub. L. No. 103-66, § 13621, 107 Stat. 312, 629-33 (1993) (codified at 42 U.S.C. § 1396r-4(g)).

This hospital-specific DSH cap is referred to as the uncompensated care cost limit (the "UCC limit").

Specifically, the SSA provides that DSH payments cannot exceed:

> the costs incurred during the year of furnishing hospital services (as
> determined by the Secretary and net of payments under this
> subchapter, other than under this section, and by uninsured patients)
> by the hospital to individuals who either are eligible for medical
> assistance under the State plan or have no health insurance (or other
> source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).  Instead of promulgating regulations to implement the UCC limit

enacted by OBRA 1993, the Health Care Financing Administration ("HCFA"), predecessor to CMS,

issued a letter dated August 17, 1994 to State Medicaid Directors ("1994 CMS Letter") to provide

guidance on the meaning and effect of the new enactment.  *See* AR 01309.  The 1994 CMS Letter

stated, in relevant part, that (1) "the legislative history of this provision makes it clear that States may

include both inpatient and outpatient costs in the calculation of the limit," and (2) "in defining 'costs

of services' under this provision, HCFA would permit the State to use the definition of allowable

costs in its State plan, or any other definition, as long as the costs determined under such a definition

do not exceed the amounts that would be allowable under the Medicare principles of cost

reimbursement." *Id.* at 01312.[2] The 1994 CMS Letter explained that "[t]he Medicare principles are the general upper payment limit [("UPL")] under institutional payment under the Medicaid program." *Id.* CMS concluded that "this interpretation of the term 'costs incurred' is reasonable because it provides States with a great deal of flexibility up to a maximum standard that is widely known and used in the determination of hospital costs." *Id.* Although intending to issue regulations interpreting the UCC limit that was enacted by OBRA 1993, CMS has not done so to date. *See* AR 01309 ("Until these regulations are published, this summary represents HCFA's interpretation of the new DSH requirements.").

### B.   Factual Background

The Commonwealth of Virginia has recognized at least two hospitals within its borders that have been accorded DSH status:  the University of Virginia Hospital ("UVA") and Virginia Commonwealth University's Medical College of Virginia Hospital ("MCVH") (together, the "Hospitals").  Each is a teaching hospital and each cares for a disproportionate share of Medicaid and indigent patients.

Virginia had a State Medicaid plan in effect during the period relevant to CMS's disallowance (*i.e.*, state fiscal years ("SFYs") 1997 and 1998) which implemented the UCC limit for these DSHs by providing:

> A payment adjustment during a fiscal year shall not exceed the sum of:
>
> > (a) Medicaid allowable costs incurred during the year less Medicaid payments, net of disproportionate share payment adjustments, for services provided during the year, and

---

[2] For ease of reference, the Court will refer to HCFA as CMS.

> (b) Costs incurred in serving persons who have no insurance less payments received from those patients or from a third party on behalf of those patients. Payments made by any unit of the Commonwealth or local government to a hospital for services provided to indigent patients shall not be considered to be a source of third party payment.

*Id.* at 01258, 01287.  CMS approved the state plan for both years.  "The Department of Medical Assistance Services ('DMAS') administers the Medicaid program in Virginia and is responsible for DSH payments."  *Id.* at 00181.

Pursuant to the quoted plan language, DMAS submitted for payment adjustment the unpaid costs for physician services to the indigent at both DSHs in SFY 1997 and 1998.  When these costs were subject to a routine audit by the HHS Office of Inspector General ("OIG"), the OIG concluded that, though Virginia's DSH payments to the Hospitals "were calculated in accordance with the State plan," Virginia should not have included the Hospitals' costs of physician care in the UCC calculations.  *Id.* at 00186, 00238.  Specifically, by final reports dated April 24, 2003 ("MCVH Report") and May 1, 2003 ("UVA Report") (collectively, the "OIG Reports"), the OIG concluded that: (1) the physician costs were not incurred by the Hospitals, but were incurred by the physician practice groups that were separate legal entities; and (2) the physician costs were not allowable because they were not consistent with Medicare cost principles.  *See id.* at 00186, 00238.  The OIG believed "that the explicit language of the DSH statute, CMS interpretation of the statute, and Medicare cost principles support our position that . . . physician costs should not be included as part of [each Hospital's] UCC."  *Id.* at 00192 (UVA), 00246 (MCVH).  The OIG therefore recommended that CMS recoup the federal government's portion of DSH payments attributable to the physician costs incurred by the Hospitals, which totaled $11,085,181.  *See id.* at 00190 (UVA), 00245

-6-

(MCVH).

Over two years later, after several meetings between representatives of CMS and the Commonwealth, CMS notified Virginia, by letter dated September 8, 2005, that it was disallowing $11,085,181 in FFP for Medicaid DSH payments because the Hospitals "overstated their UCC of furnishing hospital services by including the UCC of independent physician groups." *Id.* at 00175. CMS explained that "[t]he individual physicians that practiced as part of these groups were not hospital employees" as they "billed separately for their services and had their own Medicaid provider identification numbers." *Id.* at 00175-76.  Further, CMS reasoned that because the services provided by these physician groups "were billed and paid by the State . . . as physician services . . . and not as hospital services . . .[,] the physician groups are separate entities and their costs should not have been included with the hospitals' uncompensated cost of furnishing hospital services." *Id.* at 00176.

On October 7, 2005, Virginia appealed the CMS disallowance to the HHS Departmental Appeals Board ("DAB").  *Id.* at 00021.  Although it declined to adopt CMS's interpretation which would preclude a hospital from including physician costs in a DSH UCC limit calculation under any circumstances, *id.* at 00011, the DAB nevertheless upheld the disallowance because the physician services at issue were not reimbursable "hospital services," as that term is defined in the Medicaid statute, *id.* at 00018.  In reaching its conclusion, the DAB first explained that by designating "hospital services" (which it defined as "inpatient hospital services" and "outpatient hospital services") and "physician services" as separate categories of medical assistance, Congress intended states to treat them "as distinct for coverage, payment, and other program purposes."  *Id.* at 00010.  Thus, the term "hospital services," as used in the UCC limit statute, did not include physician services because the two are designated in the statute as "separate categories of

reimbursable medical assistance." *Id.* Next, the DAB found "no evidence that Virginia's Medicaid program regarded the physician costs at issue here as allowable costs of inpatient hospital or outpatient hospital services," *id.* at 00013 n.11, but rather found that those costs were billed separately to Medicaid as "physicians' services." *Id.* at 00010. After delineating its interpretation of the UCC limit, the DAB then concluded that, although Congress "may 'have failed to speak to the definition of hospital services with sufficient clarity,'" *id.* at 00011 (internal citation omitted), the 1994 CMS Letter placed Virginia on adequate notice of CMS's statutory interpretation of "hospital services" prior to making the disallowed DSH payments. *Id.* at 00012. Finally, the DAB concluded that the physician costs were not permissible under the terms of the 1994 CMS Letter which requires that the costs "would be allowable" under Medicare cost reimbursement principles:

> [W]hat seems critical here is not whether the hospital actually elected to receive reasonable cost-based payment under Medicare but whether the hospital satisfied the critical regulatory conditions—having an agreement among all physicians not to bill for services, or having all physicians be hospital employees who are precluded from billing as a condition of employment—for a valid election. Virginia has not alleged or shown that [UVA] and MCVH satisfied those conditions.

*Id.* at 00015. Since the DAB's decision (the "DAB Decision"), CMS has reclaimed the disallowed amount of $11,085,181, plus $884,458 in interest.

## II.  LEGAL STANDARD

### A.    Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). "Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977)). Because this case involves a challenge to a final agency action, the Court's review is limited to the administrative record. *Fund for Animals*, 903 F. Supp. at 105 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Therefore, this case may be appropriately resolved on cross-motions for summary judgment.

B.     **The Administrative Procedure Act**

Judicial review of a final determination rendered by a federal agency generally is governed by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"). *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. DEA.*, 259 F.3d 731, 736 (D.C. Cir. 2001). In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations omitted). At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious

includes a requirement that the agency adequately explain its result.").  An agency action usually is

arbitrary or capricious if:

> the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to
> a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S.v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also*

*County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has

failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the

court] must undo its action.").[3]

As the Supreme Court has explained, "the scope of review under the 'arbitrary and

---

[3] Virginia argues that the APA standard is not the appropriate standard of review in this case. It contends that where the recipient of a federal grants program is a sovereign, as is the case here, an agency's interpretation of a statute is entitled to deference only if the statute is "unambiguous" as to its requirements.  *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 17-18 [Dkt. # 15] (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  Thus, Virginia asserts that HHS may prevail only if the Medicaid statute "unambiguously" put Virginia on notice that the hospital costs for the physician services at issue in this case could not be billed as costs for "hospital services" for which Virginia could rightfully claim federal reimbursement.  Pl.'s Mem. at 18.  The *Pennhurst* standard advocated by Virginia is not applicable here.  The question in *Pennhurst* was "whether Congress . . . imposed an obligation on the States to spend state money to fund certain rights as a condition of receiving federal moneys" when such a condition was not readily apparent from the plain language of the statute.  451 U.S. at 18.  The Supreme Court concluded that Congress did not impose that precondition, holding that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously . . . ."  *Id.* at 17.  Here, the question is not whether Congress imposed a condition, or rather, an additional condition, on Virginia's right to receive federal funds for DSH costs, but rather how an explicit condition, *i.e.*, the UCC limit for hospital services, should be interpreted.  Thus, the "arbitrary [and] capricious" standard is the proper standard of review in this case.  *Cf. Massachusetts v. Sec. of HHS*, 749 F.2d 89, 95 (1st Cir. 1984) ("We do not believe that *Pennhurst* requires that every arguably ambiguous provision conditioning the receipt of federal funds by a state be construed in the state's favor. . . . The present case involves not the imposition of a new condition on the state but the interpretation of the provisions governing the remedies available to the federal government.").

capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Rather, the agency action under review is "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). If the district court can "reasonably discern" the agency's path, it should uphold the agency's decision. *Pub. Citizen*, 988 F.2d at 197.[4]

The Supreme Court set forth a two-step approach to determine whether an agency's interpretation of a statute is valid under the APA. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). This approach, commonly referred to as "*Chevron* deference," requires the court to first look to "whether Congress has spoken to the precise question at issue." *Id.* If so, the court ends its inquiry. *Id.* But, if the statute is ambiguous or silent, the second step requires the court to defer to the agency's position, so long as it is "based on a permissible construction of the statute." *Id.* at 843; *Sea-Land Servs., Inc. v. Dep't of Transp.*, 137 F.3d 640, 645 (D.C. Cir.1998) (holding that "[*Chevron*] deference comes into play of course, only as a consequence of statutory ambiguity, and then only if the reviewing court finds an implicit delegation of authority to the agency"). In applying *Chevron*, the Supreme Court has held that "administrative

---

[4] For a court to have jurisdiction under the APA, the challenged agency action must be final. *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). A final agency action "(1) marks the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature; and (2) the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Domestic Secs., Inc. v. SEC*, 333 F.3d. 239, 246 (D.C. Cir. 2003) (internal quotations omitted). The final agency action at issue in this case is the DAB Decision upholding the disallowance; that decision is the only one that is presently under review. *See* 42 C.F.R. § 430.42; *cf. id.* § 405.1877(a)(4) (explaining that where the Administrator sets forth a final decision, only that decision is subject to judicial review, not the agency decision below which was reversed, affirmed, or modified by the Administrator).

implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).   Indeed, "judgment about the best regulatory tools to employ in a particular situation is . . . entitled to considerable deference from the generalist judiciary." *W. Union Int'l v. FCC*, 804 F.2d 1280, 1292 (D.C. Cir. 1986).   There is no question here but that Congress entrusted the Secretary of HHS with the responsibility of administering the Medicare and Medicaid programs.  *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994).   Thus, the Secretary's construction of the complex statutory scheme governing these programs is frequently entitled to deference.  *See id.* ("[T]he court takes special note of the tremendous complexity of the Medicare statute.   That complexity adds to the deference which is due to the Secretary's decision."); *see also Thomas Jefferson Univ.*, 512 U.S. at 512.

## III.  ANALYSIS

This case boils down to a dispute over the nature of the "hospital services" that are subject to DSH reimbursement pursuant to section 1923(g)(1)(A) of the SSA (codified at 42 U.S.C. § 1396r-4(g)(1)(A)) and further described in the 1994 CMS Letter.  Defendants assert:

> As the term "hospital services" is used in the Medicaid statute's description of "medical assistance," and as it is explicitly defined in the legislative history, it is clear that the costs incurred in furnishing "hospital services" mean the costs incurred in furnishing "inpatient hospital services" and "outpatient hospital services."  HHS has, in its contemporaneous interpretation of the phrase "cost incurred of furnishing hospital services," adopted the legislative history confining the DSH payment to the costs of "inpatient" and "outpatient" hospital services.

Defs.' Mem. in Supp. of their Combined Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Mem.") at 2.  HHS insists that neither "inpatient hospital services" nor "outpatient hospital services" includes the physician services provided to uninsured patients at the two public Virginia hospitals.  *Id.*  Because the statute is dense and Defendants state their position in clear English, the Court quotes liberally from Defendants' brief:

> First, it is clear that under the Medicaid statute, "physician services" are not synonymous with "hospital services," nor are "physician services" simply a subset of "inpatient" or "outpatient" hospital services.  Instead, the complex Medicaid statute treats these terms differently and, indeed, provides different parameters for what the states may include within each of these categories.  Therefore, *while the Medicaid program may permit a state to decide, and then categorize, some services rendered by physicians in their hospitals as "inpatient" or "outpatient" services*, it does not categorically fold all services rendered by a physician into the costs of inpatient or outpatient hospital services.  Pursuant to the Medicaid statute, the states are required to properly categorize services provided in the state under its Medicaid plan, and the states are given flexibility under the Medicaid program in doing so, as long as they follow the parameters and conditions set forth under the statute and regulations.  The state Medicaid plan is, after all, the vehicle through which a state obtains all federal funding for its expenditures under its Medicaid program.  Thus, the Medicaid statute makes clear that "physician services" and "inpatient" and "outpatient hospital services" are distinct categories of service, and that *it is incumbent upon the states to cover and appropriately categorize any given service in their state Medicaid plans.  Virginia did not cover the types of services rendered by physicians here in its Medicaid plan as an inpatient or outpatient "hospital service."*  Therefore, it cannot now claim these costs as costs of "hospital services" for DSH payment purposes.  Under the Medicaid statute, Virginia's argument fails.
>
> Second, the Secretary's interpretation of the [DSH] requirements and the administrative record in this case make clear that the physician costs are not allowable for DSH payment purposes.  The Secretary has read the DSH provision as limiting allowable costs to inpatient and outpatient hospital costs, *as defined and covered by the state*

*plan. However, Virginia did not authorize or cover in its state Medicaid plan the types of services at issue as "inpatient" or "outpatient" hospital services.* Indeed, for the very same types of services provided to Medicaid and Medicare patients, Virginia separately billed the federal government for, and was reimbursed for, these services as "physician services" and did not bill for them as part of the hospitals['] inpatient or outpatient hospital service rate. Notwithstanding Virginia's own treatment of these services as "physician services" rather than "inpatient hospital services" or "outpatient hospital services," Virginia now wants HHS and this Court, to void Virginia's prior choices and rewrite [the] Virginia state [Medicaid] plan using a definition and categorization of certain services that would maximize Medicaid payment to the state.

Defs.' Mem. at 3-4 (emphases added).  Virginia contends that both "inpatient hospital services" and "outpatient hospital services" are separately defined in regulations to include physician services, Pl.'s Statement of Material Facts as to Which There is No Genuine Issue ¶ 12 [Dkt. # 15-2], and that its inclusion of these physician services in its UCC fully comported with Medicare principles.

It is useful to remember that the final agency decision that is challenged here is the DAB Decision and not the 1994 CMS Letter.  As the DAB itself acknowledged, Congress did not speak to the meaning of "hospital services," as used in section 1923(g)(1)(A) of the SSA, with clarity.  *See* AR 00011.  Given its agreement that the statute is dense and provides no clarity here, the Court will move directly to step two of the *Chevron* analysis, *i.e.*, whether the DAB's position was "based on a permissible construction of the statute."  467 U.S. at 843.  The DAB held that "hospital services" did not encompass the physician services that Virginia reported as reimbursable DSH costs, and that the 1994 CMS Letter gave Virginia adequate notice of that interpretation.  Although not immediately obvious, the Court concludes that both holdings are permissible and reasonable interpretations of the statute and the 1994 CMS Letter and are entitled to deference here.

First the DAB recognized that "the services of physicians are often provided *in*

-14-

hospitals and might reasonably be considered a subset or component of hospital services in that ordinary sense." AR 00008 (emphasis in original). Virginia wishes it had stopped there but the DAB concluded the sentence by finding that "the context surrounding section 1923(g) indicates that Congress intended the term 'hospital services' to have a technical or specialized legal meaning." *Id.* This conclusion was certainly within the authority of the DAB to reach and, given the complexity of the Medicare and Medicaid statutes, it is reasonable and entitled to deference. In opposition, Virginia would cut the DSH program from its moorings in Medicaid/Medicare and have it be a stand-alone, plain English provision of extra federal monies to hospitals that serve a disproportionate share of the uninsured poor. Pl.'s Reply at 2 ("[A]lthough the DSH program is found within the Medicaid statute, it is a different funding mechanism subject to completely different reimbursement and reporting standards."). Presumably, CMS could have so interpreted the program when it issued the 1994 CMS Letter but as long ago as then, it is clear that the agency chose a different path and tied reimbursement to "the amounts that would be *allowable* under the Medicare principles of cost reimbursement." AR 01312 (emphasis added). The argument that the DSH program is separate and apart from the rest of the statute is a non-starter.

Second, the DAB did in fact interpret the DSH payment provisions, and in particular, the term "hospital services," in light of the broader Medicaid statute. The DAB explained that the Medicaid statute "provides that a DSH payment (or 'payment adjustment') constitutes an 'appropriate increase in the rate or amount of payment' for 'inpatient hospital services.'" AR 00009 (citing 42 U.S.C. § 1396r-4(a)(1)(B)). It concluded that "[t]his statement suggests that Congress did not intend DSH payments to offset *all* of the costs that might be incurred by a DSH in addressing the medical needs of indigent patients, but only those costs of providing what might properly be

classified as 'hospital services' for Medicaid purposes." AR 00009 (emphasis in original). The conclusion was buttressed in part by the fact that "'[i]npatient hospital services,' 'outpatient hospital services,' and 'physicians' services' are listed in section 1905(a) [of the SSA] as distinct categories of medical assistance" and are reported separately on the Medicaid Quarterly Statement of Expenditures ("QSE"). *Id.* at 00008-00009; *see also id.* at 0009 n.8 (citing *La. Dep't of Human Servs.*, DAB No. 1772 (2003) (DAB interpreted the House Conference Report accompanying OBRA 1993 as showing an "inten[t] to *limit* the amount of funds that can be claimed as DSH payment adjustments for hospital services, rather than expand the types of medical assistance that can be claimed.") (emphasis in original)). Interpreting the Medicaid Act is certainly within the purview of the DAB and its permissible interpretation is entitled to deference.

Third, the DAB relied on the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2431, which "directs states to submit an independent audit verifying that '[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital services . . . are included in the calculation of the hospital-specific limits under such subsection." *See* AR 00009 (citing 42 U.S.C. § 1396r-4(j)(2)(C)) (emphasis in original). While this later-passed law bolsters the DAB's decision, it is cold comfort to Virginia, which incurred these physician costs and submitted them for reimbursement in the late 90s, well before the prescription drug benefit became part of Medicare.

The DAB concluded:

In view of these circumstances, it is clear that the term "hospital services" in section 1923(g)(1)(A) refers to the categories of medical assistance identified in section 1905(a) as "inpatient hospital services" and "outpatient hospital services." By designating "hospital services" and "physicians' services" as separate categories of

-16-

reimbursable medical assistance, Congress intended states to treat them as distinct for coverage, payment and other program purposes.

AR 00010.  To this rather curiously broad statement, the DAB added a footnote:

> We express no view about whether (or to what extent, if any) the statute permits a state Medicaid program to cover or pay for a particular service furnished by a physician as a "hospital service" rather than as a "physician's service."  We emphasize only that a service cannot be classified as both a hospital and a physician's service.

*Id.* at 00019 n.9.  *But see* 42 C.F.R. § 415.160 (allowing teaching hospitals to elect to have physician services covered as "hospital services" if certain conditions are met).[5]

Finally, the DAB declared:

> A cost may not be included in the calculation of the DSH payment limit unless it is the cost of a service that is covered and paid for under the state plan *as a "hospital service."* . . . Virginia has acknowledged that the services in question, when provided to Medicaid recipients, were billed to Medicaid as "physicians' services."

AR 00010 (emphasis in original).  Because physician services rendered to Medicaid patients are reported as "physicians' services" on Virginia's QSE, the DAB disallowed inclusion of "physician services" as part of "hospital services" when provided to indigent patients.  *Id.*  It is difficult to find

---

[5]  Of course, it is just those examples of "physician services" being properly reimbursed as a part of "hospital services" upon which Virginia relies.  *See* Pl.'s Reply at 22 (citing AR 01338, Audit of California's Medicaid Inpatient Disproportionate Share Hosp. Payment for Kern Med. Ctr., State Fiscal Year 1998 (Sept. 17, 2002)); AR 01402, Audit of California's Medicaid Inpatient Disproportionate Share Hosp. Payments for L.A. County Hosps., State Fiscal Year 1998 (May 2003)); *see also* 60 Fed. Reg. 61483, 61484-85 (Nov. 30, 1995) ("nurse-midwife services are similar to physician services in that they may be billed in their own distinct category or alternatively may be billed under other categories such as hospital or clinic services.").

irrationality in this analysis.[6]

　　　　　While the DAB's interpretation fully met the APA's standards, nothing issued by CMS was ever as clear as the DAB Decision under review.  Recognizing that its statutory interpretation had never before been articulated, the DAB looked to the 1994 CMS Letter to see if Virginia had received fair warning that the category "hospital services" was so limited.  This is where Virginia loses its case, its common-sense arguments notwithstanding.

　　　　　As noted by the DAB, the 1994 CMS Letter directs states to determine a hospital's uncompensated costs by using the "'definition of <u>allowable</u> costs in its State plan, or any other definition [of allowable costs], as long as the costs determined under such a definition do not exceed the amounts that would be allowable under Medicare principles of cost reimbursement.'"  *Id.* at 00012 (emphasis in original) (internal citation omitted).  The DAB explained that although the 1994 CMS Letter does not use the precise terms "inpatient hospital services" or "outpatient hospital services," nonetheless the Letter "state[d] that a hospital's 'cost of services' includes both inpatient and outpatient costs."  *Id.*  The terms "inpatient and outpatient are used in the Medicaid statute and regulations only with reference to 'hospital services' or 'nursing facility' services."  *Id.*  Further, the 1994 CMS Letter provided that "the determination of a hospital's allowable costs would be subject to the upper payment limit (UPL) regarding 'institutional payment.'  In 1994, the relevant UPLs for

---

　　　　　[6] CMS urged the DAB to adopt an interpretation, "'which CMS says is 'consistent with the statutory design and longstanding regulatory policy,' [that would] preclude[] a hospital from including physician costs in the DSH payment limit calculations *under any circumstances*."  AR 00011 (internal citation omitted) (emphasis in original).  The DAB declined to adopt such an interpretation because Virginia did not have timely notice, the interpretation appears no where in the Federal Register or other agency pronouncements, and, as late as October 2003, CMS officials "expressed the view that physician costs could be included in the payment limit calculation under some circumstances."  *Id.*; *see also* 42 C.F.R. § 415.160 (allowing physician services to be reported as "hospital services" under certain circumstances).

'institutional' payments were caps on payments for 'inpatient hospital services' and 'outpatient hospital services.'" *Id.* (citing C.F.R. §§ 447.253(b), 447.272, 447.321). The DAB therefore concluded that:

> From these elements of the 1994 CMS Letter, it should have been clear to Virginia, when it made the disallowed DSH payments, that a cost could be included in the calculation of a hospital's DSH payment limit only if it was an "allowable" cost (for payment or reimbursement purposes) of an inpatient hospital or outpatient hospital service under the state's Medicaid program or relevant Medicare cost reimbursement policies.

AR 00012. Given the DAB's reasoned explanation, the Court cannot say that the DAB acted arbitrarily or capriciously in concluding that Virginia should have been on notice that the costs incurred by the Hospitals for physician services could not be included in the calculation of the DSH payment limit because those costs were not "allowable" under its state plan or under Medicare principles of cost reimbursement. *See id.*

To rebut this conclusion, Virginia protests that under Medicare principles, physician services *are* allowed as part of hospital services at teaching hospitals, for which both Hospitals qualify. Indeed, CMS regulations provide:

> (a) Scope. A teaching hospital may elect to receive payment on a reasonable cost basis for the direct medical and surgical services of its physicians in lieu of fee schedule payments that might otherwise be made for these services.[7]
>
> (b) Conditions. A teaching hospital may elect to receive these

---

[7] Reimbursement on a reasonable cost basis is a retrospective payment system that was once the common payment method for Medicare for both physicians' and hospital costs. *See* 42 C.F.R. Part 413. Now, "[t]he statute requires that the prospective payment rate serve as total Medicare payment for inpatient operating costs for all items and services furnished other than physicians' services." 48 Fed. Reg. 39,752, 39,761 (Sept. 1, 1983). The prospective payment system generally employs a predetermined rate of payment for a given patient diagnosis. *Id.* at 39,754.

payments only if –

> (1) The hospital notifies its intermediary in writing of the election and meets the conditions of either paragraph (b)(2) or paragraph (b)(3) of this section;

> (2) All physicians who furnish services to Medicare beneficiaries in the hospital agree not to bill charges for these services; or

> (3) All physicians who furnish services to Medicare beneficiaries in the hospital are employees of the hospital and, as a condition of employment, are precluded from billing for their services.

(c) Effect of election.   If a teaching hospital elects to receive reasonable cost payment for physician direct medical and surgical services furnished to beneficiaries –

> (1) Those services and the supervision of interns and residents furnishing care to individual beneficiaries are covered as hospital services, and

> (2) The intermediary pays the hospital for those services on a reasonable cost basis under the rules in § 415.162.  (Payment for other physician compensation costs related to approved GME programs is made as described in § 413.78 of this chapter.)

(d) Election declined.  If the teaching hospital does not make this election, payment is made –

> (1) For physician services furnished to beneficiaries on a fee schedule basis as described in part 414 subject to the rules in this subpart, and

> (2) For the supervision of interns and residents as described in §§ 413.75 through 413.83.

42 C.F.R. § 415.160.  Payment for physician services is normally made on a "fee schedule basis," which pays standard rates based on a uniform set of factors – *see* 56 Fed. Reg. 59625 (Nov. 5, 1991); 42 C.F.R. Part 415; 60 Fed. Reg. 63126 (Dec. 8, 1995) – but 42 C.F.R. § 415.160 provides an

exception which allows a teaching hospital, under certain circumstances, to seek reimbursement for physician services on a "reasonable cost basis" instead of a "fee schedule basis."  If a teaching hospital complies with the applicable conditions and elects to receive "reasonable cost payment for physician . . . services," those physician services will be covered as "hospital services" for purposes of Medicare reimbursement.  *Id.* § 416.160(c).

Inasmuch as the 1994 CMS Letter instructed that states could seek reimbursement using the "definition of allowable costs in its State plan, *or any other definition*," *see* AR 00012 (emphasis added), Virginia argues that it used the definition from 42 C.F.R. § 415.160, that all of its physicians giving care to the indigent had formally agreed not to bill on a fee schedule basis for that care, and, therefore, that the DAB erred when it sustained the disallowance.  But Virginia shaves the definition that is in 42 C.F.R. § 415.160, omitting the requirement that "[a]ll physicians who furnish services *to Medicare beneficiaries* in the hospital agree not to bill charges for these services." 42 C.F.R. § 415.160(b)(2) (emphasis added).  Its physicians who provided care to indigent patients agreed not to bill charges for those services, but the physicians treating patients covered by Medicare billed on the normal fee schedule method.  Because it did not fulfill the requirements of 42 C.F.R. § 415.160, Virginia's costs for physician services to the indigent were not "covered as hospital services," and therefore were not "allowable" under Medicare cost principles; hence, they could not be submitted for federal reimbursement.  *See* AR 00014-15.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the DAB's decision disallowing the claim for federal DSH payment for Virginia's costs of providing "physician services" to the uninsured at the two Hospitals is grounded in a permissible interpretation of the Medicaid statute and

must therefore be upheld.   Accordingly, the Court will grant Defendants' motion for summary

judgment [Dkt. # 16] and will deny Plaintiff's motion for summary judgment [Dkt. # 15].   A

memorializing order accompanies this Memorandum Opinion.


Date: March 25, 2009                                    _____/s/_____
                                                        ROSEMARY M. COLLYER
                                                        United States District Judge